No. 24-3291

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

**CFOM, INC. and MICHAEL GRASSI**

*Plaintiffs-Appellees*

v.

**ALOTECH LIMITED, LLC and JOHN GRASSI**

*Defendants-Appellants*

On Appeal from the United States District Court
for the Northern District of Ohio
Case No. 1:18-cv-2619

## DEFENDANTS-APPELLANTS ALOTECH LIMITED, LLC AND JOHN GRASSI'S EMERGENCY MOTION FOR STAY AND INJUNCTION PENDING APPEAL
### *Seeking Relief Before April 19, 2024*

Aaron M. Herzig
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
(513) 381-2838
aherzig@taftlaw.com

John R. Mitchell
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-302
(216) 706-3909
jmitchell@taftlaw.com

*Counsel for Defendants-Appellants*
*Alotech Limited, LLC and John Grassi*

Appellants Alotech Limited, LLC and John Grassi ("Alotech" or "Appellants") move this Court under Fed. R. App. P. 8(a)(2) to enjoin all proceedings in the District Court pending this appeal. **Relief is necessary before April 19, 2024**, when forensic examiner Ernst & Young ("EY"), has been directed by the District Court to turn over Alotech's trade secrets and intellectual property (the "Trade Secrets") to Appellees CFOM, Inc. and Michael Grassi ("Appellees"), who do not own, and are not entitled to possess, the Trade Secrets.

**Alternatively**, Appellants request that the Court issue a temporary stay, set a briefing schedule so that the request for an injunction pending appeal can be fully considered, and order EY to keep the Trade Secrets until this Court issues a decision.

This is a trade secrets case, which ostensibly was settled on December 5, 2022. This appeal will involve the interpretation of that settlement. One provision that is not in dispute is that the Trade Secrets are Alotech's and not Appellees': "Michael Grassi and CFOM, Inc. [Appellees] agree that, … Alotech is the owner of all intellectual property and trade secrets related to Ablation Technology …" (*See* R. 181-1, Term Sheet, PageID 4820 (redacted per court order, R. 180, Order, PageID 4803) (Exhibit 1).).[1]

---

[1] The Term Sheet is entirely redacted and so is not attached to this motion. An unredacted version is available at R. 182-1. Several other exhibits that are required to be attached to this motion under 6 Cir. R. 27(c)(2) are filed in their redacted form. Unredacted versions are available on the District Court's electronic docket.

Despite this, the District Court has ordered EY to hand over Alotech's Trade Secrets to Appellees.[2] (*See* R. 322, Order, PageID 6832 (Exhibit 2).) This Court's immediate intervention is required to prevent that from happening.

## FACTS

This fight over the Trade Secrets has lasted five years, including one appeal before this Court.[3] Following remand and on the eve of trial, the parties entered into a "Binding and Enforceable Term Sheet" on December 5, 2022 (the "Term Sheet"), which was intended to conclusively resolve litigation between these parties and by which Alotech bargained to receive the return of its prized intellectual property. (*See* R. 181-1, Term Sheet, PageID 4820.) Unfortunately, before the ink had even dried, Alotech was forced to take remedial actions in pursuit of enforcing Appellees' performance as required by the Term Sheet. Appellees still have not performed, more than a year after they were required to.

The parties agreed that Alotech owns the Trade Secrets. (*Id*. ¶5, PageID 4820.) The Trade Secrets were developed through extensive scientific investigation, representing decades of costly research. (R. 275-1, Declaration of J. Grassi dated September 29, 2023) ("J. Grassi Decl.") ¶20, PageID 6343 (redacted per court order,

---

The Notice of Appeal is at Exhibit 8. The Orders being appealed from are at Exhibits 5 and 6. The District Court's Order denying the motion for injunction pending appeal is at Exhibit 2.

[2] A copy of this motion is being provided to EY by email.

[3] *Michael Grassi, et al. v. John Grassi, et al.*, Case No. 20-3358.

R. 273, Order, PageID 6063) (Exhibit 3).) For obvious reasons, these contents are irreplaceable.

The Term Sheet required Appellees to timely return Alotech's Trade Secrets within twenty days and to ensure that the Trade Secrets did not fall into the wrong hands. (*Id*. ¶5, PageID 4820.) Appellees did not return the Trade Secrets in twenty days. Indeed, they intentionally tried to abscond with them. Appellees copied the Trade Secrets and deliberately concealed their misconduct. (*Id.* ¶23, PageID 6343.)

As just one of the many examples of wrongdoing by Appellees, Michael Grassi admitted during sworn testimony on February 10, 2023 that he deleted substantial portions of Alotech's Trade Secrets. (R. 215, Transcript from 2/10/2023 hearing, PageID 5426 (Exhibit 4).) There is no telling what Appellees may do with the Trade Secrets if they are to receive them before Alotech has the opportunity to be heard by this Court.

Following that testimony, which made it plain that Appellees had failed to turn over any—let alone all—Alotech Trade Secrets within the required twenty days and had likely purloined significant portions of Alotech Trade Secrets, the District Court ordered the parties to enlist EY to review the devices at issue. (R. 215, Transcript from 2/10/2023 hearing, PageID 5508.) Alotech agreed to EY's being permitted to retain such Trade Secrets until examination was complete knowing that retention by this neutral party would keep the Trade Secrets safe in the interim.

Further, Alotech understood that Order to mean that examination would be performed until complete, so as to ascertain the extent of Appellees' wrongdoing.

EY's preliminary report showed that Appellees possessed at least 41,000 Alotech files totaling nearly 165 gigabytes of Alotech data. (R. 275-1, J. Grassi Decl. ¶10, PageID 6343.) EY was to hold onto the Trade Secrets until the District Court resolved pending motions to enforce the Term Sheet.

However, that safekeeping is now set to expire as a result of the District Court's March 19, 2024 Order, which Alotech is appealing. (R. 309, Order, PageID 6714 (Exhibit 5).) This Order contradicts the Term Sheet, in which the parties agreed that Alotech owns the Trade Secrets. It also contradicts the District Court's prior findings. The District Court expressly noted that "this settlement dispute is largely in the same place as where it began" and affirmed that the findings for which EY's retention was ordered in the first place are very much "still to be determined." (R. 301-2, Order, PageID 6618 (Exhibit 6).)

The March 8, 2024 Order turns over Alotech's Trade Secrets to Appellees so that Appellees—who admitted that they copied and deleted Alotech's Trade Secrets—could themselves "forensically examine those files to determine which, if any, are Alotech property." (*Id.*) By its explicit terms, the March 8, 2024 Order provides that "[w]hatever [Appellees] decide to do, it shall be at their own expense and on their own timeline." (*Id.*, PageID 6619.)

Thus, the orders now appealed from effectively strip Alotech of any control over what happens to its Trade Secrets and thwarts its repeated attempts to enforce the plain language of the Term Sheet. Rather, the District Court has granted Appellees the unilateral decision as to how to proceed and effectively rewritten the Term Sheet in a way that fundamentally threatens the protection of Alotech's trade secrets for which it previously bargained. (*See* R. 301-2, Order, PageID 6618; R. 309, Order, PageID 6714.) Specifically, that Order noted that whether the files and property "are Alotech property that [Appellees] should have returned under the Term Sheet is still to be determined," yet nevertheless permitted Appellees to receive that same property after a 30-day stay. (*Id*., PageID 6713.) Despite the Court's express acknowledgement that the Appellees' behavior should not be rewarded, the Court's Order does exactly that.

The merits of this appeal are inextricably intertwined with Alotech's interest in maintaining the status quo, as Appellee's receipt of the Trade Secrets would thwart a central purpose of invoking this Court's jurisdiction. Accordingly, Alotech moved under Fed. R. Civ. P. 62(d) for an injunction pending appeal in the District Court on April 9, 2024. (*See* R. 315, Mot., PageID 6767 (Exhibit 7).) Alotech's motion was ultimately denied at 4:19 pm today the District Court determined that all of the injunction factors weighed against Alotech despite the mass of evidence to the contrary. (*See* R. 322, Order, PageID 6832.) The District Court acknowledged that

5

its denial of the stay "returns the parties to the positions they were in when they agreed to the Term Sheet." (*Id*., PageID 6839.) That position is that Alotech's Trade Secrets will be in the hands of Appellees, who have copied some, and deleted other of, those Trade Secrets. The District Court's decision inflicts precisely the harm that Alotech seeks to prevent through its appeal.

Moreover, the District Court's analysis is predicated on the fact that the full extent of Alotech's property at issue "has not yet been determined," (*id.*) and the harm to be faced is "not certain." (*Id.*, PageID 6840.) The District Court's decision ignores the fact that EY determined that at least 41,000 Alotech files are included in the Trade Secrets to be handed over to Appellees, and that there is no dispute that under the Term Sheet, the Trade Secrets are Alotech's. The District Court is saying that Alotech's Trade Secrets must be turned over to Appellees because Appellees' information may be included in the Trade Secrets held by EY. So Appellees receive protection from the District Court, and they get access to Alotech's Trade Secrets, while Alotech gets nothing. No benefit of its settlement bargain; no return of its Trade Secrets; no comfort that its Trade Secrets are out of Appellees' hands.

Most remarkably, the District Court notes that "[Alotech] ha[s] demonstrated that the harm they seek to prevent has occurred in the past," but somehow concludes that this fact precludes that harm from occurring again. (*Id.*, PageID 6841.) Noting that public policy favors settlement of disputes without litigation, the District Court

nevertheless holds that returning the Trade Secrets to Appellees will "mean more litigation" (*id*., PageID 6842), despite its prior conclusion that the result returns the parties back to where they were prior to the Term Sheet and thus undoing more than a year of progress. Ultimately, the District Court's denial of an injunction pending appeal, like its recent orders which are now the subject of appeal, are rife with contradiction and operate only to award Appellees for their misdeeds while punishing Alotech for its adherence to the Term Sheet.

With the temporary stay soon to expire and no other relief to be had in the District Court, Alotech now invokes this Court's jurisdiction as a last resort. A stay of the proceedings below must be imposed in order to allow this Court to evaluate the actual merits of the appeal and ensure that Alotech's interests are not terminated in the interim.

## ARGUMENT

### A.    Alotech has complied with Fed. R. App. P. 8.

"A party must ordinarily move first in the district court for . . . a stay of the judgment or order of a district court pending appeal." Fed. R. App. P. 8(a)(1). Alotech did so. (*See* R. 315, Mot., PageID 6767.) The District Court denied the motion. (*See* R. 322, Order, PageID 6832.)

**B.    All considerations for granting a stay pending appeal weigh in Alotech's favor.**

Without a stay of proceedings in the District Court, Alotech's trade secrets will be returned to Appellees, causing irreparable harm that has no remedy. Without a stay, a central portion of the relief sought in this appeal will be out of reach. The predicament created could not be more proper for the relief provided by an injunction pending appeal.

"While an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). In deciding a motion to stay pending appeal, "[t]he court balances the traditional factors governing injunctive relief…" *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002). Thus, the court considers: (1) whether the movant has a strong or substantial likelihood of success on the merits; (2) whether the movant will suffer irreparable harm if the district court proceedings are not stayed; (3) whether staying the district court proceedings will substantially injure other interested parties; and (4) where the public interest lies. *Id*.; *Am. Standard, Inc. v. Meehan*, 614 F. Supp.2d 844, 847 (6th Cir. 2007). No single factor is dispositive in the analysis, but instead all factors must be balanced as part of the determination.

*Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

The Sixth Circuit in distinguishing standards for obtaining a preliminary injunction from an injunction pending appeal has noted that "a movant need not always establish a high probability of success on the merits." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991) (citing *State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)); *Fam. Tr. Found. of Kentucky, Inc. v. Kentucky Jud. Conduct Comm'n*, 388 F.3d 224, 227 (6th Cir. 2004). Rather, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [the movant] will suffer absent the stay." *Ohio ex rel. Celebrezze*, 812 F.2d at 290 (citation omitted). "Simply stated, more of one excuses less of the other" (*Griepentrog*, 945 F.2d at 153) and so a showing of substantial irreparable harm to be suffered may require only a minimal showing of success on the merits. Either way, all four factors weigh resolutely in Alotech's favor, and the circumstances warrant a complete stay pending appeal.

## 1.    Alotech is likely to succeed on the merits.

While an injunction pending appeal requires the movant to show "likelihood of success on the merits," a movant seeking stay "is not required to prove his case in full…" *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511

F.3d 535, 543 (6th Cir. 2007) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981)). Rather, it is generally sufficient that the movant "show more than a mere possibility of success." *Six Clinics Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *Mason Cnty. Med. Ass'n v. Knebel*, 562 F.2d 256, 261 n.4 (6th Cir. 1977)).

Alotech is likely to succeed on the merits because the Term Sheet expressly states that (1) the Trade Secrets are Alotech's; (2) Appellees were required to return the Trade Secrets within twenty days; (3) they failed to do so; and (4) they still have not done so. Alotech is plainly entitled to get its Trade Secrets back.

A Court holds "the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Acro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976). "The court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988) (citation omitted). Put plainly, where it is determined that "the parties did reach an agreement, and its essential terms were clear," the court must enforce the agreement by its express terms. *Tocci v. Antioch Univ.*, 967 F. Supp.2d 1176, 1201 (S.D. Ohio 2013).

The express requirements and conditions of the Term Sheet are unambiguous and, for the most part, Appellees do not appear to contest this fact. Appellees admit that "Alotech is the owner of all intellectual property and trade secrets related to

Ablation Technology." (*See* R. 181-1, Term Sheet ¶4, PageID 4820.) Alotech bargained to provide payment for the return of its Trade Secrets if that property was returned within twenty days. This shortened window reflects the expediency by which Alotech contemplated its property's return.

The Court confirmed the lack of ambiguity in its March 8, 2024 Order. (*See* R. 301-2, Order, PageID 6629 ("the Court concludes that the parties intended to condition [Alotech's] payment on [Appellees]' return of Alotech's property.").) Going a step further, the District Court noted that the "language of the entire agreement and its subject matter bolster this conclusion." (*Id.*) Still, Appellees refuse to comply.

The March 8, 2024 Order determined that "[Appellees] *may* have failed to return all [Alotech's] data" and accordingly excuses Alotech of any payment for the time being. (*Id.*, PageID 6630) (emphasis added).) Despite these clear findings, the District Court nevertheless has created a situation that undermines the terms for which Alotech bargained to settle this litigation, and instead creates the potential for more litigation. This conclusion on its own support the need for continued maintenance of the status quo is until a full determination of the extent of Appellees' wrongdoing can be made.

In its Order denying Alotech's motion for an injunction pending appeal, the District Court doubled-down on its misguided theory. In its determination that

Alotech was not likely to succeed on the merits, the District Court explained that it ordered EY to give Alotech's Trade Secrets to Appellees because Alotech had agreed to the procedure of letting EY conduct a forensic analysis, and that Appellees "represented that they had 'lost confidence' in EY." (*See* R. 322, Order, PageID 6839.) So according to the District Court, Alotech will lose on appeal because it agreed to a forensic analysis, which was forced only because Appellees refused to return Alotech's Trade Secrets within twenty days. Appellees then unilaterally decided that they no longer wanted EY to have the Trade Secrets, and then the District Court inexplicably went along. Those "facts" bear no relationship to whether Alotech will succeed on appeal. Nor does it follow as a logical matter that Alotech must be deprived of its Trade Secrets because of Appellees' preferences.

The District Court's likelihood-of-success analysis also relied on the idea that Alotech didn't act quickly enough to enforce the twenty-day time limit. The evidence of that is that Alotech waited "over a week" after the twenty-day period expired before seeking to enforce the Term Sheet. (*Id.*) To be sure, Alotech did wait nine days (from December 26, 2022 to January 3, 2023) before moving to enforce the Term Sheet. But the District Court does not explain how waiting "over a week" to find out if Appellees would comply is such a long period as to demonstrate that Alotech was waiving that twenty-day period. And it does not explain how that "delay" affects whether Alotech is entitled to the return of its Trade Secrets, or the

fact that Appellees are in breach. The success of those claims is plain from the face of the Term Sheet; Alotech's actions are irrelevant to that analysis.

In sum, the settlement agreement must be enforced as agreed upon and consistent with the intent of the parties at the time of execution. That intent was predicated on the immediate return of *all* of Alotech's Trade Secrets. That said, nowhere within the Term Sheet is it contemplated that Trade Secrets in the safekeeping of EY (or any other neutral party) be returned to Appellees while the parties are left to resolve this dispute. The Term Sheet is clear and unambiguous, Appellees' non-compliance is unquestioned, and Alotech is likely to succeed on the merits, warranting the imposition of a stay pending appeal.

## 2.    Alotech will suffer irreparable harm if the proceedings are not stayed.

Alotech's trade secrets carry incalculable value, and this appeal seeks their return. Just as central to Alotech's concerns is that the Trade Secrets are not returned to Appellees for them to exploit. Appellees' receipt of Alotech's Trade Secrets would result in substantial harm to Alotech for which there is no remedy.

A harm to be suffered in the absence of a stay is considered irreparable where "not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Injuries which "are difficult to quantify monetarily" inherently present a risk of irreparable harm. *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503 (6th Cir. 2022). In the Sixth

13

Circuit, "[t]he loss of trade secrets is usually considered an irreparable harm [that] cannot be measured in money damages." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp.2d 853, 867 (S.D. Ohio 2008); *see also Dayton Superior Corp. v. Yan*, No. 3:12-CV-380, 2012 WL 5497804, at *5 (S.D. Ohio Nov. 13, 2012) ("Because trade secrets rights include the right to exclude, the damages arising from the misappropriation of trade secrets [are] irreparable and impossible to calculate."). As a result, "'*where it is shown* that the [opposing party] has misappropriated the [party's] trade secrets,' irreparable harm is generally presumed." *Id.* (quoting *Deutsche Investment Mgm't Americans, Inc. v. Riverpoint Cap. Mgm't. Inc.*, No. 1:02-cv-577, 2002 U.S. Dist. Lexis 16147, at *18 (S.D. Ohio Aug. 22, 2022)).[4]

Alotech previously proffered several affidavits revealing that Appellees did in fact alter, copy, delete, or otherwise misappropriate the protected trade secrets to which this motion and this litigation are directly concerned. Beyond those misdeeds, Appellees' own testimony shows that Appellees tried to conceal this fact and take

---

[4] Other courts have highlighted the seriousness of these concerns. *See Neo Gen Screening, Inc. v. TeleChem Intern., Inc.*, 69 Fed. Appx. 550, 554 (3d Cir. 2003) ("the disclosure of trade secrets would result in irreparable harm [] that would not be remedied by monetary damages."); *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (loss of trade secret is an irreparable harm because "a trade secret once lost is, of course, lost forever"); *Airbnb, Inc. v. City of New York*, 373 F. Supp.3d 467, 499 (2019) (S.D.N.Y. 2019) ("[t]he disclosure of private, confidential information is 'the quintessential type of irreparable harm that cannot be compensated or undone by money damages.") (citing *Hirschfield v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000)).

other steps to deliberately deceive Alotech and the District Court. (R. 215, Transcript from 2/10/2023 hearing, PageID 5425.) The evidence clearly demonstrates that Appellees have destroyed or altered trade secret data in the course of this litigation, nothing prevents them from doing it again.

In addition to the irreparable harm that will result from Appellees' possession of Alotech's trade secrets, there is similarly a substantial risk of harm to Alotech's physical property should it be returned to Appellees' possession. A stay in this regard has the same effect as a preliminary injunction and would serve the important purpose of "allow[ing] [an appellate] victory by [Alotech] to be meaningful…" *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018) (quoting *AIG Aviation, Inc. v. Boorom Aircraft, Inc.*, 142 F.3d 431, 1998 WL 69013, at *3 (6th Cir. 1998)). Once the Trade Secrets are returned to Appellees, any prospective relief that Alotech may seek on appeal would be of limited value, as significant damage would already be done. As a result, the harm to be suffered in the absence of a stay is irreparable and warrants issuance of a stay to protect Alotech's interests while the appeal proceeds.

The District Court's irreparable-harm analysis relies on a misreading of the evidence. It claims that "there is no evidence that the devices in EY's possession contain Defendants' trade secrets—or even if they are Defendants' property at all." (*See* R. 322, Order, PageID 6840.) But EY's preliminary report found 41,000 Alotech files among the Trade Secrets.

Worse still, the District Court then contradicts its own "finding." The second basis for finding no irreparable harm is that "Michael Grassi …. admitted that … he made a 'virtual' copy 'for [his] purposes.'" So, Alotech has "demonstrated that the harm they seek to prevent has occurred in the past." That is, there is no irreparable harm from Appellees' receiving Alotech's Trade Secrets because the last time that Appellees had those Trade Secrets they made a copy of them for their own purposes. According to the District Court's analysis, multiple acts causing irreparable harm somehow cancel each other out. There is no case law, or logic, supporting that result.

### 3. Staying the proceedings will not injure Appellees.

Appellees face no harm from a continued maintenance of the status quo. Appellees seek payment to which they *would have been entitled* only had they properly returned the Trade Secrets to Alotech in compliance with the Term Sheet. As the District Court determined, Alotech's obligation to render payment is excused. (*See* R. 301-2, Order, PageID 6629. Appellees' continuing obligation to return Alotech's Trade Secrets *is not excused*, however. (*See* R. 181-1, Term Sheet ¶5-6, PageID 4820.) The plain language of the Term Sheet (*see id.*) and the effect of the District Court's dismissal of the action is to deprive Appellees of any right to those Trade Secrets. Accordingly, there is no benefit for Appellees to receive were proceedings to continue and simultaneously no injury to be borne by Appellees as a

result of a retention of the status quo. Appellees reap no reward from possession of Alotech's Trade Secrets beyond continued harm to Alotech.

Any injury that Appellees may purport to incur as a result of this requested stay pales in comparison to the irreparable harm Alotech faces in its absence and is purely the result of Appellees' own conduct. *See Handel Enterprises, Inc v. Schulenburg*, 765 F. App'x 117, 125 (6th Cir. 2019) (weighing third factor in the movant's favor where opposing party "likely would be harmed by an injunction, [but] this self-inflicted harm was the result of [opposing party's] willful actions and was outweighed by the harm to [the movant]."). For these reasons, Appellees will suffer no injury as a result of the requested relief and equity weighs heavily in Alotech's favor.

### 4. The public interest favors staying the proceedings.

Generally, "[t]he public has an interest in discouraging unfair trade practices." *Hoover Transp. Servs., Inc. v. Frye*, 77 Fed. Appx. 776, 785 (6th Cir. 2003). "[T]he public interest is served by discouraging practices aimed at surreptitiously acquiring trade secrets [and] by prohibiting misappropriation of trade secrets . . ." *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp.2d 848, 855 (S.D. Ohio 2000). These considerations extend by their very nature to the Trade Secrets that Alotech now seeks to shield. Beyond those interests specific to the protection of trade secrets, "[t]here is a fundamental public interest in ending [] abuse of the judicial system, in

conserving judicial resources, and in preventing further confusion and disruption in [] litigation." *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018).

Alotech's appeal relates directly to the enforcement of the Term Sheet. With this in mind, the public's interest in the enforcement of settlement agreements is similarly invoked. *See Acro Corp.*, 531 F.2d at 1372 ("Public policy strongly favors settlement of disputes without litigation…"). "Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Id*. This public interest in cost-effective resolution of complex commercial litigation favors the preservation of Alotech's bargain under the Term Sheet. That bargain will be eliminated entirely in the absence of a stay and the public's interest in making bargaining parties carry out the terms of their agreements would thereby be undermined. As a result, the public interest favors imposition of a stay pending appeal.

## C.    Alotech should not be required to post a supersedeas bond.

As the District Court properly determined below, Appellees are currently entitled to no payment under the Term Sheet due to their non-performance. As a result, there is no payment to be delayed by the stay of proceedings. The only thing to be delayed is Appellees' receipt of Alotech's Trade Secrets, which is prohibited by the Term Sheet. For this reason and based upon the lack of harm to be faced by

Appellees by a continuance of the status quo, no supersedeas bond should be required.

Alotech moves for relief under Fed. R. App. P. 8, which permits this court to "suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). By its express terms, a bond is contemplated, but "the Rule in no way necessarily implies that filing a bond is the only way to obtain a stay." *Arban v. West Pub. Corp.*, 345 F.3d 390, 409 (6th Cir. 2003) (quoting *Fed. Prescription Serv., Inc. v. Am. Pharm. Ass'n*, 636 F.2d 755, 759 (D.C. Cir. 1980)). Rather, courts "'have inherent power . . . to provide for a bond in a lesser amount' or to waive the bond requirement altogether." *Bank v. Byrd*, No. 10-02004, 2012 WL 5384162, *2 (W.D. Tenn. Nov. 1, 2012) (citing *Arban*, 345 F.3d at 409)).

If Appellees' position is to be believed, nobody owes anybody anything at this juncture. While this view is inherently incorrect based upon the plain reading of the Term Sheet, it is undisputed that Appellees are owed no payment at this time as a consequence of their own actions. Importantly, the District Court's March 19, 2024 Order on which this appeal revolves affirmatively determined that "[Appellants] currently have no obligation to pay." (R. 301-2, Order, PageID 6625). In fact, the District Court affirmatively determined that Alotech was entirely excused from its duty to perform. *See id*. The Trade Secrets which Alotech by this appeal seeks to

maintain in the hands of a neutral third-party are Alotech's property, whether Appellees will admit it or not. The circumstances are extraordinary—Alotech stands to lose all interest in its Trade Secrets and the trade secrets which it holds absent relief. Further, there is no money judgment which this appeal delays. If there were any further question, the District Court's decision not to require a bond during the temporary stay which is to expire on April 19, 2024 only further confirms there to be no need for the posting of a bond. As a result, the circumstances diverge significantly from the ordinary circumstances where bond security is necessary and, for these reasons, this Court should exercise its discretion to determine that no such bond should be required.

## CONCLUSION

Alotech respectfully requests that the Court enjoin all proceedings in the District Court pending this appeal and order EY not to turnover Alotech's property to the Appellees or, in the alternative, issue a temporary stay and set a briefing schedule so that the request for an injunction pending appeal can be fully considered.

/s/ Aaron M. Herzig
Aaron M. Herzig
aherzig@Taftlaw.com
Taft Stettinius & Hollister LLP
425 Walnut Street, Suite 1800
Cincinnati, OH 45202
Phone: (513) 381-2838

John R. Mitchell
jmitchell@Taftlaw.com
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-302
Phone: (216) 706-3909

*Counsel for Appellants*
*Alotech Limited, LLC and John Grassi*

## CERTIFICATE OF COMPLIANCE

This motion complies with the type-volume limitation in Fed. R. App. P. 27(d)(2)(A) because it contains 4,994 words. This motion also complies with the type-face requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(5) and the type-style requirements of Fed. R. App. P. 27(d)(1)(E) and 32(a)(6) because it has been prepared in 14-point Times New Roman font using Microsoft Word.

*/s/ Aaron M. Herzig*

## CERTIFICATE OF SERVICE

I certify that on April 17, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Sixth Circuit using the CM/ECF system. I also certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

*/s/ Aaron M. Herzig*

# ADDENDUM

Exhibit 1     R. 181-1, Term Sheet (SEALED)

Exhibit 2     R. 322, Memorandum Opinion and Order, PageID# 6832-6842

Exhibit 3     R. 275-1, Declaration of Grassi (SEALED)

Exhibit 4     R. 215, Transcript of Motion Hearing on February 10, 2023, PageID# 5330-5511

Exhibit 5     R. 309, Memorandum Opinion and Order, PageID# 6711-6714

Exhibit 6     R. 301-2, Memorandum Opinion and Order, PageID# 6620-6633

Exhibit 7     R. 315, Motion to Stay Enforcement of the March 19, 2024 Order Pending Appeal, PageID# 6767-6783

Exhibit 8     R. 311, Notice of Appeal, PageID# 6724-6726

# EXHIBIT 1

# (Sealed)

EXHIBIT 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL GRASSI, et al.,                    Case No. 1:18-cv-02619

     Plaintiffs,

    -vs-                    JUDGE PAMELA A. BARKER

JOHN GRASSI, et al.,

     Defendants.    MEMORANDUM OPINION & ORDER

Before the Court is Defendants' Motion to Stay Enforcement of the Court's March 19, 2024 Order Pending Appeal filed on April 12, 2024. (Doc. No. 314.) Plaintiffs oppose Defendants' Motion in two filings. First, on April 12, 2024, Plaintiffs filed a Motion to Strike Defendants' Motion to Stay Enforcement. (Doc. No. 316.) Second, on April 16, 2024, Plaintiffs filed an Opposition to Defendants' Motion to Stay Enforcement. (Doc. No. 321.) On April 16, 2024, Defendants filed a Response to Plaintiffs' Motion to Strike. (Doc. No. 319.)

## I. Relevant Background

In their Opposition, Plaintiffs accurately outline the relevant procedural history of this case. (Doc. No. 321, PageID# 6818-32.) The Court adopts their summation in full and adds the following information.

On March 8, 2024, the Court issued a Memorandum Opinion and Order that denied Plaintiffs' request to vacate the Term Sheet and dismissal under Rule 60(b)(6) and that denied in part and granted in part Defendants' Renewed Motion to Enforce Term Sheet. (Doc. No. 301.) The Court's Opinion permitted Plaintiffs to continue the forensic examination process with a forensic examiner of their

own choosing and at their own expense. (*Id*. at PageID# 6605.) The following business day, Plaintiffs

asked that the Court order EY, the forensic examiner to:

> (1) return to Plaintiffs or their counsel all devices previously provided by Plaintiffs to the forensic examiner; (2) return all login, password and other access information to Plaintiffs' Gmail account and/or devices; and (3) destroy any information relating to Plaintiffs' devices or accounts in its possession.

(Doc. No. 302.) The Court granted Plaintiffs' request. (Non-Document Order dated March 11, 2024.)

The next day, Defendants filed an Emergency Motion for Preliminary Injunction. (Doc. No.

303.) Defendants sought (1) an order that Plaintiffs are enjoined "from possessing Alotech property,

including that which is currently in possession of [EY];" (2) an order that EY return to Defendants

"the Dell M6800 laptop, the SanDisk storage device[1], and devices containing files whose metadata

identify[] them as having come from the Dell M6800;" (3) a 30-day stay of the Court's March 11,

2024, Non-Document Order; and (4) an order that EY "maintain a forensically sound copy of the

devices and data in its possession, as well as its related working papers, in escrow." (*Id*.)

On March 19, 2024, the Court denied Defendants' requests for an injunction and for an order

that the devices in EY's possession be returned to them. (Doc. No. 309.) The Court reasoned that it

is still to be determined whether the files on the devices that Plaintiffs gave to EY are Alotech property

which Plaintiffs should have returned under the Term Sheet. (*Id*. at PageID# 6712-13.) And the

Court concluded that it was not appropriate to order Plaintiffs to return the devices until that

determination had been made. (*Id*. at PageID# 6713.)

However, the Court granted Defendants' request that EY maintain a forensic copy of the

devices and data in its possession. (*Id*.) The Court gave EY 30 days to make the forensic copies if it

---

[1] The SanDisk storage device contains a virtual image of the Dell M6800 laptop. (*See* Doc. No. 207.) In effect, Defendants asked that the Dell M6800 laptop and any device that contains files that were once on the Dell M6800 laptop be returned to them.

had not already done so. (*Id.*) Moreover, the Court stayed its March 11, 2024 Non-Document Order for 30 days. (*Id.*) On the 31st day after the date of the March 19, 2024 Order—April 19, 2024—EY was to return the devices, data, and access information to Plaintiffs. (*Id.* at PageID# 6714.)

On April 5, 2024, Defendants filed a Notice of Appeal of the Court's March 8 and March 19, 2024 Memorandum Opinions and Orders. (Doc. No. 311.) Then, on April 9, 2024, Defendants filed a Motion to Stay Enforcement of the Court's March 19, 2024 Order. (Doc. No. 314.) Specifically, Defendants ask that EY retain all property in its possession until the final adjudication of Defendants' appeal. (*Id.* at PageID# 6765.)

On April 9, 2024, Plaintiffs filed a Motion to Strike Defendants' Motion to Stay Enforcement. (Doc. No. 316.) Plaintiffs argue that because Defendants filed a notice of appeal and their Motion to Stay Enforcement addresses issues now before the Sixth Circuit, this Court lacks jurisdiction to rule on Defendants' Motion. (*Id.* at PageID# 6784.)

On April 16, 2024, Plaintiffs filed an Opposition to Defendants' Motion to Stay and Defendants filed a Response to Plaintiffs' Motion to Strike. (Doc. Nos. 319, 321.)

## II.    Law and Analysis

### A.    Jurisdiction

The Court will first address whether it has jurisdiction to rule on Defendants' Motion. "[A]n effective notice of appeal divests the district court of jurisdiction over the matter forming the basis for the appeal," *NLRB v. Cincinnati Bronze, Inc.*, 829 F.2d 585, 588 (6th Cir. 1987), "unless that appeal is untimely, is an appeal from a non-appealable non-final order, or raises only issues that were previously ruled upon in that case by the appellate court." *Rucker v. United States Dep't of Labor*, 798 F.2d 891, 892 (6th Cir. 1986). Absent one of these exceptions, the only jurisdiction a district court retains is to act "on remedial matters unrelated to the merits of the appeal." *United States v.*

*Harvey*, 996 F.3d 310, 312 (6th Cir. 2021) (quoting *Fort Gratiot Sanitary Landfill v. Mich. Dep't of Nat. Res.*, 71 F.3d 1197, 1203 (6th Cir. 1995)).

Here, Defendants' appeal is timely, it appeals an appealable order[2], and it does not raise issues that the Sixth Circuit previously ruled upon. Therefore, none of the exceptions apply, and this Court only has jurisdiction to rule on Defendants' Motion if it is a "remedial matter" that is "unrelated to the merits of [Defendants'] appeal." *See Harvey*, 996 F.3d at 312.

Federal Rule of Civil Procedure 62(d), in relevant part, provides that "[w]hile an appeal is pending from an interlocutory order . . . that . . . refuses . . . an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." Fed. R. Civ. P. 62(d). And Federal Rule of Appellate Procedure 8(a)(1) provides:

> (1) *Initial Motion in the District Court*. **A party must ordinarily move first in the district court for the following relief:**
> **(A) a stay of the judgment or order of a district court pending appeal**;
> (B) approval of a bond or other security provided to obtain a stay of judgment; or
> (C) an order suspending, modifying, restoring, or granting an injunction while an appeal is pending.

Fed. R. App. 8(a)(1) (emphasis added). Thus, if a party "must ordinarily" first file a motion to stay in the district court, it follows that at least some motions to stay are remedial matters over which district courts retain jurisdiction. *See Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 931 (6th Cir. 2002) (denying a motion to stay pending an appeal because the defendant did not first move for it in the district court). But for the Court to retain jurisdiction over Defendants' Motion, it must also be "unrelated to the merits" of Defendants' appeal. *See Harvey*, 996 F.3d at 312.

---

[2] 28 U.S.C. § 1292 provides that the court of appeals "shall have jurisdiction of appeals from . . . [i]nterlocutory orders of the district courts of the United States . . . refusing . . . injunctions." 28 U.S.C. § 1292(a)(1). In its March 8 and March 19, 2024 Memorandum Opinions and Orders, the Court denied Defendants' requests for injunctions. Therefore, these Orders are appealable, non-final orders. *See, e.g., Crane v. Washington*, 2019 U.S. App. LEXIS 104 at *2 (6th Cir. Jan. 2, 2019) (citing 28 U.S.C. § 1292(a)(1)) ("An order denying an injunction is immediately appealable.").

Plaintiffs argue that Defendants' Motion to Stay is related to their appeal because the Court already denied Defendants' request for injunctive relief in its March 8 and March 19, 2024 Orders, and Defendants' Motion to stay "raise[s] various factual and legal arguments regarding their likelihood of success on the merits . . . which involve the same issues as in Defendants' appeal" of those Orders. (Doc. No. 316, PageID# 6788.) Plaintiffs cite two district court cases that they argue this Court should follow: *Doe v. Franklin Cnty. Children's Servs.*, 2020 U.S. Dist. LEXIS 174145 (S.D. Ohio Sep. 22, 2020) and *Memphis A. Phillip Randolph Inst. v. Hargett*, 2020 U.S. Dist. LEXIS 187062 (M.D. Tenn. Oct. 8, 2020).

In *Doe* and *Hargett*, the district courts granted motions for preliminary injunctions and the defendants filed notices of appeal and motions to stay the injunctions. *Doe*, 2020 U.S. Dist. LEXIS 174145 at *3; *Hargett*, 2020 U.S. Dist. LEXIS 187062 at *3-4. And in both cases, the district courts denied the defendants' motions to stay because "[i]n considering a motion to stay a preliminary injunction pending appeal, [the district court] would need to consider the same four factors it already considered when making its . . . decision to issue the preliminary injunction." *Doe*, 2020 U.S. Dist. LEXIS 174145 at *3-4; *see also Hargett*, 2020 U.S. Dist. LEXIS 187062 at *4. The district courts concluded that "all matters raised in [the] emergency motion[s] to stay are related to the merits of the appeal[s]," and, accordingly, the courts found they lacked jurisdiction to rule on the motions. *Hargett*, 2020 U.S. Dist. LEXIS 187062 at *4-5; *see also Doe*, 2020 U.S. Dist. LEXIS 174145 at *4.

The Court finds *EMW Women's Surgical Center P.S.C. v. Beshear*, 2017 U.S. App. LEXIS 24931 (6th Cir. Dec. 8, 2017), more instructive on the issue before the Court. In *EMW*, the plaintiffs, a medical facility and three physicians, sued Kentucky alleging that a bill violated their First Amendment rights. *Id*. at *3-4. The district court granted summary judgment for the plaintiffs and permanently enjoined the state from enforcing the bill. *Id*. at *1-2. Kentucky then moved in the court

of appeals—rather than in the district court—to stay the injunction, arguing that "it would have been futile[3] to ask the district court to stay its decision because the motion to stay focuses on the same issues that the district court decided in granting summary judgment to [the plaintiffs]." *Id*. at *5. The Sixth Circuit recognized that "there is substantial overlap between the criteria governing issuance of an injunction and a stay." *Id*. (citing *Nken v. Holder*, 556 U.S. 418, 434 (2009)). But it concluded that Kentucky should have filed its motion to stay pending appeal in the district court because "the district court enjoined enforcement of [the bill] as a remedy after analyzing the merits of the First Amendment claim under the summary-judgment standard." *Id*. The Sixth Circuit reasoned that:

> [Kentucky's] futility argument seeks an exception that swallows the rule: Generally, a party who seeks a stay of the enforcement of an injunction is the subject of an adverse decision by the district court. To excuse a party from the strictures of Federal Rule of Appellate Procedure 8(a)(1) merely because the district court ruled against the party would nullify the requirement.

*Id*. at *5-6.

Here, the Court denied Defendants' requests for injunctions not because they failed to prove the injunction factors, but because they failed to prove a breach of the Term Sheet. (Doc. No. 301-1, PageID# 6617; Doc. No. 309, PageID# 6712-13.) The Court simply found that Plaintiffs had failed to comply with conditions precedent included in the Term Sheet, and it set forth a path forward to so comply. Thus, the Court has yet to consider the arguments Defendants now make in their Motion to Stay. Stated differently, unlike in *Doe* and *Hargett*, this Court has not yet considered and evaluated the four factors that it will need to consider and evaluate in ruling on Defendants' Motion to Stay. Accordingly, the Court concludes that it has jurisdiction to rule on Defendants' Motion to Stay. *See*

---

[3] Federal Rule of Appellate Procedure 8(a)(2) permits a party to first file a motion to stay pending appeal in the court of appeals if the party can either "show that moving first in the district court would be impracticable" or "state that, a motion having been made, the district court denied the motion or failed to afford the relief requested." Fed. R. App. P. 8(a)(2)(A).

*also Busby v. Bonner*, 2021 U.S. App. LEXIS 30952 at *3-4 (6th Cir. Oct. 14, 2021) (concluding that the district court should have ruled on defendants' motion to stay because "the district court ha[d] not yet considered the primary argument" defendants presented in the motion to stay).

### B. Stay Pending Appeal

A district court considers four factors to determine whether a stay pending appeal is appropriate:

> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

*Nken*, 556 U.S. at 434. The four factors are not prerequisites to be met. *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991). And while the first two factors "are the most critical," *Nken*, 556 U.S. at 434, all "are interrelated considerations that must be balanced together." *Griepentrog*, 945 F.2d at 153. At this stage, "the probability of success" that Defendants must demonstrate "is inversely proportional to the amount of irreparable injury [they] will suffer absent the stay." *Id*. The Court will consider each of the four factors in turn.

### 1. Likelihood of Success

At a minimum, Defendants must show "serious questions going to the merits" of their appeal. *Dodds v. United States Dep't of Educ.*, 845 F.3d 217, 221 (6th Cir. 2016) (quoting *Griepentrog*, 945 F.2d at 153). That means Defendants must demonstrate "more than a mere possibility of relief," *id*. (quoting *Nken*, 556 U.S. at 435), but less than "a high probability of success on the merits." *Griepentrog*, 945 F.2d at 143 (citing *Ohio ex rel. Celebrezze v. Nuclear Regulatory Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)).

Defendants argue that they are likely to succeed on their appeal because "nowhere within the Term Sheet is it contemplated that property in the safekeeping of E&Y (or any other neutral party) be returned to Plaintiffs while the parties are left to dispute whether Plaintiffs actually retained that property." (Doc. No. 314, PageID# 6761.) This is true. But it is also true that the Term Sheet does not contemplate that a third party such as EY retain the property for safekeeping. The parties agreed to employ EY to resolve their dispute over the settlement agreement. (*See* Doc. No. 207.) And Plaintiffs agreed to turn over the devices in their possession to EY to further that resolution. (*See* Doc. No. 223.) The Court ordered EY to return the devices because Plaintiffs represented that they "lost confidence" in EY and opined that someone other than EY should complete the forensic examination. (Doc. No. 299, PageID# 6566.) Returning the devices to Plaintiffs thus merely returns the parties to the positions they were in when they agreed to the Term Sheet.

Defendants further argue that the intent of the settlement agreement "was predicated on the immediate return of all of Alotech's property." (Doc. No. 314, PageID# 6761.) The Term Sheet provides that Plaintiffs were to return Alotech's property "within 20 days," but Defendants have never insisted on that fixed date. In fact, they filed their Motion to Enforce the Term Sheet on January 3, 2023—that is, over a week after Plaintiffs' time for compliance had expired. And in that Motion, Defendants sought Plaintiffs' compliance with the Term Sheet notwithstanding that the deadline had passed. Moreover, at this point, the only Alotech property contemplated in the Term Sheet that is in EY's possession is the Dell M6800 laptop. The data on that laptop and the other devices has always been Defendants' chief concern. Whether that data is Defendants' property has not yet been determined.

In short, Defendants fail to show any "serious questions" going to the merits of their appeal. This factor weighs against granting a stay.

## 2.    Irreparable Injury

Courts look to three factors when evaluating irreparable injury: "(1) the substantiality of the injury alleged; (2) the likelihood of its occurrence; and (3) the adequacy of the proof provided." *Griepentrog*, 945 F.2d at 154 (citing *Ohio ex rel. Celebrezze*, 812 F.3d at 290). The irreparable harm alleged "must be both certain and immediate, rather than speculative or theoretical." *Id.* And to show harm is likely to occur, "a movant must provide some evidence that the harm has occurred in the past and is likely to occur again." *Id.* (citing *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985). Ultimately, "the key word in this consideration is *irreparable*." *Id.* (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)).

Defendants argue that they will suffer irreparable harm if EY returns the devices to Plaintiffs because the devices contain Defendants' trade secrets and Plaintiffs previously have destroyed or altered Defendants' trade secret data. (Doc. No. 314, PageID# 6762.) First, there is no evidence that the devices in EY's possession contain Defendants' trade secrets. What the Court and the parties know is that the devices contain approximately 41,000 files with Alotech in the file name. Whether these files contain Defendants' trade secrets—or even if they are Defendants' property at all—is still to be determined. Additionally, the devices *do not* contain Defendants' two "crown jewel" databases that allegedly cost Defendants more than $20 million to develop. (*See* Doc. No. 275-1, ¶¶ 5, 20.) Therefore, Defendants' alleged harm is not certain. Moreover, Defendants never made a counterclaim for trade secrets misappropriation. And while they filed a counterclaim for conversion alleging that Plaintiff Michael Grassi unlawfully took Alotech's property when he left Alotech in 2017 (Doc. No. 8, PageID# 72), Defendants voluntarily dismissed that counterclaim before trial. (Doc. No. 50.) Defendants did not make a claim to the Alotech property allegedly in Plaintiffs' possession until

9

nearly two years later when they agreed to the Term Sheet. Therefore, Defendants' alleged harm is not immediate either.

Second, Plaintiff Michael Grassi admitted that, after agreeing to the Term Sheet, he "wiped" data from one of the devices that he was to turn over, and he admitted that before doing so, he made a "virtual" copy "for [his] purposes." (Doc. No. 215, PageID# 5428, 5438-5443.) Accordingly, Defendants have demonstrated that the harm they seek to prevent has occurred in the past. Even so, the Court has ordered EY to maintain a forensic copy of all the data on the devices in its possession. Plaintiffs could entirely destroy the original devices and their data, and yet a forensic copy will remain with EY. Therefore, any harm Defendants could suffer is repairable. This factor also weighs against a stay.

### 3.     Harm to Others

There is little harm to Plaintiffs if the Court were to stay its Order requiring the return of the devices. But this consideration concerns not only the party opposing the stay, but also "the prospect that others will be harmed by the stay." *Crookston v. Johnson*, 841 F.3d 396, 398 (6th Cir. 2016). EY desires to "return[] the devices as soon as practicable" and to "cross [the Court's Order] off [their] list." (Doc. No. 310-1, PageID# 6719.) Granting a stay would force EY to maintain possession of the devices and require their continued involvement in this years-long dispute. This factor too weighs against a stay.

### 4.     Public Interest

Defendants argue that the public interest favors the protection of trade secrets and the enforcement of settlement agreements. First, as noted above, there is no evidence that Defendants' trade secrets are on the subject devices, and Defendants never made a counterclaim for trade secrets misappropriation. Second, a stay will not further a "[p]ublic policy [that] strongly favors settlement

of disputes without litigation." *ARO Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1372 (6th Cir. 1976). Rather, it will prolong this dispute, mean more litigation, result in the expenditure of additional judicial resources, and not bring the parties any closer to a final resolution of this matter.

## III. Conclusion

On balance, all factors weigh against a stay. Accordingly, the Court DENIES Defendants' Motion to Stay Enforcement of the Court's March 19, 2024 Order Pending Appeal. (Doc. No. 314.)

**IT IS SO ORDERED.**

Dated: April 17, 2024         *s/ Pamela A. Barker*
                                             PAMELA A. BARKER
                                             UNITED STATES DISTRICT JUDGE

# EXHIBIT 3

## (Sealed)

EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

MICHAEL GRASSI,                           Case No. 18-cv-2619
CFOM, INC.,

            Plaintiffs,
                                          February 10, 2023
      vs.                                 9:01 a.m.


JOHN GRASSI,
ALOTECH LIMITED, LLC,

            Defendants.


TRANSCRIPT OF MOTION HEARING PROCEEDINGS
BEFORE THE HONORABLE PAMELA A. BARKER
UNITED STATES DISTRICT JUDGE

```
 1    APPEARANCES:

 2    For the Plaintiffs:        Michael B. Pasternak, Esq.
                                 Suite 411
 3                               Park Place II
                                 3681 South Green Road
 4                               Beachwood, Ohio    44122
                                 216-360-8500
 5
                                 Jeffrey W. Saks, Esq.
 6                               Saks Law Office
                                 Suite 411
 7                               3681 South Green Road
                                 Beachwood, Ohio    44122
 8                               216-255-9696

 9                               Emmett E. Robinson, Esq.
                                 Robinson Law
10                               Suite 731
                                 6600 Lorain Avenue
11                               Cleveland, Ohio    44102
                                 216-505-6900
12
13    For the Defendants:        Suzanne Bretz Blum, Esq.
                                 Brouse McDowell - Cleveland
14                               Suite 1600
                                 600 Superior Avenue E
15                               Cleveland, Ohio    44114
                                 216-830-6830
16
                                 Cole B. Ramey, Esq.
17                               Kilpatrick Townsend & Stockton
                                 Suite 440
18                               2001 Ross Avenue
                                 Dallas, Texas    75201
19                               214-922-7100

20

21
      Official Court Reporter:   Susan Trischan,RMR,CRR,FCRR,CRC
22                               7-189 U.S. Court House
                                 801 West Superior Avenue
23                               Cleveland, Ohio    44113
                                 (216) 357-7087
24
      Proceedings recorded by mechanical stenography.
25    Transcript produced by computer-aided transcription.
```

<u>FRIDAY, FEBRUARY 10, 2023, 9:01 A.M.</u>

          THE COURT:  Good morning.

          Please be seated.

          We are on the record in the matter captioned Michael Grassi, et al. versus John Grassi, et al.  This is Case Number 1:18-cv-2619.

          Would counsel for the plaintiffs please rise and state your names for the record?

          MR. PASTERNAK:  Michael Pasternak for the plaintiff, Jeffrey Saks for the plaintiff or plaintiffs, and Emmett Robinson for the plaintiffs.

          THE COURT:  Thank you.

          Would counsel for the defendants please rise and identify yourselves for the record?

          MS. BLUM:  Suzanne Bretz Blum for the plaintiff -- for the defendants.

          MR. RAMEY:  Cole Ramey for the defendants.

          THE COURT:  All right.  Thank you very much.

          We are here today for a hearing on cross motions to enforce the settlement agreement, specifically the term sheet that was completed and executed by the parties on December 2nd of 2022, the very day that the case was set for trial.

          The Court has reviewed the respective -- or

1    the original motion to enforce that was filed by the

2    defendants, and then the cross motion that was filed by

3    the plaintiffs along with their respective oppositions

4    and replies thereto.

09:02:29  5         The Court understands from reviewing the

6    witness and exhibit lists that there are six witnesses

7    expected to testify on behalf of the plaintiffs and six

8    witnesses expected to testify on behalf of the

9    defendants.

09:02:44  10         I know, too, that the plaintiff reserved

11   the right to call John Grassi as upon cross-examination,

12   but nonetheless, we're looking at at least twelve

13   witnesses today.

14         I have allotted this day only for this

09:02:56  15   hearing to take place.  In fact, I plan to take a break

16   for 15 minutes at around 10:15 and then resume at 10:30

17   with a lunch break at noon, and then reconvening at 1:30

18   and finishing up, after a midafternoon break, by 4:30.

19         If the hearing goes longer than that, I

09:03:17  20   can't tell you when I will have another opportunity in

21   the next couple of months to reconvene for this hearing.

22         I will be gone for two weeks starting

23   tomorrow, and then when I return I have several criminal

24   trials set to begin and various hearings associated with

09:03:31  25   those trials.

1        So I just wanted to put that on the record.

2        That might urge you to think carefully how

3    much time you spend with each witness, so I just wanted

4    to give you a heads-up on that.

5        Now, the defendants filed their motion to

6    enforce the settlement -- specifically the terms of the

7    term sheet -- first, so I'm going to allow the defendants

8    to present their case first.

9        And then, of course, the cross motion was

10   filed by plaintiffs, so that's the way we'll go.

11       Anything that we need to address before we

12   begin?

13       I don't think I need opening statements of

14   any kind.  I'm familiar with the case, familiar with the

15   briefing, familiar with the exhibits that are at least

16   attached to the briefing.

17       I did not allow for objections to exhibits

18   and witnesses as part of this.  We're not -- this is not

19   a trial.  That may have been part of the trial order

20   associated with the December 2nd trial, but this is an

21   evidentiary hearing on the term sheet that was completed

22   or executed by the parties.

23       Anything on behalf of the plaintiff before

24   we begin?

25       MR. PASTERNAK:  Just one procedural

1    question.

2              In terms of exhibits, is it okay if we hand

3    our binder -- oh, you need the two binders, don't you?

4              THE COURT:  I'm sorry, I do have what I see

09:04:48  5  here are the defendants' exhibits.

6              I don't have the plaintiffs'.

7              MR. PASTERNAK:  Okay.  And when the witness

8    is on the stand, can they just refer, if we hand them the

9    binder and they just flip through the exhibits?

09:05:10 10            THE COURT:  You may.  It may be easier to

11   take it out, but I'll leave that up to you.

12            Whatever will get everything on the record

13   as quickly and efficiently as we can I would suggest is

14   the best way to do it.

09:05:22 15            All right?

16            Anything on behalf of the defendants before

17   we begin?

18            MR. RAMEY:  Only a request, Your Honor, in

19   the interest of quickness and efficiency, again it's a

09:05:30 20  bench hearing, Your Honor has read the papers and we have

21   a limited amount of time, if we are belaboring a point

22   that Your Honor is well aware of, I would welcome if you

23   would shoe me along, or the rest of us, and to move on to

24   the next point.

09:05:44 25            THE COURT:  Yes.

1          I think we're really here about whether or

2     not Mr. Michael Grassi has certain computers that Alotech

3     says is their computers, and specifically that's how I

4     see this hearing.

09:05:57    5          Obviously, there were two computers that

6     were identified in the term sheet.

7          Now, I will ask you this, Mr. Pasternak,

8     are you expecting to call Ms. Blum as a witness?

9          I didn't see her as a witness listed on

09:06:09   10     your witness list, but you do make allegations associated

11     with comments you made to her that were not counted in

12     any way during the discussions of settlement on December

13     2nd.

14          Just curious.

09:06:21   15          MR. PASTERNAK:  At this point I don't, Your

16     Honor.  I don't anticipate it.  I mean, no, at this point

17     we don't.

18          THE COURT:  All right.  Thank you.

19          MS. BLUM:  Your Honor, to that point, we

09:06:29   20     had proposed that the e-mails exchanged between counsel

21     that are proposed exhibits, both theirs and ours, be

22     admitted by agreement, if that's agreeable to --

23          THE COURT:  You mean the e-mails that were

24     exchanged at the time that you were evaluating the term

09:06:48   25     sheet?

1          MS. BLUM:  No.

2          The e-mails that we put as exhibits in our

3  exhibit list, and they put as exhibits in their exhibit

4  list.

5          THE COURT:  Oh, I'm sorry.

6          I was still on the point whether or not you

7  were going to testify, or I thought you had something to

8  say about that discussion.

9          MS. BLUM:  Oh, no.  It was more about

10  lawyers being witnesses to certain testimony, that sort

11  of thing; lawyers being witnesses to the e-mails.

12          MR. PASTERNAK:  Yeah, I don't -- the

13  e-mails between counsel fighting over -- I mean, that's

14  why we're here.

15          So I don't think those come in anyway,

16  meaning that you have a term sheet, we don't -- we keep

17  going back and forth, and it leads us here.

18          Whether or not, you know, whatever she

19  wrote in her e-mails, whatever we wrote in our e-mails, I

20  mean it can come in.  I just don't see how it comes in in

21  terms of --

22          THE COURT:  I'm not sure which e-mails you

23  are talking about.

24          There are so many e-mails that both

25  predated the December 2nd trial date and ultimate

1    execution of the term sheet that was completed that day.

2    There are e-mails that have gone back and forth between

3    counsel for the parties since that time.

4              So I'm not sure what e-mails you're talking

09:08:03  5    about.

6              All the e-mails between counsel?

7              MS. BLUM:  No, Your Honor.

8              I was talking just about the e-mails that

9    are on each parties' exhibit lists, but we can deal with

09:08:14 10    that after towards the end of the hearing when you have

11    seen the various e-mails and how they're relevant.

12              THE COURT:  Right.

13              I see your list of exhibits, obviously, but

14    I don't know exactly what they are.

09:08:26 15              So --

16              MS. BLUM:  Okay.  Thank you, Your Honor.

17              THE COURT:  All right.  Then we're ready to

18    begin?

19              MR. RAMEY:  One more question, Your Honor,

09:08:32 20    just in the interests of efficiency.

21              You mentioned this is a hearing essentially

22    about a computer.

23              THE COURT:  Two.

24              MR. RAMEY:  One that --

09:08:38 25              THE COURT:  And another one, a personal

1 one.

2     MR. RAMEY:  All right.  I have been

3 speaking with counsel kind of about three buckets of

4 items; one being the computer we know he has, another

09:08:47 5 computer that we're talking about.  Before that, what I'd

6 call, I guess, documents, data and litigation materials.

7     Would you like to hear all that evidence

8 and discussion and argument from the lawyers?

9     Clearly they've produced thousands and

09:09:00 10 thousands of pages of our data and have it.  It's Alotech

11 material.  We think it's covered by the agreement.

12     Do you want us to present that evidence and

13 go through that as well?  I thought that would be in a

14 cut version, but there may be a reason why it's being

09:09:14 15 held onto.

16     THE COURT:  I think they're saying they

17 don't have it.

18     MR. PASTERNAK:  I personally have 20 boxes

19 of documents.  And based on obviously we can't even agree

09:09:26 20 on the term sheet and there's -- we haven't gotten the

21 first payment and there's two payments coming up in the

22 next year-and-a-half, I can't get rid of those.

23     I don't know what's going to happen.  Maybe

24 the term sheet maybe is even thrown out and there's going

09:09:40 25 to have to be litigation.

1           THE COURT:  No, the term sheet is not going

2    to be thrown out.

3           MR. PASTERNAK:  I understand about me

4    holding them and I can agree to safeguard them, and then

09:09:49  5    at the last payment we can have them destroyed.

6           MR. RAMEY:  Maybe to short -- it may take

7    an hour or two out of Your Honor's time if we discussed

8    this issue preliminarily.

9           Your Honor may want to hear evidence about

09:10:01 10    it, I don't know, but there's our materials that he has,

11    and trial exhibits and things they were going to use at

12    trial, and Mr. Grassi, Mike Grassi may or may not have

13    kept some.

14           We think that's Alotech data.  We think we

09:10:16 15    get it back.

16           I've offered to safeguard it.

17           THE COURT:  Isn't that what Mr. Pasternak

18    is doing, safeguarding it?

19           MR. RAMEY:  I've offered to keep it,

09:10:24 20    download it and keep the boxes.

21           So we need Mike Grassi to turn his over,

22    and if that's in agreement, we can move forward on that,

23    we can move forward with Your Honor's order, but we will

24    spend time today talking about those computers.

09:10:42 25           THE COURT:  No, the major part of this, I

1    understand, is about the computers.

2              I understand that there was information

3    that has been demonstrated through exhibits that

4    plaintiff or plaintiffs' counsel have of Alotech in

5    those, the documents so to speak, right?

6              That's sort of a give-me?

7              MR. RAMEY:  Correct.

8              THE COURT:  So the point, as I see it, now

9    is that Mr. Pasternak is saying that he has 20 boxes

10   worth of materials, and he's willing to safekeep it until

11   this case is resolved and, he's just stated, the last

12   payment is made, and then agreed to destroy it.

13             Mr. Grassi has not made that representation

14   in terms of what he has, or are you saying that you have

15   all that Mr. Michael Grassi has?

16             MR. PASTERNAK:  I have -- I have

17   everything.  I have everything in my office.  Well, in my

18   office at my house, there's so many boxes.

19             THE COURT:  Now, we have defense counsel

20   saying that he will hold onto it because the position,

21   I'm assuming, is going to be that it's Alotech's property

22   so if anybody should hold onto it it should be defense,

23   the defendant through counsel.

24             Did I state that correctly?

25             MR. PASTERNAK:  You did.

1          The only problem, though, is that there is

2     a carve-out in the term sheet that says that Michael's

3     allowed to use nonablation technology involving mold

4     making, pumps and a bunch of other things.  So it gets a

09:12:04  5     little -- it's not as clear-cut.  I mean no offense to

6     Cole, but it's not as clear-cut.

7          What I was saying is beyond going into all

8     of that, I'll safeguard the whole thing, and I will

9     destroy it upon the last payment.

09:12:18 10          MR. RAMEY:  We'd like it returned because

11     that's what the term sheet says to return, but Your Honor

12     can rule whichever way Your Honor prefers on that.  That

13     issue is pretty finite.

14          And then there's the issue we probably need

09:12:30 15     on the record which is how much of that remains in Mike

16     Grassi's possession that is ours and what's to be done

17     with that because we can't allow that.

18          THE COURT:  Understood.

19          But I'm assuming you can ask him when he

09:12:44 20     testifies what he has.

21          MR. RAMEY:  Correct.

22          Thank you, Judge.

23          THE COURT:  All right.  I wasn't in any

24     way, when I talked about the computers, in my mind most

09:12:55 25     of this comes down to those computers.

1          So, yes, I understand the argument about

2     the documents and so forth, and I'll rule on that issue

3     and you can make your final argument associated

4     therewith, but as I see it right now, you're asking

09:13:10  5     Michael Grassi at some point during your case what

6     documents he still has that would be Alotech property.

7          And, of course, Mr. Pasternak says he's got

8     these 20 boxes' worth of documents, some of which he

9     agrees would be Alotech property.  Others would still go

09:13:25 10     back to Michael Grassi because of the term sheet allowing

11     him to keep certain documentation.

12          But the defendants' position is that

13     anything that is Alotech property should go to the

14     defendants, but then again that would beg -- you would

09:13:38 15     have to go then and review the 20 boxes of materials.

16          Correct?

17          MR. RAMEY:  Or I would have to, I guess.

18          We are bound by whatever order is in place.

19     They would have to represent that they're turning over

09:13:49 20     what's ours, and we would have to assume that what they

21     are keeping is legitimately theirs, documents and data.

22     Obviously there's electronic discovery and PDFs and

23     things like that.

24          THE COURT:  Right.

09:14:01 25          But Mr. Pasternak also indicated that he

1    would only turn that over once the settlement amount has

2    been paid.

3                    MR. PASTERNAK:  Yeah.  I'll safeguard

4    everything until the last payment, meaning that no

09:14:10  5    one's -- it's not going to leave my custody.

6                    MR. RAMEY:  Our difference on that is

7    pretty narrow.

8                    THE COURT:  Correct.

9                    MR. RAMEY:  Keep it in the meantime.

09:14:21 10                    THE COURT:  Right.

11                    MR. RAMEY:  Yes, Your Honor.

12                    THE COURT:  And then, of course, following

13    up with Mr. Michael Grassi as to whether or not he has

14    any of those documents or property that belongs to

09:14:29 15    Alotech.

16                    MR. RAMEY:  Understood, Your Honor.

17                    Thank you.

18                    THE COURT:  All right.  Then, so we've

19    narrowed the focus somewhat, which I thought would be the

09:14:37 20    primary focus of the hearing, so that's what I meant when

21    I talked about the computers.

22                    So with that said, Ms. Blum, your first

23    witness.

24                    MS. BLUM:  Thank you, Your Honor.

09:14:48 25                    We're going to call John Grassi as our

 1   first witness.
 2              Your Honor -- oh.
 3              THE CLERK:  You can go ahead and take the
 4   stand.
 5              Raise your right hand.
 6                   JOHN GRASSI,
 7         of lawful age, Defendant herein,
 8          being first duly sworn, was examined
 9              and testified as follows:
10              THE CLERK:  Thank you.
11              THE COURT:  Thank you.
12              Please be seated, and speak directly into
13   the microphone so our court reporter can hear you as well
14   as everyone else in the courtroom.
15              Thank you.
16              You may inquire.
17              MS. BLUM:  Thank you, Your Honor.
18              May I approach the witness and provide him
19   with a set of defendants' hearing exhibits for his easy
20   reference?
21              THE COURT:  Yes.
22         DIRECT EXAMINATION OF JOHN GRASSI
23   BY MS. BLUM:
24   Q.   Good morning, Mr. Grassi.
25   A.   Good morning.

1    Q.    I'll try to refer to you as John for sake of the

2    record since we have two Mr. Grassis who will be

3    testifying today.

4              John, could you introduce yourself, please,

09:17:05   5    to the Court and for the record?

6    A.    My name is John Grassi.  I am from Peachtree City,

7    Georgia.

8    Q.    Mr. Grassi, do you recall being in this courtroom

9    on December 5th, 2022?

09:17:17  10    A.    Yes, I do.

11    Q.    What happened on that day?

12    A.    On that day, we entered into a term sheet for

13    settlement relative to the litigation matter that's been

14    pending for some time.

09:17:31  15    Q.    Please turn in your exhibit book to Exhibit 43.

16    A.    I'm sorry?  What was the number?

17    Q.    43.

18              Do you recognize -- take a minute to look

19    at it, and tell me if you recognize the document.

09:17:53  20    A.    I do.

21    Q.    What is it?

22    A.    It's the binding and enforceable term sheet.

23    Q.    Who signed this document?

24    A.    I did on behalf of myself and Alotech, and Michael

09:18:07  25    Grassi did on behalf of himself and CFOM.

1    Q.    What were your goals in entering into this

2    settlement agreement?

3    A.    The objective that was understood was that Alotech

4    and myself would be able to move forward, move on in the

09:18:24  5    litigation matter, and Alotech would and John Grassi

6    would receive certain things in terms of the promises

7    made.

8              And I would be in -- obviously deliver on

9    my promises as well so Alotech can move forward.

09:18:42 10    Q.    How is that working out?

11    A.    Not very well.

12              We're here today.

13    Q.    Why is it not working out well?

14    A.    We have not received any of Alotech's property,

09:18:58 15    both tangible and intangible, to be returned that we've

16    asked for.

17    Q.    How does this failure to return -- to receive

18    return of Alotech's property affect Alotech and yourself?

19    A.    It's absolutely damaging.

09:19:16 20              The -- the issue is the items that we're

21    having and we're asking for within devices are data that

22    is trade secret information.

23              We're trying to move forward with business

24    activities.  Those business activities, no different than

09:19:37 25    the Honda agreement, requires due diligence.  You have to

```
 1   answer questions for those companies for the investments

 2   that are being made, and if you don't have the possession

 3   of your items that they're bargaining for, kind of makes

 4   it difficult to move forward and answer those questions.

 5   It makes it, frankly, impossible.

 6   Q.   So you're saying that if you aren't able to get

 7   return of Alotech's confidential information that's in

 8   Mike Grassi's hands right now, you will have trouble

 9   moving forward with business deals?

10   A.   Yes.

11   Q.   All right.  Is there any other impact to Alotech?

12   A.   Obviously the time spent pursuing this and having

13   to pursue the matters in the future, I'd like to avoid

14   that.

15   Q.   Is there any other impact to Alotech?

16   THE COURT:  What's the basis for this line

17   of questioning in terms of the impact to Alotech?

18   MS. BLUM:  The damage to Alotech is one of

19   the elements of enforcing the breach of contract.

20   THE COURT:  All right.  Damages in terms of

21   general?  Are you going to follow up with monetary, or

22   your position is generally they were damaged?

23   MS. BLUM:  Injunctive relief.

24   THE COURT:  All right.

25   MS. BLUM:  We want to have the Court
```

1     understand that this isn't just about two shell computers

2     that, you know, are worth a little bit of money.

3              This isn't about cleanup of information.

4     This is about something that's very real, very material

09:21:18 5     to Alotech's ability to use what it's bargained for, its

6     IP rights.

7              Alotech needs to be able to represent to

8     its current business partners and future partners that it

9     has complete control of its confidential information,

09:21:38 10     trade secrets.

11              And if they're out there loose in the

12     world --

13              THE COURT:  I think I understood that even

14     at the time we were talking settlement and the term sheet

09:21:46 15     was completed.

16              Would you stipulate to that, Mr. Pasternak;

17     to the extent that it is Alotech property, that there's

18     damage if they don't get it back?

19              MR. PASTERNAK:  Yes.  Except for the

09:21:56 20     carve-out, yes.

21              THE COURT:  I'm sorry?

22              MR. PASTERNAK:  Except for the carve-out in

23     the term sheet.

24              THE COURT:  Correct.

09:22:02 25              MR. PASTERNAK:  Yes.

          1              The stuff that -- they're entitled to the

          2   return of Alotech ablation technology, no question, and

          3   we're not disputing that.

          4              And they're also entitled to Alotech

09:22:15  5   property, sorry.

          6              THE COURT:  The question is whether or

          7   not --

          8              MR. PASTERNAK:  Correct.

          9              THE COURT:  -- these items are Alotech

09:22:19 10   property.

         11              MR. PASTERNAK:  That's right.

         12              THE COURT:  You would agree that if they

         13   are Alotech property, then to the extent they're not

         14   returned to Alotech or Mr. John Grassi, they are damaged.

09:22:31 15              MR. PASTERNAK:  No.  I don't agree with

         16   that.

         17              THE COURT:  All right.  Then go ahead,

         18   Ms. Blum.

         19              Again, keep an eye on the clock.

09:22:39 20              MS. BLUM:  Yes.

         21              Your Honor, that, that really is the

         22   evidence we wanted to put forward on the damage to

         23   Alotech.

         24              We think it is understood and should be

09:22:51 25   something easily stipulated to, but the evidence is now

```
         1   on the record, so I'll move on.
         2                   THE COURT:  Thank you.
         3   BY MS. BLUM:
         4   Q.   Mr. Grassi, Mike Grassi's -- John, Mike Grassi's
09:23:08 5   argument is that you don't really care about getting your
         6   property returned; you're looking for excuses to avoid
         7   paying the settlement money.
         8                   Is that true?
         9                   MR. PASTERNAK:  Objection.
09:23:18 10                  THE COURT:  Overruled.
        11   A.   No.  That's not true at all.
        12                   The settlement agreement is the term sheet,
        13   it's promises that are made.
        14                   I want to move on.  I wrote a check.  I
09:23:31 15  was -- it's being held.  I have it here.  I want to pay.
        16   I want my materials returned.
        17                   To simplify the importance, I became a
        18   vendor of Harley-Davidson with a single laptop with the
        19   information on it.  The stuff that's in it is
09:23:49 20  ablation-related.  Everything is ablation-related.  So
        21   that's Alotech.
        22                   I need my stuff back and returned.  So the
        23   promise to pay that out so I can move on with my life and
        24   Alotech, fine.  But I need to have it returned.
09:24:14 25  Q.   Looking at the term sheet, Exhibit 43, Paragraph 5,
```

|   | |
|---|---|
| 1 | do you see an obligation of Alotech to John Grassi -- |
| 2 | Alotech and John Grassi? |
| 3 | A.    Yes. |
| 4 | Q.    What is the obligation? |
| 09:24:29 5 | A.    I'll read it for you. |
| 6 | "Defendants shall return to Michael Grassi |
| 7 | within 20 days any items in the attached, to the extent |
| 8 | defendants have them still in their possession or |
| 9 | control, whether direct or indirect, as of the date of |
| 09:24:45 10 | this term sheet." |
| 11 | Q.    Did you do that? |
| 12 | A.    Yes, I did. |
| 13 | Q.    Tell the Court how you went about doing that. |
| 14 | A.    Excuse me?  Ask that -- |
| 09:24:54 15 | Q.    Tell the Court, please, how you went about doing |
| 16 | that. |
| 17 | A.    I personally went to Alotech. |
| 18 | I pulled out the e-mails and correspondence |
| 19 | in terms of what Mike Grassi had also -- had listed. |
| 09:25:11 20 | There is a page where he attached in the term sheet |
| 21 | written by hand several items. |
| 22 | I went to Alotech and searched for those |
| 23 | items physically myself in Alotech's facility. |
| 24 | Q.    And what did you find? |
| 09:25:34 25 | A.    I found a Bridgeport.  I found a tool cabinet.  I |

1  found a vice on the Bridgeport.  I found an injection

2  molding machine.  I found Mike's thermocouple welding

3  machine.  I found his cabinet with the tools or, I should

4  say, with the sight top.  There weren't any tools in it.

09:25:59  5          And I found a skid that was wrapped by my

6  personnel that were working at Alotech at the time that

7  had -- said cooktops prototypes, wrapped up on a skid.

8  Q.    Did you return everything you found?

9  A.    I did so, and I also, when I was looking around, I

09:26:22 10  had other document sheets in terms of what Mike claimed

11  to be his property.

12          I looked at those as well to make sure.

13          I found a few other items like a comparator

14  that he had listed out earlier on a term sheet -- not a

09:26:37 15  term sheet, but a list of an item, and so anything that

16  I -- there were some boxes of his records.  I collected

17  those and made them available for pickup.

18  Q.    So those items that you just described were not

19  part of the term sheet, but since you saw them in your

09:26:52 20  search, you included them in what you placed for Mike to

21  pick up?

22  A.    Absolutely.

23  Q.    Okay.  Did you find everything on Mike's list?

24  A.    On the term sheet list, no, I did not.

09:27:12 25  Q.    What did you -- what didn't you find that's on

 1   Mike's list, which is the last page of the term sheet?

 2   A.    I reported back that I did not find the machine

 3   shop equipment milling machine that had been discarded.

 4   Q.    Were there other items from this list that you did

 5   not find?

 6   A.    I did not find mills.

 7         I did -- let's see.  Tools.

 8   Q.    The tools in the cabinet you mentioned?

 9   A.    Tools in the cabinet, that was stated.  The cabinet

10   was empty.

11   Q.    All right.  And you said you -- who did you tell

12   about what you found and didn't find?

13   A.    I wrote it up in an e-mail, put the list together,

14   corresponded with my litigation team, and instructed back

15   to, I think it was, yourself in terms of what we had and

16   did a review.

17         So I asked you to write counsel, Mike's

18   counsel, to let him know so we could arrange a pickup.

19   Q.    All right.  And did your counsel contact Mike's

20   counsel to arrange a pickup?

21   A.    Yes.  In an e-mail correspondence.

22   Q.    All right.  Could you turn, please, to Exhibit 44

23   and tell me if you recognize that document?

24   A.    I do.

25   Q.    What is it?

|          |    |                                                              |
|----------|----|--------------------------------------------------------------|
|          | 1  | A.    It's an e-mail that -- from yourself to counsel for    |
|          | 2  | Mike, Mr. Pasternak.                                         |
|          | 3  | MR. PASTERNAK:  I'm going to object.                         |
|          | 4  | He's commenting on her e-mail?                               |
| 09:29:40 | 5  | THE COURT:  Correct.                                         |
|          | 6  | Sustained.                                                   |
|          | 7  | BY MS. BLUM:                                                 |
|          | 8  | Q.    Mr. Grassi, you said that you recognize this           |
|          | 9  | document.                                                    |
| 09:29:48 | 10 | Can you tell me why you recognize -- how                     |
|          | 11 | you recognize this document?                                 |
|          | 12 | A.    Because I directed you to correspond, to write         |
|          | 13 | this.                                                        |
|          | 14 | Q.    And did you receive a copy of this document?           |
| 09:30:00 | 15 | A.    I did.                                                 |
|          | 16 | MR. PASTERNAK:  Objection.                                   |
|          | 17 | THE COURT:  Sustained.                                       |
|          | 18 | MS. BLUM:  Your Honor, this is one of the                    |
|          | 19 | e-mails between counsel that I asked to be admitted by       |
| 09:30:21 | 20 | agreement of the parties because we don't want to put        |
|          | 21 | counsel on the record, and there's no -- there should be     |
|          | 22 | no reason to doubt the authenticity and the accuracy of      |
|          | 23 | these e-mails.                                               |
|          | 24 | They were exchanged between counsel.  No                     |
| 09:30:42 | 25 | one -- I am sure no one would make a representation          |

1    otherwise, that these are not what they appear to be, and

2    I would ask that the Court take judicial recognition of

3    these e-mails, of this particular e-mail.

4                THE COURT:  Mr. Pasternak, this e-mail is

09:30:57  5    directed to you.

6                Correct?

7                MR. PASTERNAK:  Yes.  I received it.

8                My point is that communication between

9    counsel is not evidence at whether or not the term sheet

09:31:09 10    was satisfied by the parties.

11                That's -- it's two separate issues.

12                MS. BLUM:  Your Honor, if I may --

13                THE COURT:  Go right ahead.

14                MS. BLUM:  If I may respond, Your Honor, it

09:31:23 15    is relevant not only because it shows that the

16    information about what was available was conveyed to

17    plaintiffs' counsel, but it also shows the date that it

18    was conveyed to plaintiffs' counsel so that we can

19    establish in evidence that Alotech performed its

09:31:46 20    obligations prior to the required date.

21                So it is evidence of performance of

22    obligations.  It's not the only evidence, but it is a

23    piece of the evidence.

24                MR. PASTERNAK:  Your Honor, may I?

09:32:12 25                THE COURT:  Direct me to the portion of

1    this e-mail that indicates what property was located by

2    John and was then available for pickup.

3                    Because he's testifying that he advised you

4    to send an e-mail to counsel to advise that he had found

09:32:27   5    certain property and make arrangements to have it picked

6    up.

7                    MS. BLUM:  That's right, Your Honor.

8                    It's on the second page of this e-mail.

9                    It starts off as, in the third paragraph,

09:32:41  10    "In this same spirit, we and the client have diligently

11    searched."

12                    THE COURT:  All right.  Can you limit,

13    then, your question to does the -- that portion of this

14    e-mail adequately reflect what you found?  Or something

09:32:55  15    to that effect.

16                    Because the bulk of the e-mail is really

17    associated with the dispute over what's Alotech property,

18    correct?  The first page is -- that's what I'm seeing.

19                    "We don't believe it's possible that Mike's

09:33:09  20    statement regarding Alotech property is accurate."

21                    I know there's a dispute about what

22    property is Alotech's, so that's the continuing theme in

23    all of these exhibits and the arguments of counsel.

24                    You're asking -- you've asked Mr. John

09:33:25  25    Grassi to testify about his compliance with the term

 1    sheet, to the extent that he went back and looked and

 2    found certain of the property that Mike had delineated on

 3    this sheet attached to the term sheet.

 4              And he's already testified what he found,

09:33:40  5    did not find, and added to that list, and provided you

 6    with that information that you then shared with

 7    plaintiffs' counsel.

 8              Is that the point of this e-mail?

 9              MS. BLUM:  That is one of the points of

09:33:53 10    this e-mail.

11              That's the point of this e-mail that is

12    relevant to the current testimony, yes.

13              THE COURT:  That's -- so ask, "Does this

14    adequately reflect or correctly reflect what you found

09:34:06 15    and told me to transmit to plaintiffs' counsel?"

16    BY MS. BLUM:

17    Q.   John, looking at Page 2 of Exhibit 44, beginning

18    with the paragraph that starts, "In this same spirit,"

19    could you please read to yourself that couple of

09:34:23 20    paragraphs and tell me if it adequately reflects what you

21    directed counsel to convey to counsel for Mike?

22    A.   I'll read it, and I did direct you to write this.

23              This is the list because I reviewed it a

24    couple times before it was sent to make sure it was

09:34:40 25    accurate, so I'll read it.

1          THE COURT:  You don't have to read it

2    again.

3              Just confirm that that's correct.

4              THE WITNESS:  That's correct.

09:34:46  5              THE COURT:  Thank you.

6    BY MS. BLUM:

7    Q.    All right.  And the e-mail reflects that this was

8    conveyed to Mike's counsel on December 16th.

9              Is that your recollection as well?

09:34:57 10  A.    Correct.

11   Q.    December 16th, 2022?

12   A.    Yes.

13   Q.    The items that we say in the e-mail are available

14   for pickup, did those items get placed by you for pickup

09:35:20 15  from Mike?

16   A.    Yes.

17   Q.    How do you know that?

18   A.    Because I worked with another gentleman that I had

19   help, and we put them in storage bins outside Alotech,

09:35:35 20  locked them, secured them, and notified yourself, our

21   counsel of record.

22              And then obviously that was transmitted

23   over to Michael Grassi through his counsel so --

24   Q.    Did the items placed for pickup get picked up by

09:35:52 25  Mike?

1    A.    They most certainly did.

2    Q.    And how do you know that?

3    A.    Because I had someone there witnessing.  And they

4    were in the containers; once they were emptied, were

5    locked up afterwards.

6    Q.    Are there, turning back to the term sheet, Exhibit

7    43, are there any other obligations in the term sheet

8    specific to Alotech and yourself as opposed to the

9    parties jointly or plaintiffs specifically?

10   A.    Yes.  Item Number 9.

11   Q.    Okay.  And what is that obligation in Item Number

12   9?

13   A.    It's clear.

14         "Subject to the representations and

15   warranties and the covenants and agreements above, the

16   defendants," Michael Grassi, "shall pay" -- or John

17   Grassi, excuse me, "shall pay the following to plaintiffs

18   at the following times."

19         So $1 million prior to December 31st or

20   before; 750 on or before August 15th, 2023; and then a

21   third payment of $750,000 on or before August 15th, 2024.

22   Q.    Did you make the payment of $1 million on or before

23   December 31st, 2022?

24   A.    No.

25   Q.    Why not?

       1    A.    Because he did not fulfill the subject to the
       2    agreement, the promise of returning Alotech's materials
       3    that we were asking for.
       4    Q.    Did you write a check in preparation -- for
09:37:24  5    Mr. Grassi, in preparation for fulfilling this
       6    obligation?
       7    A.    I did, to Michael Grassi, yeah, correct.
       8    Q.    And where is the check that you wrote?
       9    A.    I have it.
09:37:37 10    Q.    Okay.  Do you recall the date on which you wrote
      11    that check?
      12    A.    I think it was the 31st.
      13    Q.    Have Mike and CFOM returned Alotech's property to
      14    you?
09:37:59 15    A.    No.
      16    Q.    What was their settlement obligation around
      17    returning Alotech property?
      18    A.    Item 6, which goes through obviously the devices
      19    that we were very specific on, we don't have to repeat
09:38:16 20    that, I think.
      21    Q.    John, you mentioned Item 6.
      22              Item 6 of what?
      23    A.    Item 6 of the term sheet.
      24    Q.    Exhibit 43?
09:38:24 25    A.    Yes.

1    Q.    Okay.

2    A.    I apologize.

3    Q.    No, that's okay.  Go for it.

4    A.    So it says again, "Plaintiffs shall return to John

09:38:33  5    Grassi within 20 days all Alotech property, to the extent

6    plaintiffs have it still in their possession or control,

7    whether direct or indirect, regardless of when same came

8    into the possession or control of plaintiffs or was or

9    has been accessed by plaintiffs, including but not

09:38:52 10    limited to."

11            And again, it goes through the computers,

12    the storage devices, the media, and we make reference to

13    two specific computers that we are aware that Michael

14    Grassi, that we believe he has, due to information.

09:39:09 15            And so we specified it so there was no

16    argument to be made to scuttle the deal that was at hand

17    on December 5th.

18            So there's no need to argue over it.  We

19    listed it out specifically.

09:39:25 20            Then we're asking for, in Section B, "All

21    other files, data, reports," et cetera, which are part of

22    the e-mail correspondence and chains and all part of the

23    litigation which belongs to Alotech, the whole match.

24            It's very clear on that.

09:39:43 25            And then in terms of one of these devices,

1    I used it as a terminal for my own communications, so it

2    has "All passwords and/or other access or rights

3    credentials."

4                 So we're asking for that back and to be

09:40:01  5    returned without a fight for the settlement.

6    Q.    And what is your understanding of returning the

7    property?

8                 Does that mean sending you back a copy and

9    them keeping a copy for themselves, or what does "return"

09:40:15 10    mean to you?

11                 THE COURT:  You're just asking what it

12    means to him?

13                 Obviously it's part of the agreement,

14    right?

09:40:25 15                 You're asking him to interpret the

16    agreement?

17                 Doesn't it speak for itself?

18                 MS. BLUM:  We think it does, Your Honor.

19                 THE COURT:  Then there's no need for

09:40:35 20    testimony associated with it.

21    BY MS. BLUM:

22    Q.    Mike Grassi represented to Alotech on December 5th,

23    the night that the settlement agreement was being

24    negotiated and finalized, that he had no Alotech

09:41:03 25    property.

```
 1              Was that a concern of yours when the

 2   settlement agreement was being signed?

 3   A.    I never heard that on December -- no.

 4              If I heard you correctly, you're saying

 5   that he didn't have it on December 5th?  That's what I'm

 6   understanding?

 7   Q.    No.  No.

 8              I'm saying that on December 5th, Mike

 9   Grassi did say -- do you recall that Mike Grassi -- I'll

10   withdraw the question.

11              Mike Grassi on several occasions made the

12   representation that he did not have any Alotech property.

13              Was that a concern of yours?

14   A.    Yes.

15              MR. PASTERNAK:  Objection.

16              THE COURT:  When did he make those

17   representations?

18              You're testifying, so does Mr. John Grassi

19   know that he made those representations?  Did he hear it,

20   see it in an e-mail?

21              He has to have personal knowledge of it,

22   right?

23              That may have been represented to you.

24   BY MS. BLUM:

25   Q.    Mr. Grassi, are you aware that -- John, are you
```

1   aware that Mike represented on several occasions that he

2   did not have a computer of Alotech and he did not have

3   Alotech property?

4   A.    After December 5th through the correspondence up to

09:42:36  5   December 25th, thereafter, we continued to hear through

6   counsel, Michael Grassi's counsel, that they had nothing,

7   zero, which is -- I mean, of course, I mean it's obvious

8   he has our stuff.

9   Q.    How is it obvious?

09:42:57  10   A.    Well, we've got in the litigation what was turned

11   over by plaintiffs, we have, including our own, is the

12   e-mail correspondence where he takes trade secrets,

13   e-mails, the correspondence, like 157 document e-mails,

14   double that in the documents, it contains trade secret

09:43:20  15   information.

16            Okay.  And he's sending it to himself, and

17   so that material needs to be returned.  That's our

18   process information.  That's our data.

19   Q.    Mr. -- John, could you please turn to Exhibit 28?

09:43:44  20            Do you recognize that document?

21   A.    I do.

22   Q.    What is it?

23   A.    It's a list of various e-mails that Mike Grassi

24   took from -- Michael J. Grassi or Michael John Grassi,

09:44:00  25   excuse me, MichaelGrassi@Alotech.biz, and he forwarded

1    them to his personal e-mail account on, like, around July

2    5th, 2017.

3    Q.    What does it show about how many e-mails he sent to

4    himself on July 5th, 2017?

09:44:17  5    A.    He's sending to himself, if I -- could you please

6    repeat the question?

7    Q.    What does it show about how many e-mails he sent to

8    himself on July 5th, 2017?

9    A.    It shows about 57, 57 e-mails.

09:44:34 10    Q.    And do those e-mails --

11    A.    Approximately.

12    Q.    -- have attachments indicated?

13    A.    Yes.

14    Q.    And were there any other e-mails listed that were

09:44:47 15    sent to him, that he sent to himself on a day other than

16    July 5th, 2017?

17    A.    I believe somewhere in the early part of 2018,

18    February, he sent several e-mails.

19            I'm not sure how he did it, but he sent

09:45:04 20    himself a couple of e-mails as well.

21    Q.    All right.  We weren't going to review all of these

22    e-mails and the contents of them, but just for sampling

23    purposes, can you look at the titles on the exhibit list

24    and tell us what a couple of these -- the contents of a

09:45:25 25    couple of these e-mails, and why they're important to

1    Alotech?

2                      MR. PASTERNAK:  Your Honor, I'm going to

3    object.

4                      This, this document was created by counsel.

09:45:35  5    They're not showing the actual e-mails.

6                      So these titles and all this stuff was

7    created by them.

8                      THE COURT:  I understand.

9                      I'm going to get to the point right here.

09:45:44  10                      We are talking about the property that

11    defendants claim are Alotech property and that really is

12    part and parcel of the 20 boxes that Mr. Pasternak says

13    he has, right?

14                      Isn't this the subject of the discussion

09:45:59  15    that we had before the testimony began?

16                      MS. BLUM:  Your Honor, it goes beyond that.

17                      THE COURT:  I know that there's a computer

18    that contains --

19                      MS. BLUM:  It's not -- it's not just the

09:46:09  20    litigation material exchanged in discovery, but

21    it's -- this is an indication that Mike Grassi sent to

22    his personal e-mail documents and correspondence

23    belonging to Alotech.

24                      So it wasn't just that it was produced in

09:46:30  25    discovery.  It's that he has it separately on some of his

  1         systems somewhere because he sent it to himself.

  2                     And so that's the point of this, Your

  3         Honor.  It's not just what Mr. Pasternak has in his

  4         office.  It's also evidence of all that is in Mike

09:46:54  5    Grassi's control and possession separate and apart from

  6         those boxes in Mr. Pasternak's office.

  7                     THE COURT:  Do you disagree that

  8         Mr. Michael Grassi sent these e-mails to his personal

  9         account?

09:47:06 10                MR. PASTERNAK:  He did, and then he was

 11         able to download it to a disk or a flash drive, whatever,

 12         and that was it because the computer itself had died.

 13                     That flash drive was turned over to me at

 14         some point.  I then turned it over to Avalon along with

09:47:21 15    the supplemental discovery we did in January or February

 16         of 2022, and so he doesn't have it.  I have it and

 17         Avalon, which was the service to provide them the access

 18         to it, and it was all downloaded and that was it.

 19                     So I don't have -- even I don't have the

09:47:41 20    flash drive any more.  I just had the, you know, the

 21         access to the -- like they did, the server at Avalon.

 22         And it's all been -- and at that point now it's all been

 23         archived, and I have the boxes themselves.

 24                     THE COURT:  When you say it's been archived

09:48:00 25    but you have the boxes yourself, I'm still unsure what

1    you mean.

2                    MR. PASTERNAK:  The archive is the -- the

3    archive part is the electronic.

4                    THE COURT:  Where is it archived at?

09:48:09  5           MR. PASTERNAK:  Avalon, the service.  It's

6    a -- they do, you know, eDiscovery stuff.

7                    THE COURT:  Do the defendants have access

8    to that?

9                    MR. PASTERNAK:  Yeah, they did.  Yes.

09:48:21 10   Yeah.

11                   What happens is I hadn't provided it to

12   them so I provided them the same thing I got which was

13   the Avalon.  We both had access to it.

14                   THE COURT:  Okay.  So again we're back to

09:48:33 15  the same issue because this testimony is about -- I

16   understand what you're saying, Ms. Blum, it's not just

17   about what was produced in litigation and this

18   demonstrates that these e-mails were sent from

19   Mr. Michael Grassi from his Alotech computer to his

09:48:46 20  personal computer, but we're still talking about

21   documents, correct, that are, as I'm understanding what

22   Mr. Pasternak is saying, they're all in these 20 boxes.

23                   MR. PASTERNAK:  Yes.

24                   THE COURT:  So why are we going through

09:48:59 25  this if we -- can there be some agreement that the 20

1    boxes, or whatever is archived at Avalon or whatever,

2    contains property of Alotech?

3                MR. PASTERNAK:  And by the way, it can't be

4    unarchived until I give -- that's in my discretion as

09:49:14  5    well, meaning that there's a whole protocol there that

6    obviously they take seriously because they do this

7    eDiscovery all the time.

8                So that's in some sort of electronic

9    archive that can't be unlocked until I tell them to, or

09:49:27 10    something like that.

11                So in terms -- and the other thing is, Your

12    Honor, I can't really read it because it's too small, but

13    every one of these things has an Alotech Bates Number

14    which means these were all produced in discovery at some

09:49:40 15    point.

16                THE COURT:  Right.

17                But you're objecting on the fact that this

18    was created by defense counsel, and now he's being asked

19    about this but --

09:49:47 20                MR. PASTERNAK:  I'm objecting to the

21    categories.

22                If they want to show the e-mails, they want

23    to show the e-mails, but I'm telling you -- I understand

24    your point about the discovery or the documents.

09:49:56 25                To answer your question very bluntly I have

1       these boxes.  I have the discovery, the supplemental

2       discovery that we produced in, like I said, January,

3       February of 2022.

4                           THE COURT:  And the supplemental discovery?

09:50:09  5                 MR. PASTERNAK:  Yes.

6                           THE COURT:  Is what you found through the

7       computers that Mr. Michael Grassi had?

8                           MR. PASTERNAK:  Yes.

9                           What happened -- yes, to answer your

09:50:18  10    question was that, get more to the point, Michael had

11      given some stuff to his previous counsel Mark O'Brien.

12                          He thought that Mark just gave everything

13      to counsel.  He has no idea what Mark gave or didn't

14      give.

09:50:34  15                When I took over the case and the file was

16      brought to me, it was one little box.  And there was a

17      flash drive that included trial exhibits.  That's the

18      only thing I ever saw.

19                          And I'll represent to the Court that I told

09:50:47  20    Michael "There has to be more.  What about the

21      defendants' discovery?"

22                          That's when I asked the Court, I told the

23      Court at one of the pretrials, "I don't have anything, I

24      don't have the documents, the original documents that

09:50:58  25    defendants produced, I don't have the documents that Mark

1    O'Brien produced."

2              They then produced them to me through their

3    service, not Avalon but one of those type services, and

4    then I had Avalon print everything, which was the boxes.

5              Then in going through it, there was a

6    question about there seemed like there was e-mails

7    missing from Michael, and at the same time Michael is

8    trying to resurrect this stuff and he was able to do it,

9    and then that's that flash drive.

10             And they found more e-mails as well and

11   more documents, and then there was a supplemental

12   discovery by both parties.

13             That's how this whole thing -- at least

14   that's how these documents came into being.

15             Michael had nothing when he showed up at my

16   door, and whatever he gave, he gave to Mark.  And he

17   never saw anything.  Mark never gave him any discovery

18   from defendants.

19             I don't think Mark ever --

20             THE COURT:  All right.

21             MR. PASTERNAK:  Okay.

22             MS. BLUM:  Your Honor, this is important

23   here.

24             So they have represented that Mike found

25   his Alotech.biz Gmail account on a computer, he

|           |    |                                                          |
|-----------|----|----------------------------------------------------------|
|           | 1  | downloaded that, and gave it to counsel.                 |
|           | 2  | MR. PASTERNAK:  Yes.                                      |
|           | 3  | MS. BLUM:  And that that means Mike has                  |
|           | 4  | nothing.                                                 |
| 09:52:13  | 5  | First of all, we don't believe that Mike                 |
|           | 6  | has nothing, and that's the point of this evidentiary    |
|           | 7  | hearing.                                                 |
|           | 8  | We'll want to get Mike under oath to that                |
|           | 9  | point, and ultimately perhaps that issue can be dealt    |
| 09:52:30  | 10 | with by a certification from Mike Grassi.                |
|           | 11 | But the important point evidentiary of this              |
|           | 12 | exchange, Your Honor, is that they're talking about his  |
|           | 13 | Alotech.biz e-mail account.  The point we're making is   |
|           | 14 | that he sent these e-mails to his personal e-mail        |
| 09:52:54  | 15 | account.                                                 |
|           | 16 | THE COURT:  Yes, I understand that.                      |
|           | 17 | The objection --                                         |
|           | 18 | MS. BLUM:  So they're not just on his                    |
|           | 19 | Alotech.biz.                                             |
| 09:53:00  | 20 | THE COURT:  No, I understand that.                       |
|           | 21 | MS. BLUM:  Okay.                                          |
|           | 22 | THE COURT:  That's the whole reason I asked              |
|           | 23 | the question about I know that this shows that           |
|           | 24 | Mr. Michael Grassi e-mailed from the Alotech.biz account |
| 09:53:11  | 25 | to his personal computer.  That's why I was asking what  |

 1   happened to that information.

 2              Mr. Pasternak just explained it.

 3              You can certainly ask Mr. Grassi, you know,

 4   what he did with that computer or does he still have

09:53:22  5   these documents because even if he gave some to

 6   Mr. Pasternak, and I think there's some indication that

 7   this computer died or something, that's all to Michael

 8   Grassi.

 9              I don't think there's any real dispute that

09:53:34 10   he did this, is there?

11              MR. PASTERNAK:  No.

12              THE COURT:  That's what I'm getting at.

13              I think we can get to the point.  That's

14   why I was having Mr. Pasternak represent what's in the 20

09:53:43 15   boxes that he has.  It includes not just discovery

16   materials, it includes this.

17              And so you can ask Mr. Michael Grassi what

18   he does and does not have still himself because it sounds

19   to me like everything -- that Mr. Pasternak understands

09:53:58 20   that he has everything.

21              Right, Mr. Pasternak?

22              MR. PASTERNAK:  A hundred percent, Your

23   Honor.

24              THE COURT:  So again he's relying on

09:54:06 25   Mr. Grassi, Michael Grassi telling him that, but you'll

|   |   |
|---|---|
| | 1 |

1    have Mr. Michael Grassi under oath.

2                   And so I understand your position.  There's

3    no doubt in my mind that he did this.  It's been

4    acknowledged.

09:54:16  5                   MR. PASTERNAK:  Absolutely.

6                   THE COURT:  So I'm just trying to move this

7    along.

8                   I don't think we need to spend as much

9    time, but again I guess it's up to you, but it's 9:54.

09:54:28 10                   MS. BLUM:  Thank you, Your Honor.

11   BY MS. BLUM:

12   Q.    John, the term sheet specifies that there are two

13   computers identified very specifically as with serial

14   number and all, it specifies those as Alotech property.

09:55:03 15                   Is that -- do you see that?

16   A.    It's 43 again?

17   Q.    Exhibit 43.

18                   MR. PASTERNAK:  Your Honor, we'll stipulate

19   that the document speaks for itself.

09:55:16 20                   THE COURT:  I agree.

21                   Thank you.

22   BY MS. BLUM:

23   Q.    Turning to Exhibit 43, do you see in Paragraph 6A,

24   two computers that are specifically identified by serial

09:55:37 25   number?

1    A.    I do.

2    Q.    Are you familiar with those two computers?

3    A.    I do, and I'm going to make a comment.

4          It says Menz Media in there, and I need to

09:55:48  5    make sure this is understood.

6          You don't print this media.  This media is

7    something that's not tangible that you can put your hands

8    on and make a claim that you have everything.

9          It's screen write data for our process in

09:56:03 10    this correspondence, so for somebody to make a claim that

11    they verify that they have it, how?  No.

12          I need to have my -- this data, cloud data.

13    We're in a real world.  It's a cloud world.  It's not

14    paper documents.  So we really need to have our

09:56:21 15    information, our media back, which is on these drives

16    that seem to just break.

17          I mean, come on.

18    Q.    Is there -- is there any way to confirm what is on

19    a computer other than a forensic review of that computer?

09:56:38 20          MR. PASTERNAK:  Objection.

21    A.    No.  You need to do a forensics review at this

22    point.

23          THE COURT:  Did somebody say "Objection"?

24          MR. PASTERNAK:  What's that?

09:56:46 25          THE COURT:  I thought I heard somebody say

| | |
|---|---|
| 1 | "Objection." |
| 2 | MR. PASTERNAK:  I did. |
| 3 | THE COURT:  Yes, Mr. Pasternak. |
| 4 | MR. PASTERNAK:  I'm objecting. |
| 09:56:53  5 | She's asking a specific expertise issue, |
| 6 | and now he's giving a conclusion for the Court regarding |
| 7 | a forensic examination. |
| 8 | That's what I'm objecting to. |
| 9 | THE COURT:  Well, he certainly started |
| 09:57:03  10 | talking about Media Menz as that term is used in |
| 11 | Paragraph 6A, although not responsive to a specific |
| 12 | question.  He just wanted everybody to know. |
| 13 | But let me ask this question.  It's |
| 14 | specified in this paragraph what computers are to be |
| 09:57:16  15 | returned independent of ownership, whatever. |
| 16 | Why haven't they been returned? |
| 17 | MR. PASTERNAK:  Should I speak to that? |
| 18 | THE COURT:  I'd love to hear it. |
| 19 | MR. PASTERNAK:  Okay. |
| 09:57:26  20 | THE COURT:  I know what you put forth in |
| 21 | your briefing, but this is pretty specific. |
| 22 | MR. PASTERNAK:  It is. |
| 23 | The 6600 that's referenced, Michael does |
| 24 | not have. |
| 09:57:33  25 | THE COURT:  What happened to it? |

        1                 MR. PASTERNAK:  Well, he tossed it.

        2                 Now, here's the thing --

        3                 THE COURT:  Why would he agree to give it

        4        back if he tossed it?

09:57:40 5                 MR. PASTERNAK:  Because it says "Alotech

        6        property."

        7                 He knew when he left there he had no

        8        Alotech property, and he certainly did not know what the

        9        serial numbers were.

09:57:48 10                He knew leaving there, as was reasonable,

       11        "I have no Alotech computers."

       12                Now, the reason why we know that

       13        is -- well, we can get into it in discovery.

       14                THE COURT:  Again, even if he knows he

09:57:59 15      doesn't have it, you've specified it in the agreement.

       16                So I sat here, Mr. Michael Grassi -- I know

       17        you're making a face at me -- but I sat here and watched

       18        each of you, meaning John and Michael, review the term

       19        sheet and saw you each sign your respective original

09:58:18 20      signatures to two originals, let's say.

       21                I don't understand why you would include

       22        specific computers in this term sheet.

       23                MR. PASTERNAK:  Me?

       24                THE COURT:  Hold on.

09:58:28 25                MR. PASTERNAK:  Okay.

```
 1              THE COURT:  If Mr. Michael Grassi has
 2    always been of the understanding that he didn't have this
 3    property, why would it be specified?
 4              MR. PASTERNAK:  Well, we can get into why
 5    they specified it.
 6              We didn't specify it.  They specified.
 7              THE COURT:  It doesn't matter.
 8              They -- it was part of the agreement, so if
 9    they're specifying it --
10              MR. PASTERNAK:  Okay.
11              THE COURT:  -- why did you never come out
12    and say, "We can't agree to that; we don't have it"?
13              MR. PASTERNAK:  Well, we didn't
14    know -- honestly, at that moment we didn't have -- the
15    only thought we had was, and Michael's thought was, "I
16    don't have any Alotech computers so, therefore, the
17    serial number doesn't mean anything to me because I don't
18    have any Alotech computers."
19              THE COURT:  Again, but that goes right to
20    my argument.
21              If he's saying he has no Alotech computers,
22    doesn't have any Alotech property, computers or whatever,
23    and yet this is specifically put in there, how could he,
24    just generally denying that he has any Alotech property,
25    agree to give back these computers?
```

1          I don't understand it.

2              MR. SAKS:  Your Honor, if I may, the

3    conversation with counsel when the term sheet was

4    presented was that "We want Alotech computers back," and

09:59:38  5    we said, "We don't have any Alotech computers," because

6    when Michael left in June of 2017, he took two computers

7    that were his:  A Dell laptop and an ACER laptop.  That's

8    all he took, okay?

9          He did have a Dell 6600 laptop that he left

09:59:56  10   at Alotech, among a bunch of other computers.

11         And what you'll hear later today when

12   Mr. Michael Grassi testifies is that at some point in

13   mid-2018, John Grassi gave him back various computers,

14   including a Dell 6600.

10:00:12  15         That Dell 6600 became junked and got

16   disposed of sometime in the middle of 2022, okay.  But to

17   the extent that's the B & R laptop that John's talking

18   about, well, John gave it back to Michael.

19         The real rub is the 6800.  And to answer

10:00:31  20   your question, we're sitting here at 9:00, 10:00 o'clock

21   at night on December 5th.  The ask is, "Do you have any

22   Alotech laptops?"

23         And Mike's like, "No, I have my own

24   personal laptops," and so the clause says, "Alotech

10:00:45  25   property, including but not limited to X and Y."

10:01:00

1    We didn't know the serial number, there was

2    no way of looking up the serial number, but the starting

3    point being, "It's not Alotech property because I paid

4    for it and it's my personal computer that I'm using for

5    my personal stuff, my finances."

6              THE COURT:  You understand this doesn't

7    make any sense when read in conjunction with this

8    paragraph, it just doesn't.

9              I can't imagine -- I understand it was

10   late, and I misspoke when I said December 2nd.  It was

11   December 5th of 2022.

12             And, yes, I understood it was a long day,

13   but at the same time I don't know how you incorporate

14   specific laptop computers with serial numbers, et cetera,

15   into the term sheet.

16             MR. PASTERNAK:  Your Honor, there's --

17             THE COURT:  And not then give them back.

18             MR. SAKS:  Well, Your Honor, I understand

19   your question.  I hear what you are saying.

20             Our perspective was if the definition

21   begins and ends with Alotech property --

22             THE COURT:  No, it doesn't just begin and

23   end with that.  It specifies these computers.

24             That's my angst.  It specifies the

25   computers.

Case: 1:18-cv-02631-PAB Doc #: 215 Filed: 03/02/23 Page 237 of 264. PageID #:

1          If there was any issue associated with

2     whether or not Mr. Michael Grassi had them, they should

3     have been raised then.

4          I understand what you're saying is that,

10:02:00   5     "Oh, I don't have any Alotech property," but to the

6     extent that as part of this agreement or term sheet

7     they're specifying what they believe that he has that's

8     Alotech property and you've agreed to provide it, so I

9     don't know how you get around that.

10:02:15  10          MR. PASTERNAK:  Well, Your Honor --

11          THE COURT:  You can say that you don't have

12     it, and we'll hear from Mr. Michael Grassi about that,

13     and I'd love to hear from Mr. John Grassi.

14          But it was just represented by Mr. Saks

10:02:25  15     that, "Oh, Mr. John Grassi gave this computer back to

16     Michael Grassi in 2018."

17          I'd be curious if Mr. John Grassi doesn't

18     disagree with that, so it's going to come down to who I

19     believe.

10:02:36  20          MR. PASTERNAK:  Right.

21          There's also one last component, and you'll

22     hear about this, Your Honor, and that is this:  The 6800

23     that they referenced on December 5th had never been

24     mentioned in -- since 2017 up until December 5th.

10:02:49  25          They never made any claim to, conversion,

1      returning, anything.

2                    THE COURT:  That doesn't matter to me

3      because again, going back to what the agreement says,

4      there's two computers/laptops identified in the

5      agreement.

6                    So I understand it was late.  I understand

7      that you're looking at your client and he's saying, "I

8      don't have any Alotech property, I don't have their

9      computers, I gave this one back to John Grassi in '18,

10     this one died" or whatever the situation is.

11                   And you don't -- you don't think that you

12     should say to defense counsel, "You've specified this,

13     but we don't have those, so that can't be part of the

14     agreement"?

15                   MR. PASTERNAK:  Well, we couldn't -- we

16     would never have -- the requirement -- not the

17     requirement, but the point was we had to get that signed

18     that night, and I had no -- since he told us he had no

19     Alotech computers, that was enough for us, period.

20                   THE COURT:  No, it's not enough.  You know

21     why it's not enough?  Because you specified them here and

22     you signed it and Mr. Michael Grassi signed it.

23                   He never said, "I'm crossing this out

24     because I don't have them."

25                   That's what I don't understand.

```
 1              MR. SAKS:  Well --

 2              THE COURT:  If you don't have -- if

 3    Mr. Michael Grassi didn't have them, he never should have

 4    signed this agreement.

 5              MR. PASTERNAK:  Well --

 6              THE COURT:  Because he agreed to return

 7    them.

 8              MR. PASTERNAK:  No.  No.

 9              The 6600, actually it says, "Return if you

10    have it."

11              Now, the 6600 he does not have so he can't

12    return it.  He can only return -- the agreement is very

13    clear, he only has to return what he has.

14              The 6600 he does have --

15              MR. SAKS:  6800.

16              MR. PASTERNAK:  6800, rather, he does have

17    and the 6800 was always his.  There was never a dispute

18    about it, and it only has his personal stuff on it.

19              So the idea that he would even think that,

20    "My personal computer that I've been using that I had

21    used all those years and they never made a claim on, in

22    fact they dismissed their conversion claim before the

23    first trial, they dismissed all their claims regarding

24    conversion, and the fact that the 68 was never

25    mentioned," he had no knowledge or concept of, like, why
```

John Grassi                    56

1    would -- I mean, he doesn't know the serial number.

2                 "The 6800 I have is mine," that's all he's

3    thinking; "therefore I've complied."

4                 I understand -- I'm not disagreeing with

10:05:01  5    you.  I believe there's a conflict in the way it's

6    written.  I understand your point.  I'm not disagreeing.

7                 But the truth is in the context of this

8    case, the fact that Michael Grassi left in 2017 and

9    there's deposition testimony that he admits in 2017, "I

10:05:17 10    took my computer," they never made a claim to it, there

11    was no injunctive request by the Court, by any Court in

12    '17, '18, '19, '20, never saying, "Hey, you have to

13    return our stuff."

14                 And they did file a counterclaim, and that

10:05:31 15    counterclaim was dismissed on conversion, rather.  And so

16    they've never made a claim on that.

17                 And the fact that -- and there's a separate

18    issue with the tracking software which we believe is

19    obviously a very big deal.  They put software on Mike's

10:05:46 20    computer.  The reason why those two computers were

21    listed, because they knew something we didn't know.

22                 We didn't know the serial number.  We just

23    know we didn't have any Alotech property, but they've

24    been tracking him since '17 and using the Meraki software

10:06:05 25    against him since '17.  That's the big issue.

| | |
|---|---|
| 1 | And the fact is that the Meraki |
| 2 | software -- |
| 3 | THE COURT:  Why is that a big issue? |
| 4 | MR. PASTERNAK:  Because they're not allowed |
| 10:06:12  5 | to -- you can't -- you cannot spy on someone. |
| 6 | THE COURT:  No, no, that's a |
| 7 | different -- the big issue for me today is the term sheet |
| 8 | and what it means and what the responsibilities and |
| 9 | obligations of the parties are to it. |
| 10:06:24 10 | So that's a totally different issue that's |
| 11 | sort of a red herring when it comes to enforcing the term |
| 12 | sheet. |
| 13 | So that, you can take up with some other |
| 14 | cause of action against the defendants for doing just |
| 10:06:36 15 | that, but that's really not part of this hearing. |
| 16 | MR. PASTERNAK:  Okay. |
| 17 | THE COURT:  I understand you've made the |
| 18 | argument that they shouldn't have done that, that, you |
| 19 | know, they've been tracking it, he gave no permission |
| 10:06:47 20 | associated therewith, but that's not really what this |
| 21 | hearing is about. |
| 22 | This is about evaluating and enforcing at |
| 23 | the request of each side the term sheet as they -- as |
| 24 | they interpret it to mean. |
| 10:06:58 25 | MR. PASTERNAK:  And we -- I understand and |

1    get it, and we'll have to file a different lawsuit.

2          But the fact is that the 6600 does not

3    exist, the 6800 does exist, and we -- our contention is

4    it doesn't contain any Alotech information and it's his

5    computer, has always been his computer and was never,

6    ever used for Alotech ablation technology, period.

7          MS. BLUM:  Your Honor, the evidence will

8    show that Mr. Pasternak is just not well-informed on what

9    really is happening here, but --

10          MR. PASTERNAK:  Okay.

11          MS. BLUM:  -- may I have some clarification

12    on a representation that they just made?

13          They are now saying that Mike Grassi did

14    have the 6600, the B & R computer, he did have it in his

15    possession and he discarded it in 2018.

16          Is that what I just heard them say?

17          MR. PASTERNAK:  No.  No.  Let me be clear.

18          Michael, when he picked up one of his

19    pickups at Alotech, there was a Dell computer.  We

20    believe it was the 6600.  I have no idea anything about

21    it.  It was just a Dell computer.

22          That Dell computer was a Dyno-Pro Dell

23    computer that had Dyno-Pro stuff, and you can see that

24    from the spy software you guys have, and --

25          THE COURT:  Okay, stop.

|       | 1  | MR. PASTERNAK:  I'm just -- |

1        MR. PASTERNAK:  I'm just --

2        THE COURT:  Stop.

3        MR. PASTERNAK:  Okay.

4        THE COURT:  No, I'm saying stop with

10:08:24  5    reference to the spy computer.

6            Just make your argument associated with

7    that particular computer.

8            MR. PASTERNAK:  So the 6600 was Mike's

9    computer or the Dell computer.  It was not used with

10:08:34 10   ablation technology.  It was not used on the ablation

11   system.

12           It was always Mike's computer.  That Dell

13   computer was returned to him by Alotech.  Mike picked it

14   up, and at some point he discarded it because he didn't

10:08:47 15   need it because it was his.

16           And there was no claim on it, there was no

17   fight over it, so he discarded it.  And he discarded

18   it -- you can smile all you want, but your term sheet

19   says you could return that which you have.

10:09:02 20           On December 5th he did not have it, period.

21           MS. BLUM:  I'm smiling, Mr. Pasternak,

22   because until this day, Mike Grassi has been saying that

23   he does not have the 66 --

24           MR. PASTERNAK:  No.

10:09:15 25           MS. BLUM:  Let me speak.

10:09:27

10:09:42

10:09:59

10:10:20

10:10:32

1    He does not have the 6600.

2           In fact, his deposition testimony says so,

3    and his declaration says so.

4           MR. PASTERNAK:  No, you --

5           THE COURT:  Excuse me.  Excuse me.  Let

6    Ms. Blum speak.

7           MS. BLUM:  Paragraph 27 of his declaration

8    submitted in this briefing session says, "Defendants'

9    motion to enforce falsely argues that I have computers

10   and other property belonging to Alotech.  I do not.  I

11   never had possession of any Dell M6600 laptop computers,

12   including the Dell M6600 laptop the defendants are

13   referring to as their B & R laptop."

14          So that was his position in a sworn

15   declaration, and now Mr. Pasternak's making a different

16   representation.

17          It is also in our first round of this

18   trial, when we had a conversion claim to recover that

19   computer based on Mr. Grassi's, Mike Grassi's testimony

20   that he did not have that computer.  We dropped the

21   conversion claim, but Mr. Pasternak is now today

22   representing that he did have that computer.

23          MR. PASTERNAK:  No.

24          MS. BLUM:  So that's why this is a big

25   statement to us and why we cannot trust what is being

```
           1    said either by counsel or by Mike Grassi, Your Honor.

           2                    MR. SAKS:  Your Honor.

           3                    MS. BLUM:  And that's why we need

           4    independent verification of what is true.

10:10:51   5                    THE COURT:  When you say "independent

           6    verification," you're talking about --

           7                    MS. BLUM:  A forensic review of the

           8    computers at issue to --

           9                    THE COURT:  Which was part of your motion.

10:11:00  10                    MS. BLUM:  Yes, Your Honor.

          11                    THE COURT:  A subpoena, correct?

          12                    MS. BLUM:  Well, no.

          13                    THE COURT:  A subpoena?

          14                    MS. BLUM:  It would be producing the

10:11:08  15    computers that Mike Grassi has that are at issue here,

          16    and --

          17                    THE COURT:  Well --

          18                    MS. BLUM:  -- having a forensic review.

          19                    THE COURT:  That's part of the issue:  You

10:11:20  20    say he has them.  He says "I don't have them."

          21                    I can order him to produce it and he says

          22    "I don't have it," so really what is the final --

          23                    MS. BLUM:  Well, he says he does have the

          24    M6800 so that --

10:11:30  25                    THE COURT:  Right, but we're now talking
```

John Grassi                                              62

1    about the 6600.

2                    MS. BLUM:  Okay.  So speaking to the 6600,

3    he has said in his -- in multiple sworn testimony that he

4    never had it, and now they're saying that he did have it

10:11:43  5    and he disposed of it.

6                    So that's, you know --

7                    MR. SAKS:  Your Honor.

8                    MR. PASTERNAK:  Your Honor.

9                    MS. BLUM:  What do we do with that, Your

10:11:53 10    Honor?

11                    MR. PASTERNAK:  I don't like being,

12    especially in this context, to call my integrity into

13    question.

14                    This is what's going on, and especially --

10:12:01 15    and I'm sorry about the spy software -- but the whole

16    purpose of the serial number in the term sheet was to not

17    cause all these problems we see today.

18                    They never raised these issues with the

19    computer before today.

10:12:13 20                    THE COURT:  Do you really believe?

21                    MR. PASTERNAK:  Yes.

22                    THE COURT:  I don't believe that.

23                    MR. PASTERNAK:  Okay.

24                    THE COURT:  Because I know, because I was

10:12:17 25    privy to speaking with both sides, and after our

```
 1        discussions for all day long, the parties were able to

 2        agree.

 3                        So do I believe, based upon my interactions

 4        with all of you, that the defendant was using this as a

 5        ploy to somehow not settle the case?  Absolutely not.

 6                        Of course, my discussions were not part of

 7        any record.  I can just know what I -- the credibility

 8        and evaluation of the parties and their respective

 9        attorneys in terms of their desire, what they thought,

10        what they wanted, et cetera.

11                        So I, based upon what I at least understood

12        at that time, fully believed that Mr. Michael Grassi and

13        Mr. John Grassi wanted to settle this case and move on --

14        and move on.

15                        And I think that was true when I spoke to

16        both sides; get it resolved so both of you can move on.

17                        So if you want to say that this was a ploy,

18        I'm hard-pressed to believe that.

19                        MR. PASTERNAK:  As it relates to Michael

20        Grassi's declaration -- and the whole point, the whole

21        point is that they have been saying this 6600, not the

22        68, that the 6600 is a B & R, it's a very specialized

23        question, B & R laptop used for the ablation, Michael has

24        been very clear that he never took any B & R laptop used

25        for the ablation station.
```

```
 1              He was returned a Dell computer which we

 2    believe perhaps was a 66.  We don't know the

 3    serial -- the model number.  He was returned a Dell

 4    computer, and that Dell computer no longer exists.

 5              Now, if --

 6              THE COURT:  So you're saying both would

 7    have been a 6600, but they are different --

 8              MR. PASTERNAK:  I don't know that.  I don't

 9    know.

10              The only reason why we think his was a

11    6600, because they have the Meraki software which

12    shows -- they think they call it a 6600.  I have no idea.

13    I know it's a Dell.  I don't know the model number that

14    he used, but that computer no longer exists.

15              MS. BLUM:  Your Honor, we can move on with

16    testimony that will help clarify all of this.

17              We have the Meraki reports, we have a lot

18    of evidence about what was on the 6600 and the 6800, all

19    of the Alotech data that was on it.

20              We have a lot of evidence about how both of

21    those computers were used regularly at Alotech for

22    Alotech business and how the Meraki reports show that

23    they still have a large amount of data, equal to the

24    amount of data they had when they were last seen at

25    Alotech.
```

1          So we have all of that evidence.

2                Mr. Pasternak, you know, counsel, both

3     counsel can make representations to you, but we may just

4     have to go forward with the evidence to get that on the

5     record.

6                THE COURT:  All right.  But from what I'm

7     hearing, there's some confusion, at least the plaintiffs'

8     counsel is representing that there are two 6600s out

9     there; one is a Dell and one is a B & R?

10               MR. PASTERNAK:  No.

11               MS. BLUM:  No, Your Honor.

12               THE COURT:  I'm really confused.

13               MR. PASTERNAK:  All I'm representing is

14    that --

15               MS. BLUM:  The 6600 --

16               THE COURT:  Okay.

17               MS. BLUM:  The Dell -- I'm sorry, who would

18    you like to speak, Your Honor?

19               THE COURT:  The point is we're talking

20    about two specific computers that are listed in the term

21    sheet.

22               Now you're talking about the B & R, right?

23               MS. BLUM:  Your Honor, yes.

24               The Dell 6600 with a serial number listed

25    in the term sheet specifically says it is referred to as

1    the B & R laptop.

2                    THE COURT:  All right.

3                    MS. BLUM:  They are one and the same thing.

4                    THE COURT:  But Mr. Pasternak seemed to

10:15:54  5    indicate or intimate that they may be two different ones.

6                    MR. PASTERNAK:  Yeah, there's lots of Dells

7    that were used at the time.

8                    Michael does not have a B & R ablation

9    station laptop.  He didn't take that, period.

10:16:06 10                    And the only Dell, other than the one he

11    walked out with --

12                    THE COURT:  That's how you're explaining

13    what he said in his declaration?

14                    MR. PASTERNAK:  Yes.  A hundred percent.

10:16:16 15                    THE COURT:  Now, I only asked about

16    subpoenas, Ms. Blum, because in your motion you say you

17    respectfully request that the Court conduct a hearing and

18    upon such a hearing permit issuance of subpoenas to

19    confirm IP address, ownership and locations.

10:16:41 20                    MS. BLUM:  Yes, Your Honor.

21                    So getting the computers back and doing a

22    forensic review is a separate thing from confirming the

23    IP addresses.

24                    We have asked for plaintiffs to simply

10:16:58 25    admit that those are IP addresses associated with Mike

```
 1    Grassi.

 2                    THE COURT:  Aren't we getting the cart

 3    before the horse then?

 4                    Until we have the forensic analysis of

 5    these computers, how is this issue ever going to be

 6    resolved?

 7                    Because you're saying based upon what your

 8    expert has gleaned by reviewing these IP addresses that

 9    those computers have been in use by Michael Grassi at or

10    around his home, correct?

11                    MS. BLUM:  That -- you're right, Your

12    Honor, except the only point I would make is it's a fact

13    witness that we're putting forward who has the

14    information.

15                    Alotech's IT provider has the information

16    showing that both the M6600 referred to as the B & R

17    computer, and the M6800, both of which are specified in

18    the term sheet, have both been seen active in 2022.

19                    THE COURT:  Right.

20                    MS. BLUM:  At the same IP address, which is

21    located generally around Mr. Grassi's, Mike Grassi's,

22    home.

23                    So if Mike Grassi doesn't stipulate that

24    those -- that is his IP address, the subpoena would be to

25    the IP provider -- the IP address, Internet service
```

John Grassi                                              68

1    provider with that IP address, which is Spectrum.

2              So we would send a subpoena to Spectrum

3    requiring it to identify the owner of that particular IP

4    address, which we believe would show the owner is Mike

5    Grassi or CFOM.

6              And if Michael Grassi will stipulate that

7    this is his IP address, we don't need the subpoenas.  But

8    if he will not stipulate to that, then we would need a

9    subpoena to actually confirm more specifically than

10   Somerset, Ohio, that it is, in fact, Mike Grassi's home.

11             THE COURT:  Don't you really need that in

12   the ultimate analysis to see if he has these computers?

13             MS. BLUM:  Well, not as to the M6800

14   because he admits that he has that.

15             THE COURT:  Right.

16             Let's talk about the 6600.

17             MS. BLUM:  As to the M6600.

18             THE COURT:  That's what we're talking about

19   right now.

20             MS. BLUM:  He first said he didn't have

21   until today.

22             He now says he did have, and he has

23   discarded it in 2018, even though it was the subject of

24   our conversion claim, the specific subject of our

25   conversion claim, which raises a lot of separate issues,

John Grassi                                          69

 1    Your Honor, which I hope we won't have to get into.

 2                   But the IP address, the Meraki report shows

 3    that that M6600, the B & R computer, was active in 2022

 4    at the same IP address where the M6800 was active --

 5                   THE COURT:  Right.

 6                   MS. BLUM:  -- in 2022.

 7                   So that is indication that it exists still

 8    despite his representations.

 9                   THE COURT:  Correct.  Even though there's

10    been --

11                   MR. PASTERNAK:  Okay.  Sorry.

12                   THE COURT:  Mr. Pasternak.

13                   Even though they're saying there may be two

14    6600s, it's not the right one.

15                   MR. PASTERNAK:  Yeah.

16                   THE COURT:  Okay.  But beyond that, that's

17    my whole point, there's this big issue about the 6600,

18    things have been represented today that are different

19    than what was represented previously by Mr. Michael

20    Grassi.

21                   I'm sure that Mr. Michael Grassi will get

22    up and testify consistent with what he testified to in

23    his declaration, but in the final analysis, if he won't

24    stipulate that that's the IP address, then you're going

25    to need the subpoena to actually evaluate whether that

```
        1    6600 computer is alive and well and in the possession of

        2    Mr. Michael Grassi.

        3                   Correct?

        4                   MS. BLUM:  Yes, Your Honor.

10:20:43 5                 That, and a forensic review of the M6800

        6    will tell us a lot as well.

        7                   THE COURT:  Correct.

        8                   MS. BLUM:  Yes, Your Honor.

        9                   THE COURT:  But in terms of the 6600, which

10:20:51 10  is what we're talking about, it's going to be he's

       11    representing, she's representing, he declared, he

       12    declared something differently, he testifies one way,

       13    Michael Grassi testifies a different way.

       14                   So does it just come down to a credibility

10:21:05 15  issue?

       16                   MS. BLUM:  A lot of it does, Your Honor.

       17                   THE COURT:  Correct.

       18                   MS. BLUM:  Well, a credibility issue.

       19                   THE COURT:  Along with looking at

10:21:10 20  documents.

       21                   MS. BLUM:  And talking about what Mike

       22    Grassi and John Grassi say.

       23                   But you will see that we have people who

       24    have worked on these computers for Alotech who can

10:21:21 25  present evidence about what's on the computers and to
```

```
 1   establish that they are -- what's on the computers is

 2   Alotech property.

 3                 Alotech is not interested so much in the

 4   shell of the computers, you know, these old computer

 5   bodies that are not worth so much.

 6                 Alotech is interested very much and needs

 7   to secure what is on these computers, which is all of

 8   Alotech's --

 9                 THE COURT:  Right.  I understand.

10                 MS. BLUM:  Okay.

11                 THE COURT:  Mr. Pasternak.

12                 MR. PASTERNAK:  Yes.

13                 THE COURT:  This is not going to be

14   resolved today.

15                 You know that, right?

16                 MR. PASTERNAK:  Apparently not.

17                 I never said -- I said he picked it up in

18   2018.

19                 I didn't say it was gone in 2018.

20                 He picked up a Dell computer from Alotech

21   that was left for him in 2018.  Before December 5th,

22   2022, it was discarded, period.

23                 There is no -- there is no Dell, whether

24   it's a -- the only Dell we have or he has is the 6800.

25                 And that's -- and the issue then is -- I
```

1   understand maybe there's a disagreement regarding the

2   language, but the fact is is it Alotech property -- there

3   is a serial number -- to me that's a conflict, sorry, but

4   there is a 6800, there's no question, and he has it.

10:22:46   5                THE COURT:  Yeah, I know about the 6800.

6                I'm talking about the 6800 right now.

7                MR. PASTERNAK:  We have no other Dell.

8                THE COURT:  But the -- the evidence that's

9   been submitted and there will be testimony about is that

10:22:58  10   there is this Dell at or near Michael's residence.

11                Correct?

12                MS. BLUM:  That's correct, Your Honor.

13                MR. PASTERNAK:  Back in June of 2022.

14                Not since.

10:23:13  15                THE COURT:  That's when -- has there been

16   any supplement to that information, Ms. Blum?

17                MS. BLUM:  The Meraki reports show the last

18   time that particular computer was active was June of

19   2022.

10:23:27  20                That's correct.

21                THE COURT:  All right.  So you really can't

22   say what happened to it after June?

23                MS. BLUM:  We do not know, that's correct.

24                But, Your Honor, I think Mr. Mike Grassi's

10:23:50  25   credibility is in serious dispute here based on how many

John Grassi                                                    73

```
          1    different times he has said he doesn't have the M6600

          2    B & R computer versus saying now that he does have it.

          3               THE COURT:  Or did have it.

          4               MR. PASTERNAK:  No.

10:24:09  5               MS. BLUM:  Did have it.

          6               THE COURT:  First of all, he hasn't said

          7    anything today, Mr. Michael Grassi.

          8               MS. BLUM:  Correct.  His counsel is

          9    representing.

10:24:14 10               THE COURT:  His counsel is representing

         11    what he understands he would have been told by

         12    Mr. Michael Grassi, so in that regard, yes, there might

         13    be some discrepancy.

         14               But at the same time, Michael Grassi has

10:24:27 15    not testified yet, you would agree?

         16               MS. BLUM:  Yes, Your Honor.

         17               And the issue of Michael Grassi -- we can

         18    get Michael Grassi testifying.  We can get Michael Grassi

         19    to sign a sworn statement that he doesn't have

10:24:47 20    the -- this particular 6600 that we specified with the

         21    serial number and the B & R laptop; that he destroyed it.

         22               We can get that statement from him.

         23               THE COURT:  Well --

         24               MR. PASTERNAK:  Hold on.

10:25:00 25               MS. BLUM:  Your Honor --
```

 1                    THE COURT:  I'm trying to cut to the chase,

 2      okay?

 3                    MR. PASTERNAK:  Okay.

 4                    THE COURT:  We're dealing with each of

10:25:04 5      these issues one at a time.

 6                    First were the documents, right?  We sort

 7      of generally talked about those.

 8                    There was some testimony, nipped that in

 9      the bud because ultimately it will come down to the

10:25:16 10     documents, whether they were part of discovery or what

11      was transmitted from Mr. Michael Grassi from his Alotech

12      computer to his personal one.

13                    It's been represented that Mr. Pasternak

14      has all, copies of all that or there's a -- that they are

10:25:32 15     archived with Avalon.  You can ask Mr. Michael Grassi

16      does he have any of those documents.

17                    So if we try to narrow this -- so that's

18      sort of been not resolved, but we understand what the

19      issues are there.

10:25:44 20                   Now we're talking about the 6600 computer,

21      and you've heard what Mr. Pasternak has said.  You

22      don't -- haven't had the testimony yet from Mr. Michael

23      Grassi.  You're continuing with Mr. John Grassi.

24                    Can't there be a certification signed by

10:25:56 25     Mr. Michael Grassi and we can move on to the 6800?

John Grassi                                            75

```
            1            MR. PASTERNAK:  Yes.  We could sign it.
            2    Absolutely.
            3            THE COURT:  If that's what you're really
            4    looking for?
10:26:03    5            MR. PASTERNAK:  Yeah.
            6            MR. RAMEY:  I propose a certification, but
            7    not with regard to the 6600.
            8            Once we get him on the stand and I guess he
            9    gives the testimony he's going to give about where it is,
10:26:14   10    then Your Honor can't require production of something
           11    that's not in existence, we acknowledge that.
           12            THE COURT:  Right.
           13            I guess I'm trying to cut to the chase
           14    because it comes down to the fact that you don't believe
10:26:24   15    what has been represented by Michael Grassi, that he does
           16    not have this, then you might as well get him on the
           17    stand.
           18            And that should have been your first
           19    witness as upon cross-examination of Mr. Michael Grassi
10:26:35   20    because he's the one telling you "I don't have this."
           21            You think he does, or you're not sure.
           22            MR. RAMEY:  To be clear, he said in his
           23    affidavit, "I've never had a 6600."
           24            Now --
10:26:45   25            THE COURT:  And you can use that.
```

1    MR. RAMEY:  Once we get him on the stand,

2    to answer your question, all we can ask for at that point

3    in time is what relief he can give us, which is require

4    him to certify.

10:26:57 5    And I guess at the end of this we'll

6    propose orders and we'll all have our relief, and you'll

7    circle what's important, Judge.

8    THE COURT:  All right.  I thought,

9    Ms. Blum, you wanted him to sign a certification right

10:27:08 10    now to the effect he doesn't have that.

11    MS. BLUM:  No, Your Honor.

12    No, Your Honor.

13    I think we do need to get him on the stand

14    to understand fully what he says he has and what he says

10:27:23 15    he doesn't have as of today.

16    THE COURT:  To me, he should have been the

17    first witness.

18    MS. BLUM:  Yes, Your Honor.  He was our

19    second witness, so we plan to call him.

10:27:30 20    THE COURT:  I understand you had to put

21    some basics down and I understand you've got to establish

22    the elements of the breach of contract to enforce the

23    agreement and so forth, but I think the gist of this

24    whole hearing is I think, Mr. Pasternak or plaintiffs'

10:27:45 25    counsel, it's really an issue of fact.

|            |    |                                                          |
|------------|----|----------------------------------------------------------|
|            | 1  | It's really an issue of does Mr. Michael                 |
|            | 2  | Grassi have what you claim or believe he has.            |
|            | 3  | Right?                                                    |
|            | 4  | MS. BLUM:  Yes.  Yes, Your Honor.                        |
| 10:27:52   | 5  | And based on the Court's interests and                   |
|            | 6  | suggestion, may we interrupt?                            |
|            | 7  | THE COURT:  Get Mr. Michael Grassi on the                |
|            | 8  | stand.                                                    |
|            | 9  | John Grassi, you can continue with your                  |
| 10:28:03   | 10 | direct of him, and then of course --                     |
|            | 11 | MS. BLUM:  Afterwards, yes.                              |
|            | 12 | THE COURT:  Yes.                                          |
|            | 13 | MR. PASTERNAK:  Can we just take a quick                 |
|            | 14 | break?                                                    |
| 10:28:10   | 15 | THE COURT:  Remember, we're definitely                   |
|            | 16 | taking a quick break because it's 10:28 and I said at    |
|            | 17 | 10:30 we would.                                           |
|            | 18 | So we'll be in a 15-minute recess.                       |
|            | 19 | MR. PASTERNAK:  Okay.                                     |
| 10:28:22   | 20 | THE CLERK:  All rise.                                     |
|            | 21 | (Recess taken.)                                           |
|            | 22 | - - - - -                                                |
|            | 23 |                                                          |
|            | 24 |                                                          |
|            | 25 |                                                          |

```
        1              THE COURT:  Please be seated.

        2              Next witness.

        3              MR. RAMEY:  With Your Honor's guidance,

        4   we'll call Mike Grassi to the stand.

10:58:38 5             THE COURT:  Thank you.

        6              THE CLERK:  Please raise your right hand.

        7                    MICHAEL GRASSI,

        8         of lawful age, a Plaintiff herein,

        9           being first duly sworn, was examined

10:58:50 10            and testified as follows:

       11              THE CLERK:  Thank you.

       12              THE COURT:  Please be seated.

       13              Speak directly into the microphone so

       14   everyone can hear you.

10:58:55 15            And, Mr. Ramey, you may inquire.

       16              MR. RAMEY:  Yes.  Thank you, Your Honor.

       17              I asked you earlier to shoe me along.  I

       18   think you've done that, so I'm going to move as quickly

       19   as I can.

       20              CROSS-EXAMINATION OF MICHAEL GRASSI

       21   BY MR. RAMEY:

       22   Q.    Please state your name for the record, sir.

       23   A.    Michael Grassi.

       24   Q.    Let's address a couple of the things that Your

10:59:16 25   Honor raised this morning and counsel discussed.
```

|  | 1 | Have you reviewed the Meraki reports in |
|---|---|---|
|  | 2 | this case that were attached to our affidavits with our |
|  | 3 | filings? |
|  | 4 | A.    I have. |
| 10:59:22 | 5 | Q.    Have you seen the IP addresses, the public IP |
|  | 6 | addresses that reflect that those laptops, meaning the |
|  | 7 | 6800 and the B & R, are reporting in from a certain |
|  | 8 | location? |
|  | 9 | A.    I have. |
| 10:59:35 | 10 | Q.    Are those your IP addresses? |
|  | 11 | A.    I believe they may be. |
|  | 12 | Q.    Do you know whether they are or not? |
|  | 13 | A.    I never, as far as I know -- I may not have checked |
|  | 14 | or I checked. |
| 10:59:46 | 15 | I can't recall. |
|  | 16 | Q.    You don't even know if you checked? |
|  | 17 | A.    Well, I may have checked. |
|  | 18 | They could be, but I don't know. |
|  | 19 | THE COURT:  Did you or did you not check? |
| 10:59:58 | 20 | THE WITNESS:  I checked. |
|  | 21 | THE COURT:  Okay.  Thank you. |
|  | 22 | BY MR. RAMEY: |
|  | 23 | Q.    You did check? |
|  | 24 | A.    I checked. |
| 11:00:02 | 25 | Q.    Are they your IP addresses? |

Case: 1:18-cv-02619-PAB Doc #: 2151 Filed: 03/04/23

1    A.    I believe they look and appear to be.

2              THE COURT:  I'm sorry, sir.

3              Are they or are they not your IP address?

4              THE WITNESS:  I would say they are.

11:00:15  5    THE COURT:  Then the answer is yes.

6              Correct?

7              THE WITNESS:  Correct.

8              THE COURT:  Thank you.

9    BY MR. RAMEY:

11:00:19 10   Q.    You understand you're under oath, Mr. Grassi.

11              Correct?

12   A.    I do.

13   Q.    Let me start with a point that we discussed earlier

14   in the hearing to get through the first issue which is

11:00:40 15   documents and data.

16              You understand that your lawyers are in

17   possession of thousands of documents and e-mails that

18   were produced in this case, correct?

19   A.    That's correct.

11:00:50 20   Q.    Okay.  Do you have the plaintiffs' exhibit book in

21   front of you there on the stand; white binder?

22              THE COURT:  I can hand it to him.

23              MR. RAMEY:  Thank you, Your Honor.

24              THE COURT:  Although do you have another

11:01:07 25   copy, Mr. Pasternak?

```
         1                Then I can at least look at it.  (IP).
         2                MR. RAMEY:  I'm sorry, defendants', the
         3      white binder.
         4                MR. SAKS:  Defendants'?
11:01:29 5                MR. RAMEY:  Yeah, I'm sorry.
         6                It was up there.
         7                May I approach the witness?
         8                THE COURT:  Yes.
         9      BY MR. RAMEY:
11:01:41 10     Q.   Mr. Grassi, turn to Exhibit 43 in that book, the
        11      term sheet.
        12                MR. RAMEY:  Do I need to move to admit that
        13      formally, Your Honor?
        14                THE COURT:  I'm sorry?
11:01:52 15               MR. RAMEY:  Do we need to move to admit
        16      that formally as an exhibit?
        17                THE COURT:  Number 43?
        18                MR. RAMEY:  Yes.
        19                THE COURT:  You can do so, certainly.
11:02:00 20               MR. RAMEY:  We move to admit 43,
        21      defendants'.
        22                THE COURT:  Any objection, Mr. Pasternak?
        23                MR. PASTERNAK:  No.
        24                THE COURT:  So admitted.
11:02:07 25
```

Michael Grassi - Cross                              82

1    BY MR. RAMEY:

2    Q.    That's your signature on Page 4, correct, Mike?

3    A.    Correct.

4    Q.    Okay.  So I want to talk about a distinction that

11:02:13  5    was raised --

6    A.    I'm having a very difficult time hearing you.

7    Q.    Okay.

8    A.    Is my microphone on?

9              THE CLERK:  I'm going to go ahead and give

11:02:26 10    you a lapel mic.

11             MR. RAMEY:  Okay.

12             THE CLERK:  Because you're coming across

13    very quiet.

14             MR. RAMEY:  Okay.

11:02:43 15    BY MR. RAMEY:

16    Q.    Can you all hear me now?  Better?

17    A.    Not really.

18    Q.    How about now?

19    A.    A little better.

11:02:58 20    Q.    How about now?  No?

21             MR. RAMEY:  Your Honor.

22    A.    I'll just ask if I can't hear.

23    Q.    I'll speak into it this way.

24             How about that?

11:03:08 25    A.    That's better.

1  Q.   I feel like I'm at an awards ceremony.

2          On Page 2, Paragraph -- sorry -- Page 1,

3  Paragraph 4, it talks about the terms of the 2012

4  agreement that was agreed by the parties that night to be

11:03:26  5  enforceable, correct?

6  A.   Correct.

7  Q.   Okay.  And there's a carve-out in there that we had

8  all talked about and negotiated that the definition of

9  "work product" in there wouldn't include certain things

11:03:39  10  that didn't involve ablation.

11          Right?

12  A.   That's correct.

13  Q.   And you heard your lawyer make that distinction

14  this morning about what you're entitled to retain,

11:03:46  15  correct?

16  A.   That's correct.

17  Q.   Okay.  Take a look at Paragraph 6, though, and

18  we've talked about that this morning, too.

19          6A talks about some computers that are

11:03:56  20  specified that you're supposed to return, correct?

21  A.   Correct.

22  Q.   And then 6B lists all other files or data, reports,

23  videos or information relating to Alotech or any work

24  done for Alotech by or on behalf of Mike Grassi or your

11:04:10  25  company CFOM, correct?

```
        1    A.    Correct.

        2    Q.    And there's no carve-out to those things that

        3    you're supposed to return in terms of nonablation work,

        4    right?

11:04:17 5              You're required by 6B to send all that

        6    stuff back to John Grassi, correct?

        7    A.    No, I don't interpret it that way at all.

        8    Q.    You don't think 6B says what it says in that

        9    regard?

11:04:28 10   A.    It would be impossible for me to have a carve-out.

       11    Q.    Pardon?

       12    A.    It would be impossible for me to have a carve-out

       13    if you're referring to all the stuff I carved out, to

       14    return back what I carved out.

11:04:38 15   Q.    Okay.  6B requires you to return back to John

       16    Grassi within 20 days all Alotech property including but

       17    not limited to, B, all other files or data, reports,

       18    videos or information relating to Alotech or any work

       19    done for Alotech by or on behalf of CFOM Inc. or Mike

11:04:56 20   Grassi.

       21              Correct?

       22    A.    That's what it's stating.

       23    Q.    Are you in possession of any of that kind of

       24    material, files, data, reports, videos, information,

11:05:03 25   documents?
```

```
 1   A.   I have retained everything that's in the carve-out,
 2   and I have that.
 3   Q.   And what does that include?
 4   A.   It includes anything that's not ablation.
 5   Q.   Okay.  But that might include work that you've done
 6   for Alotech on behalf of CFOM?
 7   A.   No.  I did that work on behalf of CFOM.
 8            I didn't do it on behalf of Alotech.
 9   Q.   Does any of the things that you retained relate to
10   Alotech in any way?
11   A.   That gets into the definition of what "ablation"
12   is.
13   Q.   Okay.
14            MR. RAMEY:  I'm sure Your Honor understands
15   where I'm going with this so there's a distinction; we'll
16   argue and brief that later.
17   BY MR. RAMEY:
18   Q.   But in any event, you've retained things that are
19   covered by 6B, correct?
20   A.   I can't hear you.
21   Q.   Have you retained information, data and documents
22   that are covered by 6, Section 6B of our agreement?
23   A.   I have covered -- or I have retained those items
24   that are the carve-out which would be the mass flow
25   controllers, anything having to do with making a mold, et
```

1    cetera, those that are listed in the carve-out.

2    Q.    Okay.  Do any of those relate to Alotech under 6B

3    or work that you did or CFOM did for Alotech?

4    A.    No, I did not do that work specifically for

5    Alotech.

6    Q.    Do you have any information in your possession that

7    relates to Alotech?

8    A.    You'd have to ask me, like, what specifically.

9    Q.    That's the point.

10              I don't know what specifically you might

11   have.

12              I'm asking you what the agreement requires.

13              Do you have files, data, reports, videos,

14   or information relating to Alotech or any work you or

15   CFOM did for Alotech; yes or no?

16   A.    The answer then would be no because I did not do

17   any of that work for Alotech.

18   Q.    So you have no such information?

19   A.    I have the information which I keep repeating

20   myself, it's the carve-out, period.

21   Q.    And none of that relates to Alotech, correct?

22   A.    If John claims it is, then we have a dispute.

23              I'm saying ablation does not meet that.

24   Q.    I'm asking you if you believe any of that relates

25   to Alotech.

1    A.    No.

2    Q.    All the documents that were produced in this case

3    by the lawyers, do you -- have you retained copies of

4    those, any of those?

11:07:34  5    A.    I have turned everything over, to my knowledge, to

6    Michael Pasternak.

7    Q.    Have you done a search for what you might have on

8    various laptops or devices or computers at your house?

9    A.    I have tried to keep it to the one computer, the

11:07:48 10   M6800.

11   Q.    You've only searched one computer?

12   A.    That's because I moved everything to the M6800.

13           I don't have that many other computers.

14   Q.    Okay.  All I'm focusing on for now -- we'll get to

11:07:59 15   computers in a minute -- I'm focusing right now on what

16   you've done to make sure you've divested yourself of any

17   information that might be covered by Section 6B of our

18   agreement.

19           You say --

11:08:09 20   A.    There would be no other computers.

21   Q.    All right.  Have you searched on all your computers

22   and devices for materials that might be covered by

23   Section 6B of our agreement?

24   A.    Yes, I have, to the extent those computers work.

11:08:21 25   Q.    Have you retained any of those?

```
          1    A.    The computers?

          2    Q.    The information -- Michael --

          3    A.    No.

          4    Q.    -- you know what I'm talking about.

11:08:31  5    A.    No, I have not.  To my knowledge I do not.

          6    Q.    What computers do you have in your possession that

          7    don't work that might have that information that you

          8    haven't searched?

          9    A.    I have a very old Labview computer.

11:08:41 10    Q.    Anything else?

         11    A.    I have an old -- I'd have to look at my list, but

         12    they weren't working.

         13    Q.    And you haven't searched them for these data that

         14    might exist?

11:08:54 15    A.    Well, I can't do that if they're not working.

         16    Q.    Have you searched the physical premises of an

         17    office or any storage you have or your home to make sure

         18    you don't have any of this data?

         19    A.    Yes.

11:09:07 20    Q.    Okay.  Did you find any?

         21    A.    I turned everything over.

         22    Q.    Okay.  And as far as you know, you're not retaining

         23    anything that is Alotech data or information, correct?

         24    A.    That's correct.

11:09:16 25    Q.    What about, say, the videos that we argued about
```

1    earlier in this case that you took on your phone of

2    Alotech processes; where are those?

3    A.    I believe I turned those over as well to Michael.

4    Q.    I'm not asking what you believe.

11:09:29  5              Did you, in fact, turn all of them over and

6    have you retained any of them?

7    A.    I don't believe I have any.

8    Q.    Okay.  Yes or no, do you have any of those videos

9    still?

11:09:37 10    A.    To my knowledge, I do not.

11    Q.    Have you searched all of your phones and devices to

12    see if you have any?

13              For instance, there are seven or eight

14    videos that your lawyers marked as exhibits in this trial

11:09:47 15    that are of Alotech processes back when you were claiming

16    that that was your work.

17              We want to make sure you're not keeping

18    that.

19              Have you looked to see if you have those?

11:10:00 20    A.    I believe -- I did not check in the past, say, 30

21    days, but prior to that, it was removed from my files --

22    Q.    Have you -- have you checked your --

23    A.    -- from the telephone, yes.

24    Q.    Have you checked since December 5th when we signed

11:10:14 25    our agreement?

1    A.    Well, I know I don't have it on my new cell phone.

2    Q.    Not my question.

3               I'm asking after we agreed what the terms

4    were on December 5th, did you go back and look through

5    all of your devices and your locations to see if you had

6    any of these things like the videos I'm asking you about

7    now?

8    A.    I looked through everything that I possibly could.

9    I may have forgotten to look on my cell phone, to be

10   honest.

11   Q.    And, in fact, the videos we were talking about were

12   taken on your cell phone; that's what your lawyer

13   represented to us, right?

14   A.    Not on this cell phone, no.

15   Q.    A different cell phone?

16   A.    Yeah, a very old.  I don't have that cell phone any

17   more.

18   Q.    And have you looked on your existing cell phone for

19   Alotech e-mails, Alotech videos, Alotech data of any

20   kind?

21   A.    There's nothing on my cell phone.

22   Q.    But my question is did you look?

23   A.    Definitely.  Definitely.  There's nothing on my

24   cell phone.

25   Q.    Do you believe, other than what you're claiming the

Michael Grassi - Cross                91

1    carve-outs which we might have some disagreement about,

2    do you believe you have the right to retain any Alotech

3    information or data or communications?

4    A.    No.  I have no interest in it.

11:11:10  5          I do not -- I'm answering your question.  I

6    do not have the right to do that.

7    Q.    I don't want to go through all these e-mails

8    because I think the Judge knows where we're going with

9    that, but let me just show you an exemplar.

11:11:23  10         If you would turn to Defendants' Exhibit 20

11   in the binder in front of you.

12          Are you there?

13   A.    Yes.

14   Q.    Okay.  That's an e-mail from your Alotech account

11:11:49  15  to your personal account on July 5th.

16          That's after you left Alotech, correct?

17   A.    Correct.

18   Q.    And that's you forwarding a document to yourself,

19   right?

11:11:58  20  A.    Yes.

21   Q.    Specifically, there you're forwarding a

22   Harley-Davidson proposal, correct?

23   A.    Correct.

24   Q.    Okay.  Take a look at Exhibit 21.

11:12:09  25         That's a similar e-mail of you forwarding

```
           1   to yourself the Honda contract, correct?

           2   A.    Correct.

           3   Q.    And on Page 2 of that or 3 of that document, we can

           4   see that that's marked confidential.

11:12:26   5                   That's the -- that's the ablation contract

           6   between Alotech and Honda, correct?

           7   A.    On Page what?

           8   Q.    The third page of that exhibit.  It says

           9   "Development and license agreement."

11:12:37  10   A.    Okay.

          11   Q.    Okay.  That, it says "Confidential" there, right?

          12   A.    Yes.

          13   Q.    You forwarded that to yourself, correct?

          14   A.    Yes.

11:12:44  15   Q.    Okay.  And it's -- the essence of Alotech's

          16   ablation work for Honda is embodied in that agreement,

          17   correct?

          18   A.    Yes.

          19   Q.    Okay.  We've got a lot of these e-mails that you

11:12:56  20   sent to yourself and a lot of attachments.

          21                   MR. RAMEY:  But, Your Honor, we move to

          22   admit Exhibits 20 and 21 of the defendants.

          23                   MR. PASTERNAK:  No objection.

          24                   THE COURT:  Thank you.

11:13:11  25                   So admitted.
```

| | |
|---|---|
| 1 | MR. RAMEY:  I won't go through all of them, |
| 2 | Your Honor.  I'm going to just ask general questions. |
| 3 | BY MR. RAMEY: |
| 4 | Q.   You saw a list of documents that you were shown |
| 11:13:20  5 | earlier or that Mr. Grassi testified to earlier, John |
| 6 | Grassi, about e-mails you forwarded to yourself. |
| 7 | What have you done with all those things |
| 8 | you forwarded to yourself in July of 2017? |
| 9 | A.   Well, I would have handed those to Mark O'Brien. |
| 11:13:34 10 | Q.   Okay.  But they went to your personal Alotech |
| 11 | e-mail, which was MichaelJGrassi@Gmail.com, right? |
| 12 | A.   Yes. |
| 13 | Q.   You still have access to that e-mail, correct? |
| 14 | A.   I do. |
| 11:13:48 15 | Q.   And those e-mails are still in there, correct? |
| 16 | A.   I do not know. |
| 17 | I could have deleted those. |
| 18 | Q.   Did you delete them? |
| 19 | A.   I -- I don't know if I did or didn't at that point. |
| 11:13:57 20 | Q.   When you just testified that you went through |
| 21 | everything to make sure you weren't retaining any Alotech |
| 22 | data, did you go through your old e-mails to see how much |
| 23 | Alotech stuff you had there? |
| 24 | A.   I was focused on the computers. |
| 11:14:06 25 | Q.   Is the answer no, you didn't do that? |

 1    A.    No, I did not do that.

 2    Q.    Okay.

 3                MR. RAMEY:  I'll move on, Your Honor, and

 4    we'll deal with that, I guess.

11:14:15  5                THE COURT:  I have a question for

 6    Mr. Grassi.

 7                MR. RAMEY:  Yes.

 8                THE COURT:  You indicated specifically in

 9    reference to the questions about the videos -- because I

11:14:23  10    remember the videos being shown at the first trial in

 11    this matter of the ablation technology -- you said that

 12    you had those on your phone.

 13                That was -- that's evident in the briefing

 14    and the exhibits and so forth, and you just confirmed

11:14:36  15    that.

 16                And you said you got rid of your phone,

 17    correct; your other cell phone?

 18                THE WITNESS:  Yes, I downloaded those from

 19    the phone.

11:14:44  20                THE COURT:  You downloaded from your

 21    personal cell phone that you now no longer have

 22    somewhere, correct?

 23                THE WITNESS:  I -- yeah, that's correct, I

 24    do not have the cell phone, and I downloaded those videos

11:14:55  25    which I took on that cell phone, and then those would

1       have gone to my Dell M6800.

2                       THE COURT:  So you do have them?

3                       THE WITNESS:  No, I deleted those.

4                       THE COURT:  I don't think you testified

11:15:10  5     that you deleted the videos.

6                       You testified that you looked at everything

7       and they weren't there, and the only thing you didn't

8       check in the last 30 days was your old -- or new cell

9       phone and they wouldn't be there.

11:15:21  10                    So now I'm confused.

11                      I thought you said just now that you

12      downloaded them onto your 6800, and then you just

13      testified you deleted everything.

14                      I'm confused.

11:15:35  15                    THE WITNESS:  I would have taken -- in

16      order to get them off my cell phone I've got to download

17      them somewhere.

18                      THE COURT:  No, I understand that.

19                      So that was -- they were on the old cell

11:15:43  20    phone, correct?

21                      THE WITNESS:  Correct.

22                      THE COURT:  And then you downloaded them to

23      your 6800, correct?

24                      THE WITNESS:  Correct.

11:15:48  25                    THE COURT:  To the 6800, correct?

 1              THE WITNESS:  Correct.

 2              THE COURT:  And where did they go from

 3      there?

 4              THE WITNESS:  I would have put them on a

 5      USB.

 6              THE COURT:  You would have put them on a

 7      USB?

 8              THE WITNESS:  And then handed everything to

 9      Michael.

11:16:02 10              THE COURT:  All right.  But nonetheless,

11      they would still be on the 6800, correct?

12              THE WITNESS:  No, because once I moved

13      everything off of there, I have only retained -- anything

14      that was retained on that 6800 had to do with my CFOM

11:16:16 15      technology, Dyno-Pro, everything else.

16              THE COURT:  And so you deleted the

17      downloads from that 6800?

18              You deleted everything that

19      Alotech -- that's Alotech's property, including the

11:16:29 20      videos?

21              THE WITNESS:  I deleted the videos and

22      anything else that I would say would be not mine.

23              THE COURT:  Meaning Alotech's?

24              THE WITNESS:  Correct.

11:16:44 25              THE COURT:  All right.  And what happened

1    to the old cell phone?

2                THE WITNESS:  That was disposed of or

3    turned in for a credit.

4                THE COURT:  To where?

11:16:53  5            THE WITNESS:  It was either Verizon or it

6    was my current T-Mobile.

7                THE COURT:  When did that happen?

8                THE WITNESS:  Probably two or three years

9    ago.

11:17:09 10           THE COURT:  I thought you said you just got

11   a new cell phone.

12                THE WITNESS:  No, I didn't just get a new

13   one like the other day, no.

14                To me that's new, two to three years.

11:17:19 15           THE COURT:  When was the trial?  I can't

16   remember now.

17                MR. SAKS:  March of 2020.

18                THE COURT:  2020.

19                So did you get rid of that cell phone that

11:17:27 20   included those videos before or after the trial?

21                THE WITNESS:  It would have been before.

22                I mean, it's been a long time.  I know that

23   the cell phone that took that videos, those videos were

24   from, like, 2010 or, no -- yeah.

11:17:44 25           When was -- when was -- yeah, 2010.

```
            1              THE COURT:  Okay.  So before the trial, the

            2    first trial -- the trial in this case back in 2020, you

            3    had gotten rid of that cell phone, but before you did so

            4    you downloaded those videos onto the 6800, correct?

11:18:04    5              THE WITNESS:  The -- it would have been

            6    downloaded to a computer that I had been using, probably

            7    would have been either the ACER at that point and --

            8              THE COURT:  So it wasn't the 6800 that you

            9    downloaded it to?

11:18:15   10              THE WITNESS:  Right.

           11              It was a computer because, yeah, for sure

           12    it probably would have been the ACER, being that -- I

           13    mean, I'm going back in time now so in 2010 --

           14              THE COURT:  We understand that I have had

11:18:24   15    to now ask you more detailed information that leads you

           16    now to say something different than what your initial

           17    testimony was, which was that you downloaded it onto the

           18    6800, and I understand that you've also testified "To my

           19    knowledge," "I believe," et cetera.

11:18:40   20              So just be aware that what you've just

           21    stated to me is different than your responses earlier to

           22    me, but I'll let you continue to inquire.

           23              MR. RAMEY:  Thanks, Your Honor.

           24              I'm lost, but I'll just keep trying to push

11:18:59   25    on.
```

                    THE COURT:  I'm a little lost, too.

1       BY MR. RAMEY:

2       Q.    Since I just now heard something new, that you

3       apparently deleted a lot of Alotech data from the 6800

4       that we were talking about in this proceeding, did I hear

5       that correctly?

6       A.    I did not delete -- I'll -- I did not delete a

7       bunch of data that belonged to Alotech.

8                   If there was anything, it was a very small

9       amount.

10      Q.    Well, I heard you say you would have deleted

11      everything that was not yours and was related to Alotech

12      from the 6800.

13                  Did I hear that wrong?

14      A.    I may have interpreted your question incorrectly.

15      Q.    No, it wasn't my -- let me ask it again then.

16                  What did you delete from the 6800 and when?

17      A.    The 6800, we made -- I made -- there was an image

18      made for virtual, for my purposes, because that computer

19      was done.

20                  That would have been in December.

21                  THE COURT:  Wait a minute.

22                  December of '22?

23      BY MR. RAMEY:

24      Q.    December 22nd?

1                   THE COURT:  I'm a little lost, too.

2       BY MR. RAMEY:

3       Q.    Since I just now heard something new, that you

4       apparently deleted a lot of Alotech data from the 6800

5       that we were talking about in this proceeding, did I hear

6       that correctly?

7       A.    I did not delete -- I'll -- I did not delete a

8       bunch of data that belonged to Alotech.

9                   If there was anything, it was a very small

10      amount.

11      Q.    Well, I heard you say you would have deleted

12      everything that was not yours and was related to Alotech

13      from the 6800.

14                  Did I hear that wrong?

15      A.    I may have interpreted your question incorrectly.

16      Q.    No, it wasn't my -- let me ask it again then.

17                  What did you delete from the 6800 and when?

18      A.    The 6800, we made -- I made -- there was an image

19      made for virtual, for my purposes, because that computer

20      was done.

21                  That would have been in December.

22                  THE COURT:  Wait a minute.

23                  December of '22?

24      BY MR. RAMEY:

25      Q.    December 22nd?

1          THE COURT:  Is that what you mean?

2          THE WITNESS:  December -- no, I made an

3     image like -- and actually I didn't even do it.

4          Charles was with me.  We made an image of

11:20:18  5     my personal Dell 6800.

6          MR. RAMEY:  That's the clone we're talking

7     about in the case that was made on December 24th, the day

8     before the turnover was supposed to take place.

9          THE COURT:  December 4th of 2022?

11:20:29 10          MR. RAMEY:  December 24th.

11          December 5th is the agreement.  The 20-day

12     time period turnover.

13          24th a clone of the 6800 that we are

14     seeking -- granted this is before our motion gets

11:20:41 15     filed -- but a virtual clone of everything from the 6800

16     gets made -- I think he's going to tell me in a minute --

17     by him and Charles Rizzuti.

18          That's in our most recent briefing about

19     what the Meraki is showing us is happening to what we

11:20:52 20     believe is our device.

21          THE COURT:  Okay.  Thank you.

22     BY MR. RAMEY:

23     Q.   Okay.  So let's go back to my question.  I'll be as

24     clear as I can.

11:21:00 25          I thought I heard you say a minute ago that

```
 1        you took things off the 6800 or deleted them when the

 2        Judge was asking you about videos.

 3                   Did you do that?

 4        A.   The 6800 got cloned.

11:21:14  5   Q.   Just not at all what I'm asking you, but we're

 6        going to talk about the cloning in a bit, I promise.

 7                   Have you removed things -- not making a

 8        copy of or cloned them -- have you taken something off

 9        the 6800 like the deleted videos you testified about

11:21:27 10   earlier?  And if so, when did you do that?

11                   Do you understand "remove" and "copy" are

12        different things?

13        A.   I do understand "remove" and "copy."

14        Q.   And so I'm asking you about removing, taking things

11:21:41 15   off the 6800.

16                   Did you do that with regard to any Alotech

17        data?  And if so, when?

18        A.   No, I did not.

19                   Okay.  The best way to describe it is on

11:21:50 20   December 7th, a complete image of that computer was made,

21        period.

22                   After that, I deleted everything other than

23        C drive because the D drive was failing.

24                   This was all prior to understanding that

11:22:05 25   that computer was the computer listed in the term sheet.
```

1    Q.    I'll get to that in a minute then.

2              Before December 7th, had you removed

3    anything that might be Alotech data off of the 6800?

4    A.    There -- no.  No.

11:22:24  5              There wasn't anything really on there, so.

6    Q.    I'm not asking you -- I'm asking if you removed

7    anything about it -- from Alotech, any Alotech data off

8    the 6800 before December 7th?

9    A.    No, I did not.

11:22:36  10   Q.    Okay.  On December 7th, is that when the clone

11   occurred?

12   A.    That's when -- it's called a virtual image, to my

13   understanding.

14   Q.    Why did you do that?

11:22:46  15   A.    My -- that M6800 is my personal computer.  It's not

16   Alotech property.

17              I didn't even know anything having to do

18   with the serial number with that.  That's not -- it was

19   my personal computer I was using through all the

11:23:02  20   litigation so.

21   Q.    We're going to talk about that.  I'm just asking

22   you --

23   A.    The reason why the image was made is because that

24   computer was failing, was on the verge of failing, and I

11:23:11  25   have all my CFOM, all my Dyno-Pro, all my work, my wife's

```
          1    backup on her computers, everything on that computer.
          2    Q.   So you made a clone, a copy?
          3    A.   It's not -- I wouldn't call it a clone.
          4    Q.   What do you want to call it?  A copy?
11:23:26  5    A.   My -- no, the reason for the purpose of that image
          6    is because I have a new computer.
          7              It's another Dell.
          8    Q.   I'm just talking about the clone, the copy.
          9              Did you make a copy on the 7th?
11:23:38 10    A.   There was a copy made, but it's not a copy.
         11              It's an image.  It allows you to run that
         12    computer from another computer, so I could operate all my
         13    software.
         14    Q.   And it also lets you run that data or look at that
11:23:55 15    data that was on the computer, correct?
         16    A.   If there was data there, yeah.
         17    Q.   And you did that because that computer was dying or
         18    failing, you believed, correct?
         19    A.   For sure.
11:24:04 20    Q.   And then you went and deleted everything on the
         21    6800, correct?  You just said that.
         22    A.   That's when -- right, because I knew I was getting
         23    rid of that computer.
         24    Q.   Why would you delete it all just because it was
11:24:16 25    failing on December 7th, two days after we settled this
```

1   case?

2   A.   Because I didn't know, first off, on December 7th

3   that that particular computer, being the fact that it

4   belongs to me, was the serial number.

11:24:30  5              I didn't know the serial number.

6   Q.   You knew you were working on a Dell 6800 when you

7   did that, though, correct?

8   A.   I knew I was working on a Dell 6800.

9   Q.   Right.

11:24:39 10             And you knew on December 5th you had made

11  an agreement about a Dell 6800 with a certain serial

12  number that we believed was ours, correct?

13  A.   No.

14             On December 5th, I told Suzanne Blum in

11:24:51 15  front of my attorneys, "I don't have any Alotech property

16  and there is no way in heck I know serial numbers to my

17  computer."

18             And when John made a claim to some other

19  Dell as well, and I've said I never took any Alotech

11:25:05 20  property, and I said so.

21             So to the extent that we're talking about

22  this Dell, that was my computer and personal computer.

23             That was never used for Alotech, so to the

24  extent that there was any Alotech data on there, it would

11:25:20 25  have been because I had with me at some point in time

1    answered an Alotech e-mail.

2            And that's what I'm trying to tell you is

3    that there was no data, Alotech data on there.

4    Q.   We disagree and we'll have evidence about that and

11:25:32 5   we'll talk about that in a minute.

6            I just want to make sure that you said you

7    weren't aware of the serial number on the 7th.

8            When we raised this issue with your

9    lawyers, you found your purchase receipt which had the

11:25:41 10  serial number on it in very short order, correct?

11   A.   I believe it was after the 7th or the 8th, yeah.

12   Q.   Okay.  After we filed our motion?

13   A.   What day did you file a motion?

14   Q.   I believe it was on the 3rd of January.

11:26:00 15  A.   I knew I owned that computer prior to that.

16           It's not Alotech property is what I'm

17   telling you.

18   Q.   I'll make it simple.

19           Were you aware of the contents of the

11:26:10 20  December 5th settlement agreement on December 5th?

21           Did you read it?

22   A.   Right.  And it says Alotech property.

23   Q.   Right.

24           It also says a Dell 6800 with a serial

11:26:20 25  number on it, correct?

1    A.    Which I definitely figured it was definitely a

2    mistake.

3    Q.    And on the 7th it sounds like you made a copy of

4    that and then erased that device, correct?

11:26:27  5    A.    I erased everything other than what was on C drive.

6             THE COURT:  Can I interject one time?

7             MR. RAMEY:  Sure.

8             THE COURT:  Mr. Grassi, did I not hear you

9    say that before -- basically we'll call it cloning; I

11:26:41 10   know you can describe it differently -- but with regard

11   to the 6800 that you claim was yours, Alotech says is

12   theirs, the old one let's talk about, you did not delete

13   any information.

14            Is that what you testified to?

11:26:52 15            THE WITNESS:  There -- everything that was

16   on that computer should be there still, on the -- on the

17   image.

18            That's correct.

19            THE COURT:  So when you're testifying then

11:27:01 20   that you didn't delete anything, to include the videos

21   that would have been downloaded to it, correct?

22            THE WITNESS:  Those would have been deleted

23   prior to any image, prior to December 5th, period.

24            THE COURT:  All right.  That's why I'm

11:27:17 25   confused because I'm hearing some testimony about

1    deleting things and then other testimony, "No, I didn't

2    delete anything."

3                So the point being that you still made an

4    image of the old one onto a new one, and so it begs the

11:27:30  5    question what's on the new one.

6                THE WITNESS:  Yeah, that's -- and I'm -- me

7    to you, I'm actually fine with anyone looking at that

8    because what you'll find is all my stuff.

9                There won't be any Alotech data that

11:27:45 10    they're claiming.

11    BY MR. RAMEY:

12    Q.    Because you deleted, I think you testified, the

13    Alotech data when you made the virtual image before you

14    got rid of the 6800, correct, or retired it?

11:27:56 15    A.    No.

16                What I'm saying is that what -- I also told

17    you that there was, if anything, hardly any Alotech data.

18    Q.    I'm not asking you --

19    A.    And when we're saying "Alotech data," you haven't

11:28:09 20    even quantified what it is.

21                It's based on what Michael Grassi thinks

22    he's looking for, okay, or what I think is not mine.

23                So to the extent that there was an e-mail

24    or something else, that would have been deleted and/or

11:28:20 25    removed from that to a USB prior to any of all of this.

1    Q.   Okay.  So you moved things to a USB as well?

2    A.   And I handed anything having to do with this matter

3    to my attorney.

4    Q.   Okay.  Did you keep a copy of whatever USB you

11:28:33 5    moved those things to?

6    A.   No, I did not.

7    Q.   Did you keep any other copy of any other device

8    that you moved things from the 68 to?

9    A.   No.

11:28:41 10    Q.   Okay.  What drives then -- if we can't agree on

11    what data you deleted from the 6800 -- what drives did

12    you delete data from when you were making the virtual

13    image?

14    A.   I personally did not make the virtual image, okay.

11:28:56 15           This is what -- so when we're saying that

16    as far as I'm speaking, I'm working with Charles, there

17    was the C drive was absolutely completely full.  The

18    computer would barely boot up.

19           So something was cleared off the C drive.

11:29:11 20    Q.   Something was cleared off the C drive?

21    A.   Yeah.  It would have been software that, you know,

22    I downloaded for use, et cetera, et cetera, but has

23    nothing to do with Alotech.

24    Q.   Okay.  Who cleared it off of there; you or Charles?

11:29:22 25    A.   Charles did.

| | |
|---|---|
| 1 | Q. Okay. And did you give Charles a copy of our |
| 2 | settlement agreement and was he aware, to your knowledge, |
| 3 | of your obligations with regard to a 6800 specified |
| 4 | therein? |
| 11:29:33 5 | A. At some point I told him I've got to return some |
| 6 | Alotech property, for sure. |
| 7 | Q. At some point prior -- |
| 8 | A. On December 5th he and I, December 6th, we drove |
| 9 | back down to Columbus together, and I had definitely |
| 11:29:49 10 | talked to him about the situation because I owed money. |
| 11 | Q. Did you ever show him a copy of the term sheet? |
| 12 | A. I believe I did. |
| 13 | Q. On the 6th? |
| 14 | A. Most likely. |
| 11:29:59 15 | Q. Okay. And on the 7th, you all got together, made a |
| 16 | copy, virtual image, clone of that 6800, and you told me |
| 17 | you deleted the C drive, correct? |
| 18 | A. No, we did not delete the C drive. |
| 19 | Q. Then I'm not hearing correctly. |
| 11:30:16 20 | So what was deleted? |
| 21 | A. I have a D drive on that, or was, did have a D |
| 22 | drive on that computer and E drive on that computer, and |
| 23 | then the C drive. |
| 24 | Q. Which ones did you delete? |
| 11:30:28 25 | You said you deleted things because you |

1    were retiring that computer.

2    A.    C drive was so up to capacity, that's all the

3    software, that's where you would put software, and

4    Charles couldn't even put anything else on there.

11:30:41  5              So C, something on C in terms of software

6    was deleted to make room.

7    Q.    Was everything on C deleted, do you know?

8    A.    No.

9    Q.    You don't know?

11:30:49 10   A.    No, I can tell you that just enough was deleted in

11   order to be able to put on a new program.

12   Q.    Okay.  So some things were deleted from C.

13              What other deletions were effectuated to

14   the 6800?

11:31:02 15   A.    Say that again, please.  I can't hear you.

16   Q.    Yeah, so I'm just confused.

17              I thought you said earlier you deleted

18   everything but the C drive, and I've now heard you say

19   you deleted some things on the C drive.

11:31:13 20              I want to know what -- the whole list of

21   everything that was deleted from the 6800 by you or

22   Charles, to your knowledge.

23   A.    Well, I did not personally delete what was on the C

24   drive.

11:31:25 25   Q.    That's why I said "you or Charles," because you

```
        1    were there.

        2    A.    Right.

        3               And I don't -- I don't remember what

        4    Charles deleted in terms of which programs.

11:31:34 5    Q.    And were you there with Charles when he was doing

        6    it?

        7               Were you nearby?

        8    A.    I was nearby.

        9               There was -- just to let you know, there's

11:31:40 10   no data that was kept on C drive.

       11    Q.    Were you down the street?  Were you in the same

       12    room?

       13    A.    I was -- we were in my house.

       14    Q.    Okay.  These are the questions I'm asking.

11:31:49 15   A.    Yeah.

       16    Q.    Where were you -- the two of you were together in

       17    your house, and Charles deleted things from the 6800 on

       18    the 7th, correct?

       19    A.    Correct.

11:31:59 20   Q.    Do you know what he deleted other than "some things

       21    on the C drive"?

       22    A.    Not exactly.

       23    Q.    Okay.  Where is the 6800, with or without

       24    deletions, now?

11:32:10 25               Is it at your property?  Where is it?
```

1    A.    No.  It's sitting at my attorneys' office.

2    Q.    Okay.  And all you can tell me for sure about what

3    was deleted from the 6800 during the making of the

4    virtual image was that Charles took some things off the C

11:32:28  5    drive, and you're aware of no other deletions, correct?

6    A.    That's correct.

7    Q.    And as far as what Charles deleted from the C

8    drive, we'll have to ask Charles?

9    A.    Yes.

11:32:38  10   Q.    Everything else besides those minor deletions to

11   the C drive should be on the 6800 that is at your

12   lawyers' office, right?

13   A.    No.

14   Q.    Oh.

11:32:49  15   A.    C and D are completely wiped.

16   Q.    When did you wipe those?

17   A.    After I did --

18   Q.    Your lawyer is shaking his head at you so --

19              MR. PASTERNAK:  No, I'm shaking my head at

11:33:01  20   the question.

21              MR. RAMEY:  No, not you.  The one close to

22   me.

23              MR. ROBINSON:  There was just a mistake in

24   the letters.

11:33:07  25              You said C and D were wiped.

```
  1                THE WITNESS:  Oh, I'm sorry.  D -- okay.

  2                I'm sorry, D and E.  D and E were wiped.

  3      BY MR. RAMEY:

  4      Q.   You want to change your testimony?

11:33:15 5      A.   D and E were wiped.  D and E.

  6      Q.   When did you wipe D and E?

  7      A.   Sometime in December.

  8      Q.   Of 2022?

  9      A.   Yes.

11:33:32 10     Q.   Before or after the making of the virtual image?

  11     A.   It was after.

  12     Q.   Why did you do that?

  13     A.   Because that -- first of all, D drive was failing

  14     and E drive was failing, and I had already made an image.

11:33:53 15     Q.   Whatever you took off of there, would it be on the

  16     image?

  17     A.   Yeah.

  18     Q.   Okay.  So everything on -- this is helpful.

  19                Everything on the image that you

11:34:04 20     made -- strike that.

  21                Everything that was ever on the 6800 as of

  22     December 5th would now be on the image that was created

  23     on December 7th?

  24                How about that?

11:34:12 25     A.   That, that's -- that should be an accurate
```

1    statement, yes.

2    Q.   Anything else you want to tell us about other

3    things you wiped off or cleaned on the 6800, other than

4    this other December event that you just mentioned?

11:34:28  5    A.   No.

6    Q.   You -- let's talk about, I guess, the ownership of

7    that device.

8              You've sworn it was not used for Alotech

9    work and you used it as a personal laptop for Dyno-Pro

11:34:44 10    and cooktop inventions, right?

11    A.   Yes.

12    Q.   Okay.  Can you testify under oath as a fact that

13    there was no Alotech data on there as of December 5th?

14    A.   To my knowledge, there's no Alotech data on that

11:34:57 15    computer.

16              And when we're talking "data," are we

17    talking what?

18    Q.   I wish I knew any of it.

19    A.   So do I now.

11:35:05 20    Q.   Yeah.  Documents, materials, e-mails, programs,

21    computer files.

22              I've got no idea what you've got.  That's

23    part of the exercise we're doing here?

24    A.   I can tell you --

11:35:14 25              THE COURT:  The question is as of December

1   5th, correct?

2                      MR. RAMEY:  Correct.

3   A.     All my work for CFOM that I did on making molds,

4   selecting aggregates, making mass flow controllers,

11:35:28 5   that's all on there.

6   Q.     I'm asking you what Alotech data might have been on

7   there.

8                      Can you testify under oath that there was

9   no Alotech data on the 6800 on December 5th?

11:35:39 10   A.     What are you referring to in terms of Alotech data?

11   Q.     Okay.  Anything of Alotech, any -- any file, any

12   program, any e-mail, any document, any image.

13   A.     On -- I would say that there is nothing.

14                      I can't verify without going through each

11:35:59 15   and every single file.

16   Q.     And that is my question.

17   A.     But as far as, like, a database or something that

18   says "Alotech," and one terabyte of data or anything like

19   that nonsense, there is no such thing on there.

11:36:13 20   Q.     But did you search and determine that there was

21   none before you --

22   A.     I can't hear you, please.

23   Q.     My question was anytime after December 5th, did you

24   search that 6800 to determine whether there was any

11:36:27 25   Alotech data of any kind on there; yes or no?

 1    A.    Yeah.  I -- I did a search based on the image.

 2    Q.    Okay.  Since you've deleted things, you've searched

 3    the image?

 4    A.    Right.

11:36:41  5                The image is the same thing as the Dell

 6    6 -- whatever was on the Dell is on the 6800 image, the

 7    virtual machine.

 8    Q.    Whatever was on the Dell 6800 on December 5th is

 9    now on the image that you have, right?

11:36:54 10    A.    That's absolutely correct.  Yeah.

11    Q.    How can we get a copy of that?

12    A.    How would you get a copy of that?

13                It's on a SanDisk.

14    Q.    Okay.  Where is that device?

11:37:04 15    A.    I actually have it with me.

16    Q.    Here in the courthouse?

17    A.    Yeah.

18    Q.    Okay.  Have you made any other copies of that

19    device or the 6800 ever?

11:37:15 20    A.    No, that's the only -- that's what I need.

21    Q.    Have you run a search of the image to find out what

22    Alotech property or data might be on there?

23    A.    Have I done what now?

24    Q.    I tried to ask you with regard to the device.

11:37:32 25    A.    I'm just having a hard time hearing.

1      Q.    Have you done any search of the virtual image to

2      determine if there's any Alotech data on there?

3      A.    I can --

4      Q.    Yes or no?

11:37:44  5    A.    No.

6                  That's because I know there's no data.

7      Q.    How do you know that?

8      A.    Because I didn't use that computer for Alotech

9      purposes.

11:37:59 10    Q.    Is it possible that somebody else loaded a lot of

11     data on there?

12     A.    No.

13                 THE COURT:  I thought you testified

14     previously that there might be some Alotech information

11:38:07 15    on there; couldn't be sure, a little bit.

16                 THE WITNESS:  That -- that's correct, Your

17     Honor.

18                 To the extent that I was checking something

19     on the Gmail, perhaps, or I got something and I

11:38:19 20    downloaded something.

21                 THE COURT:  Right.  That's Alotech

22     property.

23                 So again, there's a disconnect between,

24     "Nope, there's none there, I looked or I didn't look, but

11:38:28 25    none there," versus what you said previously that there

```
         1     could be, you know, a little bit there.

         2               THE WITNESS:  Your Honor, I'd have to look

         3     at, like, I don't know how many files I have on there.

         4               I have, like --

11:38:39 5               THE COURT:  But that's the problem.

         6               The term sheet indicated what your

         7     responsibilities were, particularly as to two computers

         8     that were listed thereon.

         9               You didn't necessarily look at the serial

11:38:54 10    number, so you've testified, but you knew that there were

         11    two computers listed thereon.

         12              Correct?

         13              THE WITNESS:  That's correct.

         14              THE COURT:  All right.  So obviously you

11:39:05 15    knew your responsibility was to ensure that any property

         16    of Alotech that was on those computers, even if the

         17    computers themselves didn't go back, belonged to Alotech

         18    and had to be returned.

         19              So even as you were doing a cursory review

11:39:22 20    of the computer and knew that -- or knew that there was

         21    some, however small, that didn't go back to Alotech, did

         22    it?

         23              THE WITNESS:  I'm sorry to disagree with

         24    Your Honor.

11:39:33 25              When I signed that document, it said
```

1    "Alotech property."

2              I bought that computer for my own personal

3    business and my personal use.

4              THE COURT:  No, you're making a distinction

11:39:43 5    now between actually the computer itself versus what's

6    contained thereon.

7              And it's very clear from the term sheet

8    that certainly they said the return of the computer, but

9    the gist of it or the terms included the data, et cetera,

11:39:59 10   media, that's on it.

11             So you may claim that you didn't have any

12   obligation, it's your computer, you didn't have to turn

13   it over to the defendants even though that's not what was

14   stated --

11:40:12 15            THE WITNESS:  That --

16             THE COURT:  Excuse me.

17             -- that's not what was actually included in

18   the term sheet, but even if, even if that's true, you

19   knew that there was Alotech property thereon.

11:40:20 20            So you knew as part of the agreement you

21   were to return Alotech property.

22             THE WITNESS:  No, I'm trying to be

23   forthright, Your Honor, and I'm saying to you that --

24             THE COURT:  I don't know if you're trying

11:40:32 25   to be forthright because it took me three or four

1    questions to get you to agree that the IP addresses you

2    checked and were accurate and they're yours.

3                    THE WITNESS:  Fair enough.

4                    I'm not sure what question you want me to

11:40:48  5    answer now, Your Honor.

6                    THE COURT:  That wasn't really a question.

7                    I was responding to you trying to be

8    forthright.

9                    Your prior testimony about the IP addresses

11:40:56 10    demonstrates to me that you really, at least in that

11    regard, were not being forthright.

12                    So you might be trying, but not necessarily

13    succeeding.

14                    What would you like to say?

11:41:07 15                    THE WITNESS:  I forgot my point.

16                    THE COURT:  Okay.  Mr. Ramey.

17                    MR. RAMEY:  I think I've gotten as much as

18    I can think of for now on this because I'm not sure where

19    we are on these devices, but let me keep moving forward

11:41:18 20    if I could, Your Honor.

21    BY MR. RAMEY:

22    Q.    So your company CFOM did work for Alotech in

23    20 -- starting, when, 2012, '13?

24    A.    No, you're mischaracterizing it.

11:41:32 25                    I did not ever do work for Alotech.

1      It was a joint venture.

2  Q.   Okay.  However you want to characterize it, CFOM

3  and Alotech worked together at some point, correct?

4  A.   We worked together.

5       I developed technology.  He developed

6  technology.

7  Q.   When did that start?

8  A.   That started all the way back in 2006, plus

9  earlier.

10 Q.   Okay.  And continued until you left in 2017,

11 correct?

12 A.   Correct.

13 Q.   Okay.  And Charles Rizzuti worked for your company

14 CFOM on that what you call a venture, correct?

15 A.   No, you're mischaracterizing.

16      Charles is -- he worked with me, but he did

17 not work for CFOM.  He was an individual.

18 Q.   But he was a contractor working for CFOM on the

19 Alotech venture, correct?

20 A.   No.

21 Q.   No?

22 A.   That's incorrect.

23 Q.   Just man-at-large?

24 A.   Man-at-large.

25 Q.   Okay.  He was never your representative or CFOM's

          1    representative?

          2    A.    No.

          3                I had a deal with Charles.

          4    Q.    You also had -- you had a deal with Charles?

11:42:29  5    A.    Yeah.

          6    Q.    What was it?

          7    A.    That if he worked with me and John, that he would

          8    get 40 percent of whatever I got.

          9    Q.    And "me" meaning you and CFOM, correct?

11:42:40 10    A.    I'm CFOM.

         11    Q.    Correct.

         12                So take a look at Defendants' Exhibit 4 in

         13    front of you, please?

         14                I'm just going to ask you if you remember

11:42:54 15    this e-mail.

         16                We're talking now about the 6800 or a 6800?

         17    A.    Okay.

         18    Q.    And that's Charles telling you and Mike about what

         19    laptop someone is going to order, correct?

11:43:09 20    A.    That's Charles talking about him looking into some

         21    particular Dells.

         22    Q.    And he says --

         23    A.    And Hewlett Packards.

         24    Q.    And he says, "The 6800 and the 4800 are the model

11:43:21 25    we want."

           1                        Right?

           2        A.    Correct.

           3        Q.    And below there he talks about some Alotech issues

           4        like reclaim and fast cure and core blower.

11:43:30   5                        Right?

           6        A.    Sure.

           7        Q.    Okay.  And in the third sentence under core blower

           8        he talks about the B & R.

           9                        Right?

11:43:42  10        A.    Correct.

          11        Q.    Okay.  Do you -- what is the B & R?

          12        A.    It's the last name of two individuals that started

          13        a company that make machine hardware that are

          14        electronics, they're like minicomputers and so forth.

11:43:58  15        Q.    And you understand there's a period of time at

          16        Alotech when a computer, a device, worked or controlled

          17        the B & R, correct?

          18                        It was called the B & R computer.

          19        A.    Say again, please.

11:44:09  20        Q.    Do you understand that there was a computer used at

          21        Alotech for the B & R process at some point in time?

          22        A.    There was a lot of computers at Alotech.

          23        Q.    Do you understand there was a computer, one or

          24        more, used for the B & R project or the B & R process at

11:44:26  25        Alotech?

```
  1    A.    There was more than one, sure.

  2    Q.    Okay.

  3               MR. RAMEY:  Move to admit 4, Your Honor.

  4               MR. PASTERNAK:  No objection.

11:44:36  5       THE COURT:  Admitted.

  6    BY MR. RAMEY:

  7    Q.    Okay.  So let's go to Exhibit 5 now.

  8               This is a document I think that both sides

  9    have, but this is, thereafter in 2014, you ordering a

11:44:51 10   Dell 6800 from Dell.

 11               Correct?

 12    A.    Where are we?

 13    Q.    Exhibit 5.

 14    A.    Exhibit 5.

11:45:00 15   Q.    Okay.  And that's a 6800 that you contend is yours,

 16    correct?

 17    A.    Absolutely.

 18    Q.    Okay.  Take a look at the bottom of that second

 19    page, and there's the serial number we're talking about

11:45:13 20   there, GQTHP12, correct?

 21    A.    Correct.

 22    Q.    Okay.

 23               THE COURT:  Where is that, Mr. Ramey?

 24               MR. RAMEY:  Bottom of Page 2, Your Honor,

11:45:26 25   there's a spec buildout for the computer, and then there
```

1    at the bottom of Page 2 the purchase order, it says

2    "System service tags," and it identifies the one that's

3    mentioned in the term sheet with the same serial number

4    that's in Paragraph 6A.

11:45:41  5              THE COURT:  All right.  My copy doesn't

6    have that, I don't think.

7                    It says "System service tags"?

8                    MR. RAMEY:  Right next to it, GQTHP12.

9                    THE COURT:  Oh, GQTHP, that's the serial

11:45:53 10   number.

11                   MR. RAMEY:  And my point is this is the one

12   we're talking about.

13                   THE COURT:  Okay.

14   BY MR. RAMEY:

11:45:56 15   Q.    Okay.  You claim this is your computer, correct?

16   A.    Yes, I do.

17                   MR. RAMEY:  Okay.  Move to admit

18   Defendants' 5, Your Honor.

19                   THE COURT:  So admitted.

11:46:03 20   BY MR. RAMEY:

21   Q.    And on 5, on the top of that in the middle column,

22   it says, "Order number 731970568," right?

23   A.    Correct.

24   Q.    Okay.  Turn to Exhibit 6.

11:46:20 25                   And that is an e-mail from you to Vicky

1    Hawker of Alotech forwarding the purchase order

2    confirmation from Dell for that same order number

3    731970568, right?

4    A.    Correct.

11:46:34 5   Q.    And the price of that as reflected in Exhibit 5 was

6    $4,150, right?

7    A.    Correct.

8    Q.    Okay.  So this one that you forwarded to Vicky

9    matches the Exhibit 5, the computer we're talking about,

11:46:49 10  correct?

11   A.    Correct.

12   Q.    Okay.  Do you dispute under oath that you submitted

13   that for reimbursement to Alotech?

14   A.    I did not.  I did not submit that to Vicky Hawker

11:46:57 15  for reimbursement.

16   Q.    Why were you sending that to Vicky Hawker at

17   Alotech?

18   A.    Vicky Hawker did all my books for CFOM and

19   Dyno-Pro, so I sent this for two separate reasons.

11:47:07 20            One, she was to put that on CFOM, which she

21   did.

22            Second, I'm not having that computer

23   delivered to my house in Columbus, Ohio.  My wife works

24   and my daughter's in school.  I can't have that computer

11:47:18 25  sitting on the front porch.

1       So I sent that to her so to give her a

2   heads-up that this thing's been ordered, be aware of it,

3   that's number one.

4       Number two, this is CFOM's purchase.

11:47:31  5   Q.   Do you have any communications with Ms. Hawker

6   saying all the things you just did, "I'm just sending it

7   there because I can't send it to home, it's for CFOM,

8   you're my bookkeeper, take note"?

9   A.   I would have just called her on the phone and said

11:47:45 10   "Heads up" and sent her this so she could log it.

11  Q.   Why would she be logging it at Alotech?

12  A.   She's not logging at it Alotech.

13       She's logging it in my CFOM records.

14  Q.   Where was it delivered?

11:47:56 15  A.   This computer I had delivered to 8500 Clinton Road.

16  Q.   That's the Alotech facility, correct?

17  A.   That's also CFOM's facility at that point as well

18  as Dyno-Pro's.

19       It even says on the bottom below 6,

11:48:12 20  "Michael Grassi/CFOM, 8500 Clinton Road."

21       MR. RAMEY:  Move to admit Exhibit 6, Your

22  Honor.

23       MR. PASTERNAK:  No objection.

24       THE COURT:  Admitted.

11:48:20 25

        1    BY MR. RAMEY:

        2    Q.   Okay.  Let's turn to 7 now, Mike.

        3              That's a document that purports to be an

        4    acknowledgement receipt one day after the e-mail to

11:48:29 5    Ms. Hawker December 5th, 2014 saying, "This is to

        6    acknowledge that Michael Grassi/CFOM received $4,200 in

        7    cash from Alotech for reimbursement of computer order

        8    731970568.  $50 is owed back to petty cash."

        9              And there's a signature beneath that.

11:48:50 10             Is that your signature?

       11    A.   I never signed this document.

       12    Q.   You never signed this document?

       13    A.   Nope.

       14    Q.   You're contending this is a forgery?

11:48:56 15   A.   Absolutely.  You got it.

       16    Q.   Okay.

       17              MR. RAMEY:  Your Honor, I'll just refer you

       18    back to --

       19    A.   Nice forgery.

11:49:08 20             MR. PASTERNAK:  Michael, just relax.

       21    BY MR. RAMEY:

       22    Q.   Do you recall being in this courtroom back in the

       23    spring of last year when, because of these forgery

       24    allegations, you were asked to provide an exemplar of

11:49:19 25   your signature to the Court?

```
 1   A.    Yes.
 2   Q.    Okay.  Ten of them, correct?
 3   A.    I thought it was 20.
 4                 MR. RAMEY:  May I approach, Your Honor?
 5                 THE COURT:  Yes.
 6                 MR. RAMEY:  This was Trial Exhibit 323,
 7   Your Honor.
 8                 MR. PASTERNAK:  Do you have the original of
 9   this, by chance?
10                 MR. RAMEY:  With me, no.
11                 MR. PASTERNAK:  Okay.
12   BY MR. RAMEY:
13   Q.    Here you go.  I'll pass it under there.
14                 Ask you to confirm for the Court that
15   that's the document that you signed that day.
16   A.    Yes.
17                 MR. RAMEY:  Okay.  What's our last number?
18                 Move to admit that, Your Honor, as --
19                 THE COURT:  I don't have a copy.
20                 What number is it?
21                 MR. RAMEY:  May I approach your Bench, Your
22   Honor?
23                 THE COURT:  Yes.
24                 MR. RAMEY:  We move to admit that as 54,
25   defendants'.
```

```
         1              Yes.  Thank you.

         2              THE COURT:  So admitted.

         3     BY MR. RAMEY:

         4     Q.    Let me also hand you --

11:51:06 5              THE COURT:  This you're marking as 54 for

         6     purposes of this hearing?

         7              MR. RAMEY:  Pardon me?

         8              THE COURT:  You're marking this as 54 for

         9     purposes of this hearing?

11:51:15 10             MR. RAMEY:  For purposes of this hearing

        11     because our last exhibit was 53 on our list.

        12              THE COURT:  Right, because this was marked

        13     as Trial Exhibit 323, correct?

        14              MR. RAMEY:  It bears the old trial exhibit

11:51:26 15    number, too.

        16              THE COURT:  Correct.

        17              I just want to make sure I have the exhibit

        18     number right.

        19              Thank you.

11:51:32 20             MR. RAMEY:  Okay.  I'll -- one more.

        21              May I approach, Your Honor?

        22              THE COURT:  Yes.

        23              MR. RAMEY:  This was Trial Exhibit 58.

        24              That is for Her Honor and that for the

11:51:57 25    witness.
```

Michael Grassi - Cross                    131

1    BY MR. RAMEY:

2    Q.    Mr. Grassi, these are forms that you filled out and

3    testified about in the last case at your deposition.

4             Do you recognize those documents?

11:52:10  5    A.    I recall these documents.

6    Q.    Those were documents that you signed or provided

7    when you commenced the work you were doing with Alotech,

8    correct?

9    A.    Yes.

11:52:19 10    Q.    First page is an I-9 form, third page is your

11   driver's license, and the fourth page is your passport,

12   right?

13   A.    Yes.

14   Q.    Okay.  Those are your signatures, as you've

11:52:31 15   admitted before, correct?

16   A.    Yes.

17             MR. RAMEY:  Move to admit Defendants' 55,

18   if we could mark it as such for this hearing, Your Honor.

19             THE COURT:  I'm sorry?

11:52:39 20             MR. RAMEY:  We'd like to move to admit that

21   as Defendants' 55 for this hearing.

22             THE COURT:  Yes.  Thank you.

23   BY MR. RAMEY:

24   Q.    Okay.  Those are your signatures, correct?

11:52:47 25   A.    In Defendants' Exhibit 58?

1    Q.    55, the one I just handed you, which it has a 58

2    sticker on it.

3    A.    Right.  A 58 sticker.

4    Q.    Right.

11:53:02  5          It's now been admitted for this hearing,

6    it's Defendants' Exhibit 55.

7                Are those your signatures?

8    A.    Yes.

9                MR. RAMEY:  Okay.  We didn't bring a

11:53:09 10  handwriting expert, Your Honor, and we'll just submit

11   that those signatures are spot-on matches for what he's

12   already admitted are his, and we'll move forward with

13   regard to the acknowledgement of receipt.

14               I don't think I can move to admit it

11:53:21 15  because he's denied it's his signature.

16               MR. PASTERNAK:  Your Honor, can I object to

17   the exhibit?

18               We just got this two nights ago.  There's

19   no Bates Number on it.  This is the first time we've ever

11:53:32 20  seen it in five -- four years of litigation, whatever it

21   is, and they didn't bring the original.

22               This literally just appeared.

23               THE COURT:  Well, he testified that those

24   were his signatures.

11:53:42 25               MR. PASTERNAK:  No.  No.  I'm talking about

Michael Grassi - Cross                                    133

1    Exhibit 7.

2                    THE COURT:  I'm sorry?

3                    MR. PASTERNAK:  I'm talking about Exhibit

4    7.

11:53:46  5                    THE COURT:  Oh, Exhibit 7?

6                    MR. PASTERNAK:  Yeah.

7                    This was -- this first appeared in this

8    case a night-and-a-half ago.

9                    THE COURT:  Right.

11:53:54 10                    Two days ago, right?

11                    MR. PASTERNAK:  Yes.

12                    MR. RAMEY:  In our exhibits, this -- the

13   notion that the thing we agreed on we were going to get

14   back being his now was new to us in the motion to

11:54:03 15   enforce.

16                    He is correct that we did not provide that

17   until our exhibit list.  We listed it and then gave it to

18   him during the exhibit exchange.  He's correct about

19   that.

11:54:14 20                    MR. PASTERNAK:  And there's no original,

21   again.

22                    Okay.

23                    THE COURT:  Objection noted.

24                    MR. PASTERNAK:  Thank you.

11:54:24 25                    THE COURT:  Not sustained.

1          MR. RAMEY:  Well, we'd move to admit it,

2     Your Honor.

3                MS. BLUM:  We did.

4                MR. RAMEY:  We did?

11:54:34  5                MS. BLUM:  Yes.

6                MR. RAMEY:  The acknowledgment?

7                MS. BLUM:  Yes.

8                MR. RAMEY:  Okay.  Thank you.  As

9     Defendants' 7.

11:54:37 10                Thank you.

11                I'll keep moving.

12                THE COURT:  I mean, it's admitted.

13                Obviously Mr. Grassi has testified that

14     that's not his signature.

11:54:50 15     BY MR. RAMEY:

16     Q.    Let me ask you some questions about another laptop

17     to make sure we're covering all the devices, which is

18     what the Court wants to hear about.

19                I'm going to get to the 6600 in a minute.

11:55:02 20                You've already testified in this case, I

21     think, that in the second half of 2021 you were able to

22     recover a number of Alotech.biz e-mails.

23                They were produced in this case, and you

24     used your ACER laptop to download those or to retrieve

11:55:16 25     those, correct?

|  | 1 | A. | They were on my ACER, yes. |

1  A.  They were on my ACER, yes.

2  Q.  Okay.  And I think you said in the second half of

3  2021 you discovered those in a single file and provided

4  them to counsel, right?

11:55:26  5  A.  It's a complicated story, but yes.

6  Q.  Anything else you want share with us about that?

7  A.  On -- yeah, I'll give you the whole story.

8  Q.  What happened to that ACER?

9  A.  That ACER's gone.

11:55:40  10  Q.  Yeah.

11  A.  That was pitched for sure.

12  Q.  And when did you destroy that one?

13  A.  I want to say in the early part of 2022.

14  Q.  As we were headed to trial in this case, right?

11:55:53  15  A.  No.

16  Q.  You don't recall being headed to trial in this case

17  in 2022?

18  A.  It was before -- way before the trial.

19  Q.  Which was set in May?

11:56:03  20  A.  Yeah.

21  Q.  Okay.  And when did you destroy the ACER?

22  A.  It would have been shortly after I was able to

23  retrieve anything off of it.

24  Q.  When was that?

11:56:12  25  A.  Early part of 2022.

```
          1   Q.   January, March, what?  Do you know?

          2   A.   I'm thinking it was February.

          3   Q.   Okay.  So four -- three months before trial?

          4   A.   Okay.

11:56:24  5   Q.   So you discovered Alotech e-mails on an ACER, you

          6   produced those to counsel, then you just -- did you throw

          7   it in the trash?

          8             What did you do with the ACER?

          9   A.   No, I wiped it before I threw it away.

11:56:34 10   Q.   Where is it now?

         11   A.   Landfill.

         12   Q.   And you knew this litigation was pending at the

         13   time, correct?

         14   A.   Yeah.  Of course.

11:56:43 15   Q.   We were talking earlier about the Michael J. Grassi

         16   personal e-mail account.

         17             Do you still maintain that account, the one

         18   you forwarded the e-mails to back in 2017?

         19   A.   I do.

11:57:00 20   Q.   And have you gone back to see whether any of these

         21   or other Alotech e-mails or data are on that e-mail

         22   account?

         23   A.   I -- I believe I've got whatever was forwarded

         24   probably still there, for all I know, yeah.

11:57:17 25   Q.   Because you haven't gone back and deleted it or
```

1    turned that over to your lawyer, right?

2    A.    I had turned it over to Mark O'Brien.

3                Other than that, they could still be there.

4    Q.    Okay.  And I assume that's accessible from any

11:57:29 5    laptop or device you have, right?

6    A.    Sure.  It should be.

7    Q.    Are there any other e-mail addresses that you might

8    have sent Alotech data or documents to?

9    A.    No.

11:57:37 10    Q.    Let me ask you about the 6600, which is kind of the

11    quandary we're in here.

12                So I assume from your earlier testimony

13    that you -- you signed the December 5th settlement

14    agreement, you knew you had no Alotech property according

11:58:06 15    to you so you were not focused on laptops or devices

16    because you didn't believe you had any, right?

17    A.    Correct.

18    Q.    And I think you -- did the notion of any Alotech

19    laptops or device or devices, did it occur to you at all

11:58:27 20    until you saw our motion to enforce on January 3rd of

21    this year?

22    A.    I'm not sure.  What is your question?

23    Q.    Yeah, I'm trying to figure out did you ever stop

24    and think before January 3rd, "Well, wait a second, these

11:58:39 25    devices they're looking for, I might have them, I might

1   need to look for them"?

2   A.   I did go search.

3        I don't have any of your Alotech computers.

4   Q.   When did you do that search?

5   A.   I did that in December.

6   Q.   When?

7   A.   Shortly after, probably after Charles left.

8   Q.   Okay.  And if you did that search, you would have

9   found the Dell 6800 that you thought was yours, right?

10  A.   I had the Dell 6800 --

11  Q.   Right.

12  A.   -- with me.

13  Q.   And you just didn't check the serial number, right?

14  A.   I -- no, I never even, even considered thinking

15  that that was the serial number based on what you guys

16  were looking for.

17  Q.   You saw that we were looking for a 6600 that we're

18  calling the B & R as well, correct?

19  A.   Ask the question -- I'm having a hard time hearing,

20  so just repeat the question.

21  Q.   Let me just break it down for you.

22        You know that we agreed on two computers in

23  the settlement agreement, right?

24  A.   Correct.

25  Q.   The 6800 is one.  We know you have it, but you

         1    might have wiped some of it clean, right, but you took an

         2    image, that one?  That's one?

         3    A.    68.

         4    Q.    Right.

11:59:39 5          Then there's the 6600, right, that we've

         6    been referring to and it's in the settlement agreement as

         7    the B & R laptop, correct?

         8    A.    Correct.

         9    Q.    Okay.

11:59:47 10   A.    John has -- yes.

        11    Q.    So these questions I'm going to ask you are about

        12    the 6600, and I'm going to call it the B & R, is that

        13    okay, or do you want to call it the 6600?

        14    A.    No, go ahead, call it the B & R.

12:00:00 15   Q.    Okay.  Did you go look for that after December 5th?

        16    A.    The -- no, I did not because I didn't have it.

        17          I already knew what computers I had in both

        18    places, and I did not have a Dell that he's referring to

        19    as the B & R.

12:00:15 20   Q.    Okay.  I thought we heard your lawyer state earlier

        21    this morning that a 6600 was trashed by you in mid-2022.

        22          Is that not right?

        23    A.    I don't know what I trashed actually in the middle

        24    of -- with respect to the Dell, like, the model number,

12:00:33 25   the serial number.

1           That's gone, and I'm telling you that

2    that's not, quote, what John's referring to as the B & R

3    computer.

4    Q.    But you do know that you threw away a Dell 6600 at

12:00:49  5    some point in mid-2022, right?

6    A.    I'm telling you I -- I do not know even what the

7    model number was.

8           It could have been a 4800, for all I know.

9    Q.    Then how do you know it wasn't the B & R?

12:00:58  10   A.    Because that computer was used for Dyno-Pro.

11          Whatever I tossed had a -- it appeared to

12    have an image -- it wasn't working, which is why it got

13    tossed, and it was a computer that I used for data

14    acquisition for Dyno-Pro.

12:01:12  15   Q.    When did you acquire that computer?

16   A.    That computer was acquired probably in 2014, 2013.

17   Q.    Did I understand your lawyer correctly earlier to

18    say that you had gotten it back from Alotech in 2018?

19   A.    Right.  The purchase of that computer.

12:01:29  20          You asked me when I acquired the computer.

21   Q.    Okay.  But you got it from Alotech in 2018?

22   A.    I picked up a bunch of computers that John had

23    kept, okay, in 2018.

24   Q.    And how do you know that that one wasn't the B & R

12:01:42  25   that we're talking about?

1    A.    Because I didn't take -- when John's referring to a

2    B & R, we're referring to, and his testimony is as such,

3    that it refers to a computer that was used in connection

4    with what's called the ablation station.

12:01:59  5    Q.    And I'm asking you why are you so positive under

6    oath that the one that you received back in 2018 was not,

7    in fact, that computer?

8    A.    Well, I wouldn't have known in 2018.

9    Q.    Okay.  How do you know that in 2022 when you threw

12:02:14 10    it away?

11    A.    Because when I opened it up, it had Dyno-Pro stuff

12    on it.

13    Q.    Is it possible that a computer running the B & R

14    has both Dyno-Pro stuff on it and --

12:02:24 15    A.    No.

16    Q.    You don't think so?

17    A.    Absolutely not.

18    Q.    Okay.  In any event, you threw away a Dell 6600 in

19    mid-2022, right?

12:02:31 20    A.    I can't testify to the fact that it was a 6600.

21          I can't testify to a serial number.

22    Q.    Okay.  But you did dispose of a Dell that you

23    received back from Alotech?

24    A.    Along with other computers as well.

12:02:47 25    Q.    Okay.  Did you go through all those computers when

1    you disposed of them to see if there were Alotech data on

2    them?

3    A.    No.  Actually I was looking for my -- they would

4    have been deleted anyway.

12:02:59  5    Q.    I'm asking if you went through -- you got computers

6    back, you deleted them.

7    A.    Okay.

8    Q.    Did you go through and say, "I need to make sure

9    that there's no Alotech data on here"?

12:03:09  10    A.    I needed to make sure that there was nothing

11    important at all.

12    Q.    You didn't do that, right?

13    A.    Yeah, I didn't just toss them without, like, wiping

14    them.

12:03:18  15    Q.    Okay.  But you didn't search for Alotech data,

16    correct?

17    A.    Not -- I could have.

18              I probably would have searched for anything

19    associated with personal or otherwise.

12:03:32  20    Q.    Okay.  You probably wouldn't have searched for

21    Alotech data on those devices before you destroyed them,

22    correct?

23              MR. PASTERNAK:  What year are we talking

24    about?

12:03:39  25              MR. RAMEY:  I'm talking about the things he

1    says he's got in 2022 and threw away without looking at

2    them.

3    A.    Well -- well, of course I would have looked for

4    that.

12:03:46  5              I would have looked for CFOM, Alotech,

6    Dyno-Pro, anything related to my wife, personal,

7    whatever.

8    Q.    Okay.  The whatever number it was, which was

9    earlier talked about in court as a 6600 that you received

12:03:59 10   back in 2018, you've now testified to us that you wiped

11   it and destroyed it or discarded it in 2022, right?

12   A.    In 2022, yeah.

13   Q.    What month was that?

14   A.    I want to say it was mid year.

12:04:15 15   Q.    Okay.  So June, Julyish?

16   A.    Sounds about right.

17   Q.    Okay.  Did you search that laptop at that time to

18   see if any Alotech data was on it?

19   A.    I would have looked to see what file folders were

12:04:28 20   on there.

21   Q.    I didn't say what --

22   A.    I would have looked.

23   Q.    Did you, yes or no, that you can recall as you sit

24   here today, look for Alotech data before you threw it

12:04:35 25   away?

1  A.   Here's the issue that I have here.

2            You keep saying "Alotech data."

3            You're not specifying what.  I have no

4  idea, when you say "data," what that means.

12:04:46  5  Q.   If you looked for Alotech data, though, you would

6  know, and that's the answer I'm looking for.

7            Did you or did you not look for any?

8  A.   There were no Alotech folders on there, so I'm

9  assuming so when you say "Alotech data" that it would

12:04:58 10  have been properly listed under an Alotech folder.

11  Q.   Did you search the computer for every folder and

12  see whether or not any of them said "Alotech"?

13  A.   There were no -- there were no folders on there

14  that said "Alotech."

12:05:10 15  Q.   I just want you to answer my question.

16            Did you search and look for Alotech data or

17  folders before you threw it away?

18  A.   I'm answering yes at this point --

19  Q.   Okay.

12:05:18 20  A.   -- because I would have seen every folder on

21  whatever drive.

22  Q.   Not because you would have seen.

23            Did you look at every folder on every drive

24  before you discarded it?

12:05:27 25  A.   Did I look at every folder?

1    Q.    You just said "I would have looked at every

2    folder."

3          I'm asking did you; not would you.

4    A.    I looked -- I looked at -- how do I know if I

12:05:38  5    looked at every folder?

6    Q.    We get the point, I think.

7          Can you testify under oath that you went

8    through, before you discarded that computer, and searched

9    for all Alotech data?

12:05:51 10    A.    Yeah, I'm having a very difficult time -- maybe you

11    should write them because I can't hear you.

12    Q.    Before you discarded the computer we're talking

13    about, did you make an effort to search on it and see if

14    there was any Alotech data of any kind?

12:06:09 15    A.    I searched for whatever I knew was Alotech data.

16          MR. RAMEY:  Your Honor, would you please

17    ask him to answer the question?

18          THE COURT:  Yes.

19          Please, sir, listen to the question.  It's

12:06:19 20    a very specific question.  And then answer the question

21    posed to you.

22    BY MR. RAMEY:

23    Q.    Prior to discarding that computer in mid-2022 as

24    you say, did you affirmatively go on and search to see

12:06:33 25    whether it had any Alotech data on it?

1    A.    It's impossible.

2              What -- when I look for something, okay,

3    it's going to be in a folder.

4              What data are we talking about?

12:06:51  5    I have my stuff that I did for CFOM.

6              I have no way of answering your question.

7              You're saying did I search for Alotech

8    data.  Before I answer a question, I have to understand

9    what is Alotech data.

12:07:03 10    Q.    It's six words.

11              Did you search for Alotech data; yes or no?

12              THE COURT:  He's saying he doesn't

13    understand what "Alotech data" means.

14              MR. RAMEY:  Okay.

12:07:12 15              THE COURT:  Except he signed an agreement

16    whereby he agreed to return Alotech data.

17              MR. RAMEY:  Exactly.

18    BY MR. RAMEY:

19    Q.    Did you know what that word meant when you saw it

12:07:20 20    on the term sheet in Section 6B?

21    A.    "Alotech data" to me means whatever file, like a

22    picture or something like that, or something along those

23    lines.

24              "Data" means from the -- a B & R, a

12:07:37 25    temperature of some type of program that we collected

1   data from so --

2                THE COURT:  Maybe you should be specific,

3   Mr. Ramey, and use the verbiage that's contained in the

4   term sheet --

12:07:48  5                MR. RAMEY:  Sure.

6                THE COURT:  -- that incorporates files,

7   data, videos, files, information relating to Alotech.

8                Maybe that will lead him to understand what

9   you're talking about.

12:07:57 10                MR. RAMEY:  Thank you, Judge.

11   BY MR. RAMEY:

12   Q.    Mr. --

13                MR. RAMEY:  Well, it's got the word "data"

14   in it, so I think we're at the same dilemma, but I'll ask

12:08:04 15   him.

16                THE COURT:  Well, "data" is one of the

17   words used.

18                I mean, certainly with regard to the

19   computers you talk about all computers and data storage

12:08:10 20   devices and media, including all data stored on said

21   computers, right?

22                But then there's also all other files,

23   data, reports, videos or information.  And we know some

24   of that's contained on those computers, to include

12:08:23 25   videos, right?

    1    BY MR. RAMEY:

    2    Q.    Before you discarded the computer in 2022 that

    3    we're discussing, did you search to see if there were any

    4    files, data, reports, videos or information relating to

12:08:32 5    Alotech on it?

    6    A.    I searched for any data that belonged to or that I

    7    thought was either Alotech, Dyno-Pro, CFOM -- it doesn't

    8    matter what the name of the company would have been --

    9    before I discarded it.

12:08:46 10                THE COURT:  So you do understand what

    11    "data" is?

    12                THE WITNESS:  When I'm saying "data," if

    13    you're talking the files and as I explained it

    14    temperature data, pressure data, anything along those

12:08:57 15    lines.

    16                THE COURT:  But the question was did you

    17    review that for files, data, reports, videos or

    18    information?

    19                You said you didn't understand what "data"

12:09:04 20    was.  He's clarified it to include all those things.

    21                Did you search for all those things?

    22                MR. PASTERNAK:  Your Honor, could I just

    23    object for one second?

    24                We're talking about a term sheet and we're

12:09:13 25    talking about discarding something in 2000 -- six months

          1    before.

          2                    THE COURT:  I understand.

          3                    MR. PASTERNAK:  Okay.

          4                    MR. RAMEY:  I'm trying to find out where

12:09:20  5    our stuff is.

          6                    MR. PASTERNAK:  What's that?

          7                    MR. RAMEY:  I'm not saying you're violating

          8    the term sheet by that.

          9                    I'm trying to find out where our stuff

12:09:27 10    might be.

         11                    MR. PASTERNAK:  Okay.

         12                    THE COURT:  But we're going to have to take

         13    a break.  It's already 12:09.

         14                    I'm just giving you a heads-up so you can

12:09:34 15    figure out in the next two or three minutes what would be

         16    a good stopping point.

         17                    MR. RAMEY:  Okay.  Let me get through the

         18    6600, and then, hopefully, I'll be able to -- if I could

         19    have five minutes, I could check my notes so we could

12:09:44 20    move on, hopefully.

         21                    THE COURT:  Sure.

         22    BY MR. RAMEY:

         23    Q.    So you've said in your sworn testimony that you

         24    don't know what specific laptop my clients are referring

12:09:54 25    to as the B & R laptop.

1        Is that accurate?

2    A.    I've been under the assumption that we're talking

3    about -- and everything points to -- a computer that was

4    connected to the ablation station.

12:10:11  5    Q.    And why was it that you came to have a discussion

6    with Mr. Ortiz on December 29th about the -- about the

7    B & R laptop?

8    A.    On what date?

9    Q.    In your affidavit, you said the 29th when you went

12:10:25 10   to pick up your property, you had a discussion about the

11   B & R laptop with Mr. Ortiz.

12   A.    Actually, he stopped by and then we wound up

13   talking the next day.

14   Q.    Okay.  And why were you having that discussion with

12:10:37 15   him?

16   A.    Because in the past, I was accused of taking an

17   Alotech computer which is what John refers to as the

18   B & R, which is associated with the ablation station.

19              And Miguel had continued working with

12:10:53 20   Alotech.  That's what I learned.

21   Q.    Okay.  In any event, you don't believe you

22   currently have a Dell 6600 laptop of any kind, whether or

23   not that's the B & R laptop, correct?

24   A.    That's correct.

12:11:03 25   Q.    Okay.  I'm going to read to you -- do you know

1    whether or not the one you disposed of in mid-2022 was a

2    Dell 6600?

3                 I believe your lawyer said it was.

4                 MR. PASTERNAK:  No, I said it was a Dell.

12:11:19  5    A.    What's the question?

6    Q.    Yeah.

7                 Was the computer you disposed of, not

8    serial number, but the one you disposed of in 2022, was

9    that a Dell 6600?

12:11:28 10    A.    It was a Dell.

11                It could have been a 6600.  Could have been

12    a 4800.

13    Q.    Okay.  I'm just going to read to you a line from

14    your affidavit.

12:11:38 15                "I never had possession of any Dell 6600

16    laptop computer, including the Dell M6600 laptop that

17    defendants are referring to as the B & R."

18                Was that a true statement when you made it?

19    A.    Right, because I don't have any 6600 and I don't --

12:11:54 20    at that point, when I'm saying that, is whatever I

21    discarded, I can't tell you if it was a 4800 or whatever

22    model.

23                I never checked.  I just know it was a

24    Dell.  So I didn't have a Dell 66.

12:12:05 25    Q.    And so when you dispose of a computer, and don't

|      |                                                           |
|------|-----------------------------------------------------------|
| 1    | know what it was, you think it's accurate to swear under  |
| 2    | oath, "I never had a Dell 6600"?                          |
| 3    | MR. SAKS:  I'm sorry, Cole, where are you                 |
| 4    | reading from?                                             |

12:12:18  5    MR. RAMEY:  Paragraph 27 of Mike Grassi's
6    January 13th affidavit, the second line of Page 8, "I
7    never had possession of any Dell M6600 laptop computers."
8    And if he doesn't, he doesn't, but I heard
9    different this morning.

12:12:47  10    MR. PASTERNAK:  If you read the whole
11    thing, he's talking about the B & R but --
12    MR. RAMEY:  I disagree.
13    MR. PASTERNAK:  Okay.
14    MR. RAMEY:  It says, "Including but not

12:12:55  15    limited to the B & R."
16    So probably a good time if you want to take
17    a break, Your Honor.
18    I'll collect my notes and try to finish
19    five minutes with Mr. Grassi when we are done and so we

12:13:08  20    can move forward.
21    THE COURT:  I'm sorry?
22    MR. RAMEY:  Probably a good time for me
23    to -- for us to take that break and for me to collect my
24    notes and see if I can just finish with him for two
25    minutes after we're done.

```
                            THE COURT:  All right.  What's the time?
                            MR. PASTERNAK:  We're taking a break for
         lunch or --
                            MR. RAMEY:  12:15.
12:13:21                    THE COURT:  For lunch.
                            So we will be in recess for an hour and 15
         minutes.
                            All right?
                            THE CLERK:  All rise.
12:13:28                    THE COURT:  Thank you.
                            (Luncheon recess taken).
                            (Proceedings recessed at 12:13 p.m.)
                                        -   -   -   -   -


13:34:37
```

13:35:37

13:35:46

13:36:05

13:36:14

13:36:26

 1              FRIDAY, FEBRUARY 10, 2023, 1:35 P.M.

 2                  THE COURT:  Please be seated.

 3                  Mr. Ramey, you may continue.

 4                  MR. RAMEY:  Thank you, Your Honor.

 5          CROSS-EXAMINATION OF MICHAEL GRASSI (RESUMED)

 6   BY MR. RAMEY:

 7   Q.    I have much to ask, but in the interests of moving

 8   this along today I'm going to just spend a couple minutes

 9   and try to keep us going.

10              Mike, you were in the courtroom earlier

11   this morning when there was some discussion about a Dell

12   computer being received by you and discarded in mid-2022.

13              Do you recall that?

14   A.    Yes.

15   Q.    Okay.  And then a lot of the last few minutes of

16   your testimony, we were talking about what that device

17   was.

18              Do you recall that?

19   A.    Yes.  Pretty much, yes.

20   Q.    Okay.  And I think you said at a point in your

21   testimony you don't know what the computer was, whether

22   it was a 6600 or a 4600; you know you got something back

23   in 2018 and you discarded it in 2022.

24              Right?

25   A.    Yes.  In June of 2022 or whenever I discarded, I

| | |
|---|---|
| 1 | did not know that it was a Dell 6600. |
| 2 | Q.   And you still don't know that, right? |
| 3 | A.   The only way I know it is by studying your reports. |
| 4 | Q.   Based on our reports? |
| 13:36:41  5 | What reports are those, the Meraki? |
| 6 | A.   Some Meraki reports. |
| 7 | Q.   Okay.  Let me show you or do you have plaintiffs' |
| 8 | exhibit book with you there on the stand, a black one? |
| 9 | A.   I do not. |
| 13:36:56 10 | I do not. |
| 11 | MR. RAMEY:  Your Honor, do you have yours? |
| 12 | THE COURT:  Yes. |
| 13 | MR. RAMEY:  41.  Plaintiffs' 41. |
| 14 | May I approach? |
| 13:37:11 15 | THE COURT:  Yes. |
| 16 | BY MR. RAMEY: |
| 17 | Q.   Mike, do you recognize that document? |
| 18 | A.   I do. |
| 19 | Q.   Okay.  That was a document that your lawyers |
| 13:37:31 20 | identified as an exhibit in this case. |
| 21 | It's titled, "List of computers purchased |
| 22 | by Mike Grassi/CFOM, used while at Alotech facility." |
| 23 | Do you see that? |
| 24 | A.   Correct. |
| 13:37:42 25 | Q.   I assume you gave that information to your lawyers? |

1   A.    When I typed this up the first time for sure, that

2   said Dell -- "Dell laptop M6600?"

3   Q.    So you're saying there's another document where you

4   put a question mark next to that, right?

13:37:59  5   A.    Yeah, I think we left it as the 6600 so we knew

6   what we were talking about.

7   Q.    But in any event, your Plaintiffs' Exhibit 41 talks

8   about only two Dell computers that you used at the

9   Alotech facility; the 6800, which we've been discussing,

13:38:16 10   and a Dell M6600, correct?

11   A.    To my knowledge, that would be correct.

12   Q.    Okay.  And it says there on that exhibit that you

13   picked up a 6600 in mid-2018 and it wasn't operational,

14   and is that the device you discarded in 2022?

13:38:30 15   A.    I'm identifying the Dell laptop that I picked up in

16   2018 as this, this M6600, based on the Meraki report.

17   Q.    The 6600 was a number that you or your lawyers put

18   on this document, correct?

19   A.    Yes, so that we all knew what we were referring to

13:38:49 20   as far as what both parties were referring to, yes.

21            MR. RAMEY:  That's all I have, Your Honor,

22   for now.

23            Pass the witness.

24            THE COURT:  Thank you.

13:38:56 25            All right.  I have some questions.

1    Now, following up, I think, on the

2    questions that were just relayed again to you, before we

3    broke for lunch I think you were testifying that -- and

4    you've clarified it was in June of 2022 -- that you

5    trashed some computers, and it was plural, correct?

6              THE WITNESS:  Yes.

7              THE COURT:  All right.  And one of those,

8    then, could have been and was or possibly was this B & R

9    6600, correct?

10             THE WITNESS:  That everyone is referring

11   to, correct.

12             THE COURT:  All right.  So is it your

13   testimony that you do believe that you trashed that

14   computer in June of 2022?

15             THE WITNESS:  I -- I trashed a Dell.

16             I don't know if it was the 6600.  I don't

17   know what the serial number is.

18             I trashed something that I picked up in

19   2018 from Alotech that was given back to me.

20             THE COURT:  Okay.  And before you trashed

21   it, what did you do with it?

22             THE WITNESS:  I would have -- my normal

23   practice is to just wipe the drives and then throw it

24   away, or I -- so that's what I would have done.

25             So I would have wiped the drives, meaning

1        that I clear it of any data.

2                    THE COURT:  All right.  Were you the only

3        one that had access to that computer that you trashed?

4                    THE WITNESS:  Yes.

13:40:15  5                    THE COURT:  All right.  And so when you

6        would have wiped the data, you said, would that then

7        explain the fact that the report by Mr. Peltz showed that

8        that computer was active near your home?

9                    THE WITNESS:  Correct.

13:40:32  10                    THE COURT:  Your IP address?

11                    THE WITNESS:  Correct.

12                    THE COURT:  Okay.  Now, before you trashed

13        it, did you download any information to any other device?

14                    THE WITNESS:  No.

13:40:42  15                    THE COURT:  And with regard to your

16        personal cell phone that you testified about previously,

17        you said that you sold it back to the provider?

18                    THE WITNESS:  I turned it in for a

19        telephone credit.

13:40:54  20                    THE COURT:  Okay.  Turned it in for a

21        telephone credit, so you did not get another phone at

22        that time?

23                    THE WITNESS:  I would have gotten another

24        phone.

13:41:02  25                    THE COURT:  Okay.  And so when you turned

1    in that personal phone and got a credit towards the

2    purchase of a new one is what I'm thinking you're

3    saying --

4                      THE WITNESS:  That's correct.

13:41:10  5          THE COURT:  -- did they transfer your data

6    from your old phone to the new one?

7                      Usually that happens.  I just know from my

8    own experience; you transfer data from one phone to the

9    other so it's not lost when you get a new one.

13:41:23 10          THE WITNESS:  Not with respect to the

11   photos.

12                     I believe it was just the -- some of the

13   software and texts.

14                     THE COURT:  So you don't believe it was

13:41:34 15  with respect to --

16                     THE WITNESS:  No, I know -- I know there's

17   no photos because --

18                     THE COURT:  What about videos?

19                     I think the key is the videos, right?

13:41:40 20  Those were on your personal cell phone.

21                     THE WITNESS:  No.

22                     THE COURT:  Okay.  So you know for a fact,

23   your testimony is, that you did not have transferred from

24   the old phone, that contained the videos to the new phone

13:41:54 25  that you replaced it with, those videos?

1    THE WITNESS:  That's correct.

2    THE COURT:  Did you have any information on

3  that old, old cell phone that you turned in for a credit

4  and had transferred information from to the new one, did

13:42:06  5  any of that contain Alotech information or data?

6    THE WITNESS:  No.

7    THE COURT:  And how do you know?

8    THE WITNESS:  Because that phone got

9  completely wiped.

13:42:16  10    There's a program that they give you to

11  wipe it.

12    THE COURT:  But you said you transferred

13  information from the old phone to the new phone.

14    THE WITNESS:  I transferred software, like,

13:42:27  15  apps, and I transferred what -- they were -- I got my

16  texts, text messages.

17    THE COURT:  How about e-mails?

18    THE WITNESS:  No.

19    The e-mails would be just in the cloud.

13:42:39  20  They're not on a telephone.

21    THE COURT:  All right.  So are any of the

22  Alotech e-mails, information, data in your cloud?

23    THE WITNESS:  The only place it would be

24  would be in the MichaelGrassi@Gmail.com.

13:42:55  25    THE COURT:  And that's what you've already

Michael Grassi                                161

1     testified to you still have, right?

2                    THE WITNESS:  That's correct.

3                    THE COURT:  And you haven't checked to see

4     what's there?

13:43:02  5                    THE WITNESS:  That's correct.

6                    THE COURT:  Is there some reason you did

7     not so as to comply with the settlement, the term sheet?

8                    THE WITNESS:  I didn't even think about it

9     because most of those were already forwarded to my

13:43:14 10     attorneys.

11                    THE COURT:  Well, they might have been

12     forwarded to your attorneys, but at the same time

13     "forward" means just to send them on, but you retained

14     them, right?

13:43:23 15                    THE WITNESS:  They could still be there,

16     that's correct.

17                    THE COURT:  Correct.

18                    All right.  Any follow-up associated with

19     that?

13:43:31 20                    MR. RAMEY:  If I could just ask, just so we

21     know for the record completely, Your Honor, whether he

22     still has possession of any of the other devices listed

23     on Exhibit 41.

24                    THE WITNESS:  The only one that I would

13:43:48 25     potentially have is this Labview computer which I believe

Michael Grassi - Cross          162

 1   I already testified to that I didn't fire up.  That's a

 2   very old computer.

 3               That was -- I mean, Labview computer, this

 4   is from the year 1999.

13:44:05  5   BY MR. RAMEY:

 6   Q.   Well, it says --

 7   A.   There wouldn't be any Alotech on there is the

 8   bottom line.

 9   Q.   Okay.  Other than the Labview computer, do you have

13:44:13 10   any of the -- besides the 6800 that's been turned over to

11   your lawyers, are you currently in possession of any of

12   the other devices on Exhibit 41?

13   A.   I cannot locate this IBM ThinkPad.  That's it.  And

14   I brought that up, that was my wife's computer.

13:44:35 15   Q.   I'm asking --

16   A.   That would have -- so I don't -- I don't have it.

17   It hasn't been located.

18               It could have been thrown away and I don't

19   remember it, but it wouldn't have any Alotech data on it.

13:44:45 20   Q.   Okay.  But I didn't ask what you can't locate.

21               I asked do you have possession of any of

22   these devices?

23   A.   Oh, no, I don't.

24               If I do have possession, I don't know where

13:44:55 25   it would be, but I know that's the only one I can refer

1    to, that and the Labview.

2                    I know I've got the Labview computer, and I

3    don't -- in terms of any computers that I remember that I

4    could not locate, it would have been the IBM.

13:45:12  5                The others I can talk to.

6    Q.    Have you searched the other ones?

7    A.    Yes.

8    Q.    You couldn't find them?

9    A.    They've been tossed, but they're all -- like the HP

13:45:26 10   ZA 20, I don't have that so, yes, the simple answer is

11   I'm not in possession of anything other than the Dell

12   M6800 at this point on this list and the Labview

13   computer.

14   Q.    Okay.  Nor did you transfer those to any third

13:45:39 15   party, correct?

16   A.    That's correct.

17                   MR. RAMEY:  Okay.  Thank you.

18                   Nothing further, Your Honor.

19                   Move to admit Plaintiffs' 41.

13:45:44 20               MR. PASTERNAK:  Sure.

21                   THE COURT:  Admitted.

22                   I have one more question, Mr. Grassi.

23                   I know that you were just asked about the

24   list that's identified as Plaintiffs' Exhibit 41 in terms

13:45:54 25   of any of those computers or devices listed thereon,

Michael Grassi

164

1    whether you have them, et cetera.

2              But what devices do you currently own in

3    terms of laptops, iPads, cell phones?

4              What are the names -- identify the devices

13:46:11  5    that you currently own.

6              THE WITNESS:  I own -- I don't know the

7    model number, but I own a Samsung phone and only one

8    phone.

9              THE COURT:  Is that the one that you

13:46:22 10    transferred the data to, the apps and so forth?

11              THE WITNESS:  That's correct.

12              THE COURT:  Okay.  So you have a Samsung

13    phone.

14              THE WITNESS:  Correct.

13:46:29 15              THE COURT:  What else?

16              THE WITNESS:  I have a new Dell computer.

17              THE COURT:  A new Dell computer.

18              THE WITNESS:  And that's correct.

19              THE COURT:  What is it?

13:46:38 20              THE WITNESS:  I don't know the model

21    number.

22              It -- I think it's something Dell 17, maybe

23    if I recall, XPW.

24              THE COURT:  When did you purchase that?

13:46:48 25              THE WITNESS:  In the year 2020.

|        |    |                                                          |
|--------|----|----------------------------------------------------------|
|        | 1  | THE COURT:  And you have that in your                    |
|        | 2  | possession?                                              |
|        | 3  | THE WITNESS:  Yes.                                        |
|        | 4  | THE COURT:  What others?                                 |
| 13:47:00 | 5 | THE WITNESS:  That's it.                                 |

                        1    THE COURT:  And you have that in your
                        2  possession?
                        3            THE WITNESS:  Yes.
                        4            THE COURT:  What others?
13:47:00                5            THE WITNESS:  That's it.
                        6            THE COURT:  Okay.  So aside from --
                        7            THE WITNESS:  Well, I mentioned the Labview
                        8  computer.
                        9            THE COURT:  I'm sorry?
13:47:09               10            THE WITNESS:  I did mention the Labview.
                       11            THE COURT:  Right.  The Labview.
                       12            But aside from the Samsung phone, the new
                       13  Dell computer that you bought in 2020, and the -- well,
                       14  you gave the 6800 to your counsel Mr. Pasternak.
13:47:25               15            Correct?
                       16            THE WITNESS:  That's correct.
                       17            THE COURT:  Where would I -- where would
                       18  anybody find the duplicate or the -- what was copied off
                       19  of the one you gave back to Mr. Pasternak?
13:47:38               20            THE WITNESS:  I -- I already said that.
                       21            Everything was on the 6800.
                       22            THE COURT:  Correct.
                       23            THE WITNESS:  And then there's a what's
                       24  called a virtual image.
13:47:47               25            THE COURT:  Yeah.

```
          1              Where is the virtual image?

          2              THE WITNESS:  It's on a SanDisk.

          3              THE COURT:  It's on a what?

          4              THE WITNESS:  It's on a SanDisk USB drive.

13:47:58  5              THE COURT:  Okay.  And you can then recover

          6    the information from the SanDisk through the use of any

          7    device?

          8              THE WITNESS:  I don't know if you can do

          9    that or not.

13:48:11 10              It has to communicate with the outside

         11    world.

         12              THE COURT:  Um-hmm.

         13              THE WITNESS:  I'm not actually sure.

         14              My -- I believe it -- yeah, it probably

13:48:19 15    does.

         16              It probably can do that, yes.

         17              THE COURT:  Have you ever tried to access

         18    that information?

         19              THE WITNESS:  No, I have not had a chance

13:48:25 20    yet.

         21              My biggest concern with that is, and the

         22    reason for that, is to be able to use programs that were

         23    created that work in Windows 7 and earlier that will not

         24    work in Windows 10 or 11, which is my current

13:48:41 25    computers -- computer, I should say, which is the Dell.
```

1          I think it's the Dell 17 XPW.

2                   THE COURT:  All right.  Any questions based

3     upon my questions?

4                   MR. RAMEY:  No, Your Honor.

13:48:54  5         THE COURT:  All right.  Thank you.

6                   I'd like to see counsel in chambers,

7     please.

8                   (Recess taken.)

9                   THE COURT:  Please be seated.

14:41:51 10        Mr. Grassi, would you please take the

11    witness stand again, Mr. Michael Grassi?

12                  You're still under oath.

13                  Mr. Ramey.

14                  MR. RAMEY:  Thank you, Your Honor.

14:42:14 15   BY MR. RAMEY:

16    Q.    Mr. Grassi, please turn back to Exhibit 43 in the

17    defendants' exhibit book there, the term sheet.

18                  Are you there?

19    A.    Yes.

14:42:34 20   Q.    Okay.  Turn to Page 3, which is the top of that

21    page, Paragraph 6B.

22    A.    Okay.

23    Q.    Okay.  Have you read that 6B?

24    A.    Okay.

14:42:55 25   Q.    Are you aware of any of those materials in 6B being

1    located anywhere other than possibly your phone, your new

2    Dell computer, the virtual image on the SanDisk, the Dell

3    6800 that we've discussed, or your Gmail account?

4    A.    That's it.

14:43:17  5    Q.    Okay.  When the --

6                 THE COURT:  You mean you're not aware of

7    them being anywhere else?

8                 THE WITNESS:  They're not anywhere else.

9                 THE COURT:  Okay.  Thank you.

14:43:28 10   BY MR. RAMEY:

11    Q.    And you're sure of that?

12    A.    I'm sure of that.

13    Q.    When the virtual image was made on December 7th

14    with you and Mr. Rizzuti, you've testified that that

14:43:37 15   virtual image resides on a SanDisk that you have here in

16    the courtroom, correct?

17    A.    That's correct.

18    Q.    Okay.  Were there any other images or copies made

19    at that or any other time of that Dell 6800?

14:43:51 20   A.    No.  No.

21    Q.    Was any information transferred off a Dell 6800

22    otherwise after December 5th, 2022?

23    A.    No.

24                 MR. RAMEY:  I believe that's what you

14:44:07 25   wanted us to ask, Your Honor.

```
              1              THE COURT:  Yes.

              2              All right.  Thank you.

              3              You may step down, Mr. Grassi.

              4              MR. PASTERNAK:  Should I go get Charles?

14:44:14      5              THE COURT:  Yes.

              6              MR. PASTERNAK:  Okay.

              7              (Witness excused).

              8              THE CLERK:  Please step forward.  Watch

              9    your step.

14:45:03     10              Remain standing and raise your right hand

             11    so I can swear you in.

             12                      CHARLES RIZZUTI,

             13       of lawful age, a witness called by the Defendants,

             14              being first duly sworn, was examined

14:45:12     15                and testified as follows:

             16              THE CLERK:  Thank you.

             17              THE COURT:  Mr. Rizzuti, please be seated.

             18              And speak directly into the microphone in

             19    response to Mr. Ramey's questions, so that we can all

14:45:21     20    hear you and our court reporter can take down your

             21    testimony.

             22              You may inquire.

             23       CROSS-EXAMINATION OF CHARLES RIZZUTI

             24    BY MR. RAMEY:

14:45:26     25    Q.   Good afternoon, Mr. Rizzuti.
```

Rizzuti - Cross                                    170

```
          1              You've got a binder of exhibits next to you

          2     there on the stand that says defendants' exhibits.

          3              Do you see that?

          4     A.    Yes.

14:45:34  5     Q.    Would you open that up, please, and turn to Exhibit

          6     43?

          7              Are you there?

          8     A.    Yeah.

          9     Q.    Okay.  Go to Page 2, Paragraph 6.

14:45:55 10              Do you see that?

         11     A.    Yes.

         12     Q.    Okay.  It has an obligation of Mr. John Grassi to

         13     return certain property to Alotech.

         14              6A talks about some laptops, and 6B talks

14:46:11 15     about some file, data, reports, videos or information

         16     relating to Alotech or any work done for Alotech by or on

         17     behalf of CFOM, Inc. or Michael Grassi or their

         18     respective affiliates.

         19              Do you see that?

14:46:25 20     A.    Yes.

         21     Q.    Okay.  At any time after December 5th, 2022, have

         22     you come into possession from Mike Grassi of any of the

         23     materials that might be covered by Section 6B there?

         24     A.    No.

14:46:40 25     Q.    Okay.  Let's talk about 6A.
```

         1                 I understand from earlier testimony this

         2       morning that on December 7th, you and Mike Grassi got

         3       together and made a virtual image of a device that we

         4       call the Dell 6800.

14:46:56 5                 Correct?

         6       A.   Yes.

         7       Q.   Okay.  Got a lot of questions I want to ask you

         8       about that, but the Court has asked me to be very narrow

         9       in my questioning.

14:47:03 10                So, first of all, can you tell us

        11       specifically what might have been removed from the 6800

        12       at that time?

        13       A.   No.

        14                 I don't -- I deleted a few files, some old

14:47:17 15      stuff to make room because the C drive was super full.

        16       Q.   Do you know what those files were?

        17       A.   No.

        18       Q.   And at that point in time, I don't know how this

        19       works, but you set about making a virtual image somehow

14:47:31 20      using some software.

        21                 Right?

        22       A.   Yes.

        23       Q.   That's VMware, I take it?

        24       A.   Yes.

14:47:36 25      Q.   Okay.  And there's been testimony today that that

```
         1    virtual image was placed on a SanDisk device that's here

         2    in this courtroom.

         3                   Do you -- do you recall that happening on

         4    the 7th?

14:47:49 5    A.    Yes.  We -- I put it on a SanDisk.

         6    Q.    Okay.  Was any other image created of that device,

         7    the 6800, on the 7th or at any other time after December

         8    5th that you know of?

         9    A.    No.

14:48:03 10   Q.    Are there any other virtual images or media

         11   containing any information that was at one time located

         12   on the 6800 that you know about?

         13   A.    Not that I know.

         14   Q.    Is the only copy of anything from the 6800, to your

14:48:19 15   knowledge, the one that was placed on the SanDisk via the

         16   virtual image?

         17   A.    Yes.

         18   Q.    And since that time, has there been any

         19   alterations, deletions, additions to the virtual image

14:48:31 20   since December 7th?

         21   A.    Not that I know of.

         22   Q.    Okay.  But that's been in the possession of Mike

         23   Grassi, correct?

         24   A.    Yes.

14:48:36 25   Q.    Okay.  And you don't have possession of any of that
```

Rizzuti - Cross                         173

```
          1    material in any form or fashion?
          2    A.    No.
          3                MR. RAMEY:  One moment, please.
          4                (Pause.)
14:48:55  5    BY MR. RAMEY:
          6    Q.    I have just been asked to clarify one thing.
          7                Do you know what drive you deleted things
          8    from on the 6800 on the 7th?
          9    A.    The C drive.
14:49:06 10                I moved some stuff to the D drive and
         11    deleted some files off the C drive.
         12    Q.    But you're not sure what those deleted files were?
         13    A.    It was junk files.
         14    Q.    And no other files were deleted from other drives,
14:49:22 15    to your knowledge?
         16    A.    No.
         17    Q.    Okay.  By either you or Mike Grassi?
         18    A.    No.
         19    Q.    Okay.
14:49:27 20                MR. RAMEY:  I think that's it, Your Honor.
         21                THE COURT:  All right.  Thank you.
         22                Mr. Rizzuti, you may step down.
         23                Thank you, sir.
         24                (Witness excused).
14:49:36 25                MR. PASTERNAK:  Can he stay in the
```

1      courtroom, or do you want him out?

2                    THE COURT:  No, because he may come back to

3      testify if we continue with the evidentiary hearing at

4      some point.

14:49:46  5              MR. PASTERNAK:  What about all those people

6      in the back?

7                    MS. BLUM:  Your Honor, I was going to say

8      we do have some witnesses who we thought could sit in for

9      the rest of this because there weren't going to be other

14:49:57  10   witnesses, but we can ask them to leave, too.

11                   MR. PASTERNAK:  Yes.

12                   THE COURT:  Yes, please.

13                   MS. BLUM:  Okay.  Our witnesses have to

14     leave.

14:50:07  15                  (Pause.)

16                   THE COURT:  Of course, the good news is

17     that the questioning of Mr. Rizzuti was very limited to

18     just what occurred that only he would know about.

19                   A factual -- it was a factual witness as

14:50:19  20   distinguished from anything else.

21                   So -- all right.  Now, the Court met with

22     counsel for the parties in chambers, and it was agreed by

23     the Court and counsel that the following will take place.

24                   First, Mr. Michael Grassi, I understand

14:50:39  25   that you brought the SanDisk to Court today.

1          Is that correct?

2          MR. MICHAEL GRASSI:  Correct.

3          THE COURT:  All right.  Where is that

4  SanDisk?

14:50:46  5          MR. MICHAEL GRASSI:  I mean, it's in

6  my -- in the other room.

7          THE COURT:  In the other room.

8          Would you go get it, please?

9          (Pause.)

14:51:52  10          THE COURT:  Mr. Grassi, would you hand that

11  SanDisk to your lawyer, Mr. Pasternak?

12          Thank you.

13          All right.  First, Mr. Pasternak is charged

14  with keeping possession, control of that SanDisk that was

14:52:07  15  just handed to him by Mr. Grassi that is the clone, I'll

16  call it, of the 6800 computer, the Dell computer.

17          That virtual copy was made, as I understand

18  it from the testimony of both Mr. Grassi and Mr. Rizzuti,

19  on December 7th at the Columbus home of Mr. Grassi.

14:52:26  20          As far as the testimony has shown,

21  Mr. Rizzuti has confirmed, that is the only copy of that

22  virtual copy or representation of the 6800 Dell, so

23  that's going to be kept by Mr. Pasternak along with the

24  Dell 6800 computer.

14:52:43  25          And then, also, those two items, the

1    SanDisk and that 6800 computer, as well as Mr. Grassi's

2    Samsung phone and his new Dell computer that he

3    referenced he bought or purchased in 2020, and the Gmail

4    account of Mr. Michael Grassi will be the subject of a

14:53:06  5    forensic examination to be conducted as quickly as we can

6    get that situated.

7              But in anticipation of that examination,

8    I'm ordering that the parties agree on a forensic

9    examiner, a third party neutral forensic examiner by

14:53:24  10   March 1st and report back to the Court a joint status

11   report who they've agreed to to conduct the forensic

12   examination of these devices.

13             And then by March 15th, the parties or

14   counsel for the parties must file another joint status

14:53:41  15   report notifying the Court of their progress in terms of

16   meeting with the identified forensic examiner, evaluating

17   how the examination is going to take place, agreeing on

18   that; perhaps what's going to be shown in the report,

19   anything search-term wise.

14:54:03  20             In other words, anything you can agree on

21   in terms of the forensic examiner moving forward to start

22   this process, I need to know about in a joint status

23   report to be filed by March 15th.

24             Mr. Grassi, to the extent that you

14:54:16  25   obviously still have your Gmail account and your Samsung

1    phone and your new Dell, obviously the forensic

2    examination of the devices will be fine-tuned so that you

3    have access to those for your own personal and business

4    reasons as much as possible.

14:54:36  5              In other words, giving the forensic

6    examiner just what time he absolutely needs to review

7    those devices, see if he can make, in fact, copies or

8    whatnot.

9              But nonetheless, we'll try to minimize you

14:54:47  10   not having those devices, but we have to wait and

11   confer -- or the attorneys do -- with the forensic

12   examiner to see how much time he would need to review the

13   information on those two devices.

14              So you are not to -- I'm going to tell you

14:55:03  15   not to delete, remove, move anything from those, the

16   Samsung phone and the new Dell computer.

17              Is that satisfactory, Ms. Blum?

18              MS. BLUM:  I would say from any of the

19   items that are going to be reviewed by the forensic --

14:55:19  20              THE COURT:  Well, he's not going to

21   have -- he's not going to have possession of the 6800

22   computer, right?  Or the -- what he just -- the virtual

23   copy that he just handed to Mr. Pasternak.

24              And the Gmails, obviously, that's --

14:55:36  25   I -- that's on those devices or in the cloud.

14:55:52 So again don't delete, remove, in any way
alter the contents of those devices and your Gmail, okay,
your Gmail account, what's on it, because we have to make
sure what's on it and what's not on it.

So again, and I need to strongly advise
you, sir, that if I would find out at any point in the
future that you did alter or do something with these
devices before the forensic examination can take place,
then I reserve the right specifically to issue a show
14:56:15 cause order why I shouldn't find you in contempt of the
order of this Court.

And there are consequences associated
therewith, including financial consequences and
ultimately could be a period of incarceration.  So please
14:56:27 be mindful of that.

And I will say that the agreement was that
counsel, that both parties would share the cost of that
forensic examination, and so that's the way it should go.

Mr. Pasternak, you're looking at me
14:56:40 quizzically.

Did you want to say something?

MR. PASTERNAK:  I'm just enjoying the
moment.

I'm not doing anything.
14:56:45 I'm not looking quizzically.

```
          1              THE COURT:  All right.  I thought maybe I
          2      stated something incorrectly.
          3              MR. PASTERNAK:  No.  No.  I'm just
          4      listening.
14:56:53  5              THE COURT:  Ms. Blum?
          6              MS. BLUM:  No, Your Honor.
          7              That's correct.
          8              THE COURT:  All right.  Is there anything
          9      that I missed in terms of advising Mr. Grassi and setting
14:56:59 10      forth on the record what was agreed to and the Court
         11      agreed to order in this case to move it forward?
         12              Because we could take days to get through a
         13      hearing on this motion, and I wanted to cut to the chase
         14      to have a forensic examiner evaluate these devices and
14:57:13 15      see what's on them, what may have been deleted, removed,
         16      transferred, et cetera.
         17              So I think this is the quickest way to get
         18      from point A to point B.
         19              MS. BLUM:  Question, Your Honor.
14:57:26 20              I assume that then the motions remain
         21      pending.
         22              THE COURT:  Pending, yes.
         23              Yes.
         24              And the hearing will be held in abeyance.
14:57:34 25              Obviously, we may have to get back on and
```

1    have a hearing on other issues, but I think this is a

2    good starting point to see -- the main concern from

3    Alotech, as I understand it, is the information.

4             They want the property back.  So looking at

5    the devices will show them what's there, what may not be

6    there, what was removed, transferred, et cetera.

7             So we'll get it -- and otherwise, you would

8    be having witnesses come on and in a roundabout way try

9    to testify to reach circumstantial conclusions about what

10   must have happened, should have happened, possibly

11   happened, but in the end, I think the forensic

12   examination is the best way to have direct evidence of

13   it.

14             Satisfied, Mr. Pasternak?

15             MR. PASTERNAK:  Yes, Your Honor.

16             Yes.

17             THE COURT:  All right.  So we'll hold the

18   motions pending this forensic examination.

19             And once you give me that status report by

20   March 15th, then we'll set some more dates depending upon

21   what's contained therein because that will really tell me

22   what the forensic examiner needs to do and how much time.

23             And so then certainly we can reconvene this

24   hearing if as necessary, depending upon the results of

25   that forensic examination.

1          MS. BLUM:  Thank you, Your Honor.

2          MR. PASTERNAK:  Thank you, Your Honor.

3          THE COURT:  All right.  Thank you, all.

4          THE CLERK:  All rise.

5          (Proceedings concluded at 2:58 p.m.)

6                     -  -  -  -

7              C E R T I F I C A T E

8              I certify that the foregoing is a correct

9    transcript from the record of proceedings in the

10   above-entitled matter.

11

12

13

14   **/s/Susan Trischan**
     /S/ Susan Trischan, Official Court Reporter
15   Certified Realtime Reporter

16   7-189 U.S. Court House
     801 West Superior Avenue
17   Cleveland, Ohio 44113
     (216) 357-7087

18

19

20

21

22

23

24

25

1          **I N D E X**

2

3     <u>**WITNESSES:**</u>                                              <u>**PAGE**</u>

4       DIRECT EXAMINATION OF JOHN GRASSI                      16

5       BY MS. BLUM

6       CROSS-EXAMINATION OF MICHAEL GRASSI                    78

7       BY MR. RAMEY

8       CROSS-EXAMINATION OF MICHAEL GRASSI (RESUMED)         154

9       BY MR. RAMEY

10      CROSS-EXAMINATION OF CHARLES RIZZUTI                  169

11      BY MR. RAMEY

12

13                          *  *  *  *  *

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT 5

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL GRASSI, et al.,                              Case No.: 1:18-cv-02619

      **Plaintiffs,**

    -vs-                              **JUDGE PAMELA A. BARKER**

JOHN GRASSI, et al.,

      **Defendants.**  **ORDER**

On March 8, 2024, the Court issued a Memorandum Opinion and Order denying Plaintiffs'

request to vacate the Term Sheet and dismissal under Rule 60(b)(6) and denying in part and granting

in part Defendants' Renewed Motion to Enforce Term Sheet.  (Doc. No. 301.)  In its Opinion, the

Court concluded that "Plaintiffs are free to find and pay for their own forensic examiner from this

point forward."  (*Id*. at PageID# 6605.)  The following business day, Plaintiffs filed a Motion for

Order to Forensic Examiner to Return Devices.  (Doc. No. 302.)  In the Motion, Plaintiffs requested

an order from the Court stating that:

> [T]he forensic examiner is to: (1) return to Plaintiffs or their counsel all devices
> previously provided by Plaintiffs to the forensic examiner; (2) return all login,
> password and other access information to Plaintiffs' Gmail account and/or devices;
> and (3) destroy any information relating to Plaintiffs' devices or accounts in its
> possession.

(*Id*.)

Plaintiffs contended that "implicit" in the Court's March 8, 2024, Opinion was that "the

current forensic examination process has concluded, and Plaintiffs are entitled to the return of their

devices."  (*Id*.)  The Court agreed and granted Plaintiffs' Motion the same day they filed it.  (Non-

Document Order dated March 11, 2024.)  In its Order, the Court added the proviso that the forensic

examiner is to return the devices and destroy any information in its possession only "[t]o the extent that doing so will not interfere with any pending federal grand jury subpoena." (*Id.*)

On March 12, 2024, Defendants filed an Emergency Motion for Preliminary Injunction seeking (1) an order enjoining Plaintiffs from possessing Alotech property; (2) the return to Defendants rather than Plaintiffs of "the Dell M6800 laptop, the SanDisk storage device, and devices containing files whose metadata identify[] them as having come from the Dell M6800;" (3) a 30-day stay of the Court's March 11, 2024, Order; and (4) an order that the forensic examiner, Ernst & Young, "maintain a forensically sound copy of the devices and data in its possession, as well as its related working papers, in escrow." (Doc. Nos. 303, 303-2.)

On March 14, 2024, Plaintiffs filed an Opposition to Defendants' Motion for Preliminary Injunction. (Doc. No. 306.) Plaintiffs argue that Defendants have failed to demonstrate any of the factors necessary for injunctive relief. (*Id.* at PageID# 6665-69.) And they contend that if the Court were to grant Defendants' Motion, the Court should require Defendants to post a $2.5 million bond. (*Id.* at PageID# 6670.)

On March 15, 2024, Defendants filed a Reply. (Doc. No. 308.) Defendants chiefly argue that they only "seek[] to maintain the status quo" and that "escrow of the material by a neutral third party [i.e., Ernst & Young] is the only way to guarantee it is unadulterated for any future proceedings." (*Id.* at PageID# 6701.)

After carefully considering the parties' arguments, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion for Preliminary Injunction, as follows.

First, the Court DENIES Defendants' request for an order "enjoin[ing] [Plaintiffs] from possessing Alotech property, including that which is currently in possession of Ernst & Young." (Doc. No. 303-2, PageID# 6651.) As the Court stated in its Memorandum Opinion and Order,

whether the files on the devices Plaintiffs gave to the forensic examiner "are Alotech property that Plaintiffs should have returned under the Term Sheet is still to be determined."  (Doc. No. 301, PageID# 6618.)  Until that is determined, there is no breach of the settlement agreement, and the Court thus lacks authority to grant injunctive relief.  (*Id*. at PageID# 6617.)

Second, the Court DENIES Defendants' request that "the Dell M6800 laptop, the SanDisk storage device, and devices containing files whose metadata identify[] them as having come from the Dell M6800" be returned to Defendants.  (Doc. No. 303-2, PageID# 6651.)  In the Term Sheet, Plaintiffs agreed to return the Dell M6800, and Plaintiffs voluntarily turned over the SanDisk storage device to Ernst & Young.  But the decision to return these devices to Defendants—that is, to comply with the condition precedent of the Term Sheet—is for Plaintiffs to make.  The Court will not order that Plaintiffs return the devices at this stage.

Third, the Court GRANTS Defendants' Motion to the extent that it requests that the Court order Ernst & Young to maintain forensic copies of the devices and data at issue.  It appears to the Court that Ernst & Young has already created forensic copies of the devices and data.  (*See* Doc. Nos. 223, 228.)  If this is the case, Defendants shall direct Ernst & Young to maintain these copies at Defendants' expense.  (*See* Doc. No. 308-1, PageID# 6707.)  If Ernst & Young has not created forensic copies, Defendants shall direct Ernst & Young to do so **within 30 days of the date of this Order**.  Defendants shall pay the costs of creating these copies, if necessary.  Ernst & Young shall maintain the forensic copies until further order of the Court, and Ernst & Young shall not conduct any further forensic examination on them.

Fourth, the Court GRANTS Defendants' request to hold the Court's March 11, 2024, Order in abeyance for 30 days.  The purpose of this 30-day stay is to provide Ernst & Young time to create forensic copies of the devices and data if they have not already done so, and to determine whether

3

returning the devices and data to Plaintiffs per the March 11, 2024, Order will interfere with any still pending federal grand jury subpoena. **On the 31st day after the date of this Order**, Ernst & Young shall return the devices, data, and access information to Plaintiffs in accordance with the March 11, 2024, Order.

     **IT IS SO ORDERED.**

Dated:  March 19, 2024             _s/ Pamela A. Barker_
                                       PAMELA A. BARKER
                                       UNITED STATES DISTRICT JUDGE

# EXHIBIT 6

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

MICHAEL GRASSI, et al.,                           Case No.: 1:18-cv-02619

           Plaintiffs,

      -vs-                                      JUDGE PAMELA A. BARKER

JOHN GRASSI, et al.,

           Defendants.          **MEMORANDUM OPINION & ORDER**

Before the Court are several motions. On January 3, 2023, Defendants filed a Motion to Enforce Term Sheet. (Doc. No. 182.) On January 17, 2023, Plaintiffs filed an Opposition to Defendants' Motion and their own Counter-Motion to Enforce Term Sheet. (Doc. No. 186.) On October 2, 2023, Defendants filed a Renewed Motion to Enforce Term Sheet. (Doc. No. 275.) Most recently, on January 9, 2024, Plaintiffs requested that the Court vacate the Term Sheet and the dismissal order (Doc. No. 178) under Federal Rule of Civil Procedure 60(b)(6). (Doc. No. 292.) On January 19, 2024, Defendants filed a Response to Plaintiffs' Rule 60(b)(6) request (Doc. No. 296), to which, on January 24, 2024, Plaintiffs filed a Reply. (Doc. No. 299.)

For the following reasons, the Court DENIES Plaintiffs' request under Rule 60(b)(6), GRANTS IN PART Defendants' Renewed Motion to Enforce Term Sheet, and DENIES as MOOT Defendants' Motion to Enforce Term Sheet and Plaintiffs' Counter-Motion to Enforce Term Sheet.

## I.     Relevant Background

The Court has described the factual and procedural background of this case in multiple prior orders. The Court will pick up where its last order, entered on October 5, 2023, left off.[1] (Doc. No. 279.) On October 30, 2023, the Court held a status conference with the parties pursuant to its October 5, 2023, order. (Doc. No. 282.) The parties and the Court discussed the preliminary forensic report and data and resolution of the ongoing dispute in this case. (*Id.*) While the parties could not reach an agreement during the status conference, they agreed to confer further and notify the Court of the status of their negotiations by November 22, 2023. (*Id.*)

On November 22, 2023, the parties filed a Joint Status Report on their negotiations. (Doc. No. 287.) They asked for additional time to narrow the issues between them. (*Id.*) The Court ordered that the parties file a further status report by January 8, 2024.

On January 8, 2024, the parties filed a Joint Status Report notifying the Court that they had reached an impasse. (Doc. No. 292, PageID# 6486.) Seeing no way to resolve the dispute, Plaintiffs requested that the Court vacate the Term Sheet and the dismissal order under Rule 60(b)(6) and set the case for trial. (*Id.* at PageID# 6488.) Defendants instead asked that the Court rule on its Renewed Motion to Enforce Term Sheet. (*Id.* at PageID# 6493.) The Court set a schedule for further briefing on Plaintiffs' Rule 60(b)(6) request. (Non-Document Order dated January 10, 2024.) Defendants

---

[1] Specifically, in that Order, the Court identified three options to resolve the case: (1) the forensic examiner and the parties review ▮▮▮▮▮▮▮ and determine which, if any, are Defendants'; (2) ▮▮▮▮▮▮▮ are not reviewed, Plaintiffs do not return Defendants' property, and, since Defendants' payment ▮▮▮▮▮▮▮ is conditioned on the return of Defendants' property, Defendants are excused from paying Plaintiffs; or (3) the parties renegotiate the settlement agreement to add an additional term such as a permanent injunction preventing Plaintiffs from using Defendants' intellectual property and trade secrets. (Doc. No. 279, PageID# 6352-53.) At the status conference, the parties chose the last option.

2

timely filed a Response opposing Plaintiff's request to vacate. (Doc. No. 296.) And Plaintiffs timely filed a Reply in support of their request. (Doc. No. 299.)

## II.    Law and Analysis

The Court will begin its analysis with Plaintiffs' request to vacate under Rule 60(b)(6). It will then turn to Defendants' Renewed Motion to Enforce Term Sheet. Finally, the Court will provide a framework for a way forward.

### A.    Plaintiffs' Request to Vacate Under Rule 60(b)(6)

In their request to vacate, Plaintiffs argue that Defendants' conduct since they filed their Motion to Enforce Term Sheet is exceptional and extraordinary and justifies vacating the dismissal and the settlement agreement under Rule 60(b)(6) and setting the case for trial. (Doc. No. 292, PageID# 6490.) Defendants respond that the dispute between the parties is "merely one of disagreement regarding the performance of a contract" and does not merit relief under Rule 60(b)(6). (Doc. No. 296, PageID# 6545.) They further contend that Plaintiffs' request is untimely, and that Plaintiffs have acted in bad faith. (*Id*. at PageID# 6547, 6551.)

For the following reasons, the Court concludes that, at this stage, this case does not merit relief under Rule 60(b)(6). Therefore, it does not reach the parties' timeliness and bad faith arguments.

Rule 60(b) provides:

On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
    (1) mistake, inadvertence, surprise, or excusable neglect;
    (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
    (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
    (4) the judgment is void;

(5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or

**(6) any other reason that justifies relief**.

Fed. R. Civ. P. 60(b) (emphasis added). Plaintiffs seek relief under Rule 60(b)'s last provision.

Rule 60(b)(6) is a "catchall provision." *Miller v. Mays*, 879 F.3d 691, 698 (6th Cir. 2018) (quoting *West v. Carpenter*, 790 F.3d 693, 696 (6th Cir. 2015)). It only authorizes relief for reasons not addressed in one of Rule 60(b)'s other five provisions. *Hopper v. Euclid Manor Nursing Home, Inc.*, 867 F.2d 291, 294 (6th Cir. 1989). And it only applies in "exceptional or extraordinary circumstances where principles of equity mandate relief." *West*, 790 F.3d at 696-97. Whether "to grant Rule 60(b)(6) relief is a case-by-case inquiry." *Id.* at 697. The district court must "intensively balance numerous factors, including the competing policies of the finality of judgments and the incessant command of the court's conscience that justice be done in the light of all facts." *Zagorski v. Mays*, 907 F.3d 901, 904 (6th Cir. 2018) (quoting *McGuire v. Warden, Chillicothe Corr. Inst.*, 738 F.3d 741, 750 (6th Cir. 2013)). A party must establish a right to relief under Rule 60(b)(6) by clear and convincing evidence. *Info-Hold, Inc. v. Sound Merch., Inc.*, 538 F.3d 448, 454 (6th Cir. 2008). A district court has "especially broad" discretion to decide a Rule 60(b)(6) motion. *Hopper*, 867 F.2d at 294.

Rule 60(b)(6) is "rarely invoked to vacate a settlement agreement." *G.G. Marck & Assocs. v. N. Am. Invs., Corp.*, 465 F. App'x 515, 517 (6th Cir. 2012); *see also G.G. Marck & Assocs. v. Peng*, 309 F. App'x 928, 935 (6th Cir. 2009) ("A district court should normally seek to enforce a settlement."). The mere breach of a settlement agreement is insufficient to invoke it. *Info-Hold, Inc.*, 538 F.3d at 459. Rather, the Rule requires "something more." *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 487 F.3d 465, 469 (6th Cir. 2007) (*Mustangs Unlimited I*) (quoting *Pruzinsky v.*

4

*Gianetti (In re Walter)*, 282 F.3d 434, 440 (6th Cir. 2002)). The Sixth Circuit has found "something more" to exist where a party "repudiate[es]" (or attempts to repudiate) a settlement agreement. *ARO Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976); *see also Ford Motor Co. v. Mustangs Unlimited, Inc.*, 420 F. App'x 522, 529 (6th Cir. 2011) (*Mustangs Unlimited II*).

But what does it mean to repudiate a settlement agreement? The dictionary definition provides that to repudiate is "to reject or renounce (a duty, obligation, offer, etc.); esp., to indicate an intention not to perform (a contract)." REPUDIATE, Black's Law Dictionary (11th ed. 2019). *Mustangs Unlimited II* offers additional guidance. The district court in that case found repudiation where the defendant "exhibit[ed] a certain amount of confusion to the operation" of the consent judgment at issue and "substantial[ly and continu[ally] disregarded" the judgment over three years. *Ford Motor Co. v. Mustangs Unlimited, Inc.*, 2007 U.S. Dist. LEXIS 66207 at *20 (E.D. Mich. Sep. 7, 2007). The Sixth Circuit affirmed the district court's Rule 60(b)(6) vacatur because "the traditional remedies relied upon to enforce a consent agreement appear[ed] insufficient" based on the defendant's repeated violations of the agreement. *Mustangs Unlimited II*, 420 F. App'x at 529. However, the court found it "unnecessary" to "[d]elineat[e] the difference between repudiation and breach to resolve th[e] case." *Id*. at 529.

Ohio state decisions clarify the line between repudiation and breach. The settlement agreement in this case is governed by state contract law. *See Smith v. ABN AMRO Mortgage Group, Inc.*, 434 F. App'x 454, 460 (6th Cir. 2011). Under Ohio contract law, "anticipatory repudiation" occurs when "one party to a contract refuses to perform under the terms of the contract . . . 'before the time fixed for performance has arrived.'" *Sunesis Trucking Co. v. Thistledown Racetrack, LLC.*, 22 N.E.3d 190, 195 (Ohio 8th Dist. Ct. App. 2014) (quoting *McDonald v. Bedford Datsun*, 570 N.E.2d 299, 301 (Ohio 8th Dist. Ct. App. 1989)). The party's repudiation must be clear and unequivocal.

*McDonald*, 570 N.E.2d at 301. A request for a change in terms or for cancellation is not a repudiation. *Id*. Nor is an "expression of doubt as to willingness or ability perform." *Farmers Comm'n Co. v. Burks*, 719 N.E.2d 980, 990 (Ohio 3d Dist. Ct. App. 1998). Rather, the party must "insist[] upon terms contrary to the parties' agreement to the point where that insistence amounts to a statement of intention not to perform except on conditions which go beyond the contract." *Bank One, N.A. v. Echo Acceptance Corp.*, 380 F. App'x 513, 518 (6th Cir. 2010) (quoting *Mihelich v. Active Plumbing Supply Co.*, 2009 Ohio App. LEXIS 1908 at *8 (Ohio 8th Dist. Ct. App. May 14, 2009)).

Plaintiffs argue that Defendants have repudiated the settlement agreement through three actions: (1) refusing to pay any of the settlement amount despite Plaintiffs' turning over the disputed devices to the forensic examiner; (2) seeking to file a new complaint; and (3) stating they will not pay under the Term Sheet unless they receive databases not mentioned in the Term Sheet. (Doc. No. 292, PageID# 6489-90.)

Defendants respond that these alleged actions do not "mandate relief," do not meet the exceptional or extraordinary standard of Rule 60(b)(6), and are conclusory and without support. (Doc. No. 292, PageID# 6548 (citing *Frank v. Good Samaritan Hosp.*, 2023 U.S. App. LEXIS 27221 at *3 (6th Cir. Oct. 11, 2023)).)

For the following reasons, the Court concludes that Plaintiffs have failed to establish that these actions are clear and convincing evidence that Defendants have repudiated the settlement agreement.

First, as further explained in the next section, Defendants' performance under the Term Sheet—███████████████████████████████—is, at this time, excused. Plaintiffs may have failed to turn over all Alotech property, so Defendants currently have no obligation to pay. Their refusal to pay is not, therefore, a repudiation. Rather, it is their contractual right due to Plaintiffs' possible failure to satisfy the Term Sheet's condition precedent.

6

Second, Defendants did not repudiate the settlement agreement by seeking to file a new complaint.  In June 2023, Defendants filed a Motion to File Complaint Under Seal.  (Doc. No. 240.)  In the Motion, Defendants asked to file a new complaint that "overlap[ed]" with the parties and subject matter of this case but included "additional factual allegations and claims" not before the Court.  (*Id*. at PageID# 5792.)  They wrote that the new complaint  "discuss[ed] in detail the parties' confidential Term Sheet and the confidential settlement terms therein."  (*Id*. at PageID# 5792, 5795.)  To the extent the new complaint was related to enforcing the settlement agreement, it would have been (and is) entirely appropriate.  In *Mustangs Unlimited I*, the court favorably quoted language that "[i]f adequate relief is available through a separate lawsuit for a breach of the settlement agreement, the court may leave the parties to that remedy and refuse to set the judgment aside."  487 F.3d at 469 (quoting 12 Moore's Federal Practice § 60.48[3][d] (3d ed. 2000)).  But even if the new complaint was unrelated to enforcement of the settlement agreement, it is far from clear and convincing evidence of repudiation, primarily because Defendants did not ultimately file the new complaint.  The mere filing of a motion to file a new lawsuit is akin to "[a] mere request for a change in terms or for cancellation," which does not constitute repudiation.  *2454 Cleveland, LLC v. TWA, LLC*, 2020 Ohio App. LEXIS 323 at *9 (Ohio 10th Dist. Ct. App. Feb. 4, 2020).

Plaintiffs' last argument is that Defendants have taken the position that they will not pay unless Plaintiffs return certain databases and data—what Defendants have called the "crown jewels"—and since this demand is not in the Term Sheet, it amounts to a repudiation of the settlement.  This argument is Plaintiffs' strongest, but it still fails to meet Rule 60(b)(6)'s high burden.  The Term Sheet provides that ████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

7

███████████████████████████████████████████

███████████████████████████████████

Defendants argue that, at the time they executed the Term Sheet, Plaintiffs possessed two separate computers that contained the databases but, rather than return the databases, Plaintiffs "copied, deleted, destroyed, hid, counterfeited and lied" about them. (Doc. No. 275, PageID# 6076.) Plaintiffs counter that "[n]one of this is true." (Doc. No. 299, PageID# 6567.) In short, whether the Term Sheet contemplated the return of these databases and, more specifically, whether Plaintiffs possessed the databases at the time they executed the Term Sheet are hotly contested questions. Accordingly, at this stage, Plaintiffs have failed to establish that Defendants are insisting on terms that are contrary to the parties' agreement such that the insistence amounts to a repudiation. *See Cincinnati Dev. III LLC v. Cincinnati Terrace Plaza, LLC*, 2023 U.S. App. LEXIS 6132 at *22 (6th Cir. Mar. 14, 2023).

Finally, the Court notes that both parties still have pending motions to enforce the Term Sheet. Plaintiffs filed their Counter-Motion to Enforce Term Sheet in January 2023, and, notwithstanding their instant request for vacatur, they have not withdrawn that Motion. Defendants have repeatedly sought to enforce the Term Sheet since their initial Motion to Enforce in January 2023, not only formally through their Renewed Motion to Enforce, but also informally in the many status reports that they have filed and during the many status conferences that the Court has held since this dispute began. In sum, both parties still want the benefit of the bargain they reached in the Term Sheet—Defendants want their data and Plaintiffs want their money.

Because Plaintiffs have failed to establish by clear and convincing evidence that Defendants have repudiated the Term Sheet, the Court denies Plaintiffs' Rule 60(b)(6) request.

8

**B.      Defendants' Renewed Motion to Enforce the Term Sheet**

In their Response to Plaintiffs' Rule 60(b)(6) request, Defendants write that "[t]he dispute before the Court is now simply a contractual interpretation dispute . . . [about] whether [Defendants'] payment obligation is in fact 'subject to' Plaintiffs' return of [Defendants'] data and devices." (Doc. No. 296, PageID# 6553.)  They then ask that the Court rule on their Renewed Motion to Enforce Term Sheet.  (*Id.* at PageID# 6554.)  In that Motion, Defendants seek three things: they ask that the Court hold (1) that Defendants' payment to Plaintiffs was subject to Plaintiffs' return of all Defendants' property by December 25, 2022; (2) that Plaintiffs' breach of the Term Sheet completely offsets Defendants' payment obligations; and (3) that the Court issue a permanent injunction that prevents Plaintiffs from using Defendants' property that Plaintiffs agreed to return.  The Court will consider each of these arguments in order.

First, the Term Sheet provides, in pertinent part, that:



And it later provides that:



Defendants argue that the ▮▮▮▮▮▮▮ language in paragraph nine means that Defendants' obligation to pay was "conditioned upon Plaintiffs' returning all ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮" (Doc. No. 275, PageID# 6082.)

In Ohio, "[a] condition precedent is a condition which must be performed before the obligations in the contract become effective." *Troha v. Troha*, 663 N.E.2d 1319, 1323 (Ohio 2d Dist. Ct. App. 1995) (citing *Mumaw v. W. & S. Life Ins. Co.*, 119 N.E. 132, 135 (Ohio 1917)). A condition precedent essentially means "that an act must take place before a duty to perform arises." *DN Reynoldsburg, LLC v. Maurices Inc.*, 225 N.E.3d 454, 463 (Ohio 10th Dist. Ct. App. 2023). If that act never takes place, then "the parties are excused from performing." *Id.* To determine whether the parties intended a condition precedent, the Court considers "the language of [the] particular provision, the language of [the] entire agreement, [and] the subject matter of [the] agreement." *Campbell v. George J. Igel & Co.*, 3 N.E.3d 219, 223 (Ohio 4th Dist. Ct. App. 2013). Ohio law disfavors conditions precedent. *4218868 Can., Inc. v. Kwasny*, 654 F. App'x 727, 731 (6th Cir. 2016) (citing *Campbell*, 2 N.E.3d at 223). Therefore, courts are to "avoid construing provisions to be such unless the intent of the agreement is plainly to the contrary." *Id.*

The Court begins with the plain language of paragraph 9. It provides that ██████████ ████████████████████████████████████████████████████ One of those above agreements is for Plaintiffs to ██████████████████████████ "Subject to" are "usual words used in creating and stating a condition precedent in a contract context." *Purdin v. Hitchcock*, 1993 Ohio App. LEXIS 505 at *11 (Ohio 4th Dist. Ct. App. Jan. 21, 1993); *see also Grigoryan v. MaxOut Sports, LLC*, 94 N.E.3d 1214, 1221 (Ohio 8th Dist. Ct. App. 2017) (noting that "subject to" are "words that are typically found in a conditional contract"). Based on the language of paragraph 9, the Court concludes that the parties intended to condition Defendants' payment on Plaintiffs' return of Alotech's property.

The language of the entire agreement and its subject matter bolster this conclusion. *C.f. Kwasny*, 654 F. App'x at 731 (reversing district court's conclusion that "subject to" created a

condition precedent because the court did not consider the entire agreement or its subject matter). Plaintiffs originally brought this action because they claimed an interest in Defendants' ablation casting technology. (*See* Doc. No. 1-1, PageID# 7.) Defendants ultimately agreed to settle the action ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ███████████████████████████████████████████ In other words, the parties' intent, based on the entire agreement and its subject matter, was to condition ███████████████ ███████████████████████████████████████████████████

The preliminary results of the forensic exam revealed that Plaintiffs may have failed to return all Defendants' data. (*See* Doc. No. 275, PageID# 6080; Doc. No. 276, PageID# 6268 n.10; Doc. No. 279, PageID# 6349.) In their Statement Interpreting Forensic Report and Data, Plaintiffs agreed that the forensic examiner found ██████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████████████ ████ (Doc. No. 276, PageID# 6268 n.10.) The Court agreed (and agrees) with this argument. (*See* Doc. No. 279, PageID# 6349.) As Plaintiffs wrote in their Reply to their Rule 60(b)(6) request, determining whether ███████████████████████████ requires further forensic examination. (Doc. No. 299, PageID# 6555.) Since that further examination has yet to occur, Defendants' performance—████████████████████████—is, at this time, excused.

Defendants also argue that Plaintiffs have breached the Term Sheet and that their damages completely offset their obligation ███████████████████. This argument is premature. The Court has concluded that Plaintiffs may have failed to perform a condition precedent of the Term

11

Sheet. But "[n]on performance of a condition precedent is not a breach of the contract." *Wsb Rehab. Servs. v. Cent. Accounting Sys.*, 2022 Ohio App. LEXIS 2050 at *14 (Ohio 1st Dist. Ct. App. June 24, 2022); *see also Morrison v. Bare*, 2007 Ohio App. LEXIS 5955 at *11 (Ohio 9th Dist. Ct. App. Dec. 19, 2007). As the Court has already indicated, should Plaintiffs return Defendants' property, Defendants could move to offset their payment to Plaintiffs by the amount of attorney's fees they incurred as a direct result of Plaintiffs' breach. (Doc. No. 279, PageID# 6349 (*citing Rayco Mfg. v. Murphy, Rogers, Sloss & Gambel*, 142 N.E.3d 1267, 1277 (Ohio Ct. App. 8th Dist. 2019) (en banc)).)

Lastly, Defendants ask that the Court enter a permanent injunction that prevents Plaintiffs ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Doc. No. 275, PageID# 6087.) There may be some authority for the Court to grant injunctive relief in the event of the breach of a settlement agreement. *See Frazier v. Malek*, 591 F. App'x 468, 469 (6th Cir. 2015) ("Retained jurisdiction vests the court with inherent authority to enforce its orders by granting injunctive relief."). But, as the Court explained in the preceding paragraph, there is no breach of the Term Sheet—only possible nonperformance of a condition precedent.

Moreover, the Court notes that the Term Sheet already contains a provision that largely delivers what Defendants are seeking. Paragraph four provides that:



(Doc. No. 182-1, PageID# 4843.) The parties have not briefed this issue, but it appears to the Court that the parties' intent is for this provision ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

█████████████████████████████████████████████████

█████████████████████████████████████████████████

Accordingly, Defendants could waive the condition precedent ██████████████████████

████████████████████████ and then receive the contractual benefit ██████████████

██████████████████████████████████ *See, e.g., Corey v. Big*

*Run Indus. Park, LLC*, 2009 Ohio App. LEXIS 4352 at *15 (Ohio 10th Dist. Ct. App. Sept. 29, 2009)

("a party may waive a condition precedent by the act of performance . . . despite the non-fulfillment

of the condition").

In any case, because there is no breach at this stage, the Court denies Defendants' request for

a permanent injunction.

**C.     Framework for a Way Forward**

Over a year and a half later, this settlement agreement dispute is in largely the same place as

where it began.  Back in January 2023, Defendants argued that Plaintiffs failed to ████████████

█████████ as required under the Term Sheet.  (Doc. No. 182, PageID# 4832.)  They continue to make

that same, though somewhat evolved, argument now.  Not all is unchanged, however.  The forensic

exam did reveal that ████████████████████████████████████████████████████████

██████████████████████████████████████ (Doc. No. 275,

PageID# 6080; Doc. No. 276, PageID# 6268 n.10; Doc. No. 279, PageID# 6349.)  Whether those

files are █████████████████████████████████████████████ is still to be

determined.

Accordingly, one possible resolution is for Plaintiffs to forensically examine █████████

████████████████████████████ If none are Alotech's, Plaintiffs could provide such

proof to Defendants and, presumably, demand payment.  If any are Alotech's, Plaintiffs could return

13

those files to Defendants and, presumably, demand payment.  Should Defendants fail ████ per the Term Sheet after Plaintiffs present them with proof of compliance, Plaintiffs could file a new motion to enforce the Term Sheet with the Court.[2]  Whatever Plaintiffs decide to do, it shall be at their own expense and on their own timeline.  Plaintiffs write that they have "lost confidence" in the forensic examiner from Ernst & Young.  (Doc. No. 299, PageID# 6566.)  Plaintiffs are free to find and pay for their own forensic examiner from this point forward.

In any event, the Court will set no further deadlines, and this case remains dismissed.

## III.  Conclusion

For the foregoing reasons, the Court DENIES Plaintiffs' request under Rule 60(b)(6).  (Doc. No. 292.)  The Court GRANTS IN PART Defendants' Renewed Motion to Enforce Term Sheet to the extent it seeks a determination that the return of Alotech property is a condition precedent of the Term Sheet and, therefore, no payment is required.  (Doc. No. 275.)  Finally, the Court DENIES as MOOT Defendants' Motion to Enforce Term Sheet and Plaintiffs' Counter-Motion to Enforce Term Sheet.  (Doc. Nos. 182, 186.)

**IT IS SO ORDERED.**

Dated:  March 8, 2024

_s/ Pamela A. Barker_____
PAMELA A. BARKER
UNITED STATES DISTRICT JUDGE

---

[2]  Taking this hypothetical one step further, should the Court agree with Plaintiffs and order Defendants to pay, but Defendants fail to comply with the Court's order, then, perhaps, Plaintiffs could renew their Rule 60(b)(6) request.  As Plaintiffs note, the Court's authority for vacating the Term Sheet and dismissal "would be even stronger should it first order Defendants' compliance with their payment obligations under the Term Sheet."  (Doc. No. 292, PageID# 6491.)

# EXHIBIT 7

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CFOM, INC. and MICHAEL GRASSI, | ) | Case No. 1:18-CV-2619-PAB |
| Plaintiffs, | ) | |
| | ) | Judge Pamela A. Barker |
| vs. | ) | |
| | ) | |
| ALOTECH LIMITED, LLC and JOHN | ) | |
| GRASSI, | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION TO STAY ENFORCEMENT OF THE MARCH 19, 2024 ORDER PENDING APPEAL

Defendants Alotech Limited, LLC and John Grassi (collectively, "Alotech" or "Defendants") hereby move under Fed. R. Civ. P. 62(d) for a stay of all proceedings pending the appeal of the Court's orders of March 8, 2024 and March 19, 2024. Because return of the property identified in the Court's March 19, 2024 Order contains Alotech's sensitive trade secrets, returning this material will irreparably harm Alotech. Therefore, execution of the March 19, 2024 Order should be stayed and the status quo maintained until the underlying merits can be heard on appeal.

This motion rests on the accompanying memorandum of law in support.

*/s/ John R. Mitchell*
John R. Mitchell (#0066759)
JMitchell@Taftlaw.com
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-302
T: (216) 706-3909
F: (216) 241-3707

HERMAN JONES LLP
John C. Herman
(admitted *pro hac vice*)
jherman@hermanjones.com
Carlton R. Jones
(admitted *pro hac vice*)
cjones@hermanjones.com
3424 Peachtree Road, NE, Suite 1650
Atlanta, GA 30326
T: (404) 504-6500
F: (404) 504-6501

*Counsel for Defendants*
*Alotech Limited, LLC and John Grassi*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| CFOM, INC. and MICHAEL GRASSI, | ) | Case No. 1:18-CV-2619-PAB |
| Plaintiffs, | ) | |
| | ) | Judge Pamela A. Barker |
| vs. | ) | |
| | ) | |
| ALOTECH LIMITED, LLC and JOHN | ) | |
| GRASSI, | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM IN SUPPORT OF DEFENDANTS' MOTION TO STAY ENFORCEMENT OF THE MARCH 19, 2024 ORDER PENDING APPEAL

Defendants Alotech Limited, LLC and John Grassi (collectively, "Alotech" or "Defendants") hereby submit this memorandum in support of their Motion to Stay Enforcement of the March 19, 2024 Order Pending Appeal. Defendants filed a Notice of Appeal on April 5, 2024, appealing this Court's orders of March 8, 2024 and March 19, 2024.

A stay of proceedings is necessary because any change to the status quo resulting in the concurrent turnover to Plaintiffs of Alotech's protected trade secrets would cause the precise irreparable harm that the settlement agreement is intended to avoid. Defendants appreciate that the Court is attempting to bring finality to this matter. But absent a stay the Court's solution perpetuates, rather than mitigates, the harm that Plaintiffs are causing Alotech as the Court has now given Plaintiffs a choice that does not exist ███████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████ For those

3

reasons, Defendants must appeal, and respectfully request that the Court enter a stay to protect the status quo and Alotech's trade secrets while the appeal proceeds.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The Court is well-apprised of the background of this dispute. The parties executed a "Binding and Enforceable Term Sheet" on December 5, 2022 (the "Term Sheet") which was intended to conclusively resolve litigation between these parties. By the Term Sheet, the parties agreed that

---

[1] Even to the extent which the Court's March 8, 2024 Order determines the return to be a condition precedent to payment, this determination has no effect on the nature of the property in question. As expressly agreed to by the parties. CF No. 182-1 at 6 ¶4. As a result, all protected information and materials nevertheless remain Alotech's property, as agreed upon by the parties. *See id.*

Plaintiffs not only failed to timely return any of Alotech's property, but copied the protected trade secrets and data and later engaged in a deliberate concealment of this fact in a consistent pattern to avoid turnover of the same. Notably, among the Alotech property held by Plaintiff which ██████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████████████████ ████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█ ██████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████

_____

[2] The same technology which, ████████████████████████████████████████████ ECF No. 182-1 at ¶4.

- ███████████████████████████████████████████

  ████████████████████████

- ███████████████████████████████████████████

  ████████████████████████████████████████████

  ██████████████████████████████

- ████████████████████████████████████████████

  ████████████████████████████████████████████

- ████████████████████████████████████████████

  ████████████████████████████████████████████

  ██████████

- ████████████████████████████████████████████

  ██████████████████████████

- ████████████████████████████████████████████

  ████████████████████████████████████████████

  ████████████████████████████████████████████

  █████████

- Plaintiffs' repeated denial that they have any Alotech property in their possession despite clear evidence affirming otherwise (J. Grassi Decl. at ¶26; 2/10/23 Transcript, passim).

Following Michael Grassi's testimony which made it plain that Plaintiffs had failed to turn over ████████████████████████████████████████████████████████ ████████████████████████████████ the Court ordered the parties to enlist the use of third-party forensic examiner E&Y to review the devices at issue and "see what's on them, what

6

may have been deleted, removed, transferred, et cetera." 2/10/23 Transcript at 179. Alotech agreed to E&Y being permitted to retain such property until examination was complete knowing that retention by this neutral party would keep the property safe in the interim. Based on E&Y's report,

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████

████████████████████████.[3]

In previous hearings, the Court acknowledged that through E&Y "we've learned that [Plaintiffs] had destroyed or gotten rid of or just didn't have as of that date certain a specific computer or other information that [Alotech] expected to receive as part of the settlement." June 14, 2023 Transcript, ECF No. 243, at 9:13-16. The Court also opined that "I just think that when Michael Grassi left this courtroom, this courthouse and . . . decided to download that information on a device, [it's] just – bad faith. It's just not something that – that kind of conduct I don't think should be rewarded." *Id*. at 27:10-15. More recently, the Court on March 8, 11, and 19, 2024 entered orders relating to Alotech's attempted settlement enforcement and Plaintiffs' subsequent motions. The March 8, 2024 Order determined, *inter alia* and despite the plain language of the Term Sheet, that Plaintiffs had not *yet* breached the Term Sheet. ECF No. 301 at 13. The Court also noted that the "results of the forensic exam revealed that Plaintiffs *may* have failed to return all Defendants' data." *Id*. at 11 (emphasis added).

That said, the Order later suggests that Plaintiffs themselves "forensically examine those files to determine which, if any, are Alotech property." *Id*. at 13. By its explicit terms, the March

---

[3] ███████████████████████████████████████████████████████████
███████████████████████████████. This fact alone confirms that Plaintiffs accessed Alotech's critical databases to steal protected information. *Id*.

8, 2024 Order provides that "[w]hatever Plaintiffs decide to do, it shall be at their own expense and on their own timeline." *Id*. at 14. Thus, the Court, in trying to fashion a path forward, has instead granted Plaintiffs the unilateral decision as to how to proceed. Alotech has been stripped entirely of its ability to enforce the Term Sheet, whereby it expressly bargained for return of its property. Given the background of this case and the wrongdoing alleged, leaving the avenue of resolution solely in the hands of Plaintiffs is in error. Despite the Court's view that the Plaintiff's behavior should not be rewarded, the Court's Order does exactly that. Future forensic examination requires the continued retention of the original property by an entity—E&Y—that is free from influence. The March 19, 2024 Order required E&Y to maintain forensic copies. ECF No. 309 at 3. However, it permits return of the property after thirty-one days. *Id*. at 4. As such, every precaution must be taken to prevent further harm.

As recently as March 26, 2024, Plaintiffs sought to circumvent the explicit thirty-one day stay included in the Court's March 19, 2024 Order. While the Court denied that request, the choice which the Court's orders have provided ██████████████████████████████████ ███████████████████████████████████████████████████████████████ ████████████████ Alotech appreciates the Court's rulings, but the result of the orders now appealed puts Alotech and its trade secrets at significant risk. As it currently stands, Plaintiffs will be entitled to the property in E&Y's possession and Alotech's interests will inevitably be damaged while on appeal. Because the Court's orders with regard to retention of the property contradict the law and equity of the case, Alotech now appeals the orders to the extent they permit the property to be given to Plaintiffs prior to a resolution of the forensic questions.

## II.     ARGUMENT

### a.     The Court must stay the effects of the March 19, 2024 Order pending appeal.

Were this Court to permit E&Y to give Alotech's property to Plaintiffs, it would expose Alotech to potential loss of the confidentiality and value of its protected trade secret information, causing irreparable harm which has no remedy. Simply put, this is not a bell that can be unrung.

As provided by Fed. R. Civ. P. 62(d), "[w]hile an appeal is pending from an interlocutory order or final judgment that grants, continues, modifies, refuses, dissolves, or refuses to dissolve or modify an injunction, the court may suspend, modify, restore, or grant an injunction on terms for bond or other terms that secure the opposing party's rights." In deciding a motion to stay pending appeal, "[t]he court balances the traditional factors governing injunctive relief…" *Baker v. Adams Cnty./Ohio Valley Sch. Bd.*, 310 F.3d 927, 928 (6th Cir. 2002). Thus, the court considers: (1) whether the defendant has a strong or substantial likelihood of success on the merits; (2) whether the defendant will suffer irreparable harm if the district court proceedings are not stayed; (3) whether staying the district court proceedings will substantially injure other interested parties; and (4) where the public interest lies. *Id.*; *Am. Standard, Inc. v. Meehan*, 614 F. Supp.2d 844, 847 (6th Cir. 2007). No single factor is dispositive in the analysis, but instead all factors must be balanced as part of the determination. *Performance Unlimited, Inc. v. Questar Publishers, Inc.*, 52 F.3d 1373, 1381 (6th Cir. 1995).

The Sixth Circuit in distinguishing standards for obtaining a preliminary injunction versus a stay pending appeal of an injunction has noted that "a movant need not always establish a high probability of success on the merits." *Michigan Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 153 (6th Cir. 1991) (citing *State of Ohio ex rel. Celebrezze v. Nuclear Regul. Comm'n*, 812 F.2d 288, 290 (6th Cir. 1987)); *Fam. Tr. Found. of Kentucky, Inc. v. Kentucky*

*Jud. Conduct Comm'n*, 388 F.3d 224, 227 (6th Cir. 2004). Rather, "[t]he probability of success that must be demonstrated is inversely proportional to the amount of irreparable injury [the movant] will suffer absent the stay." *Ohio ex rel. Celebrezze*, 812 F.2d at 290 (citation omitted). "Simply stated, more of one excuses less of the other" (*Griepentrog*, 945 F.2d at 153) and so a showing of substantial irreparable harm to be suffered may require only a minimal showing of success on the merits. Either way, all four factors weigh resolutely in Alotech's favor and the circumstances warrant a stay pending appeal.

### 1. Alotech is likely to succeed on the merits.

The orders which Defendants appeal stem from their attempt to enforce the Term Sheet. While the Court granted Alotech partial relief in its March 19, 2024 Order, it nevertheless permitted E&Y to give the property to Plaintiffs after thirty-one days. The Order lacks any oversight of this transaction. This result flies in the face of the plain language of the Term Sheet and the intent of the parties when they entered into the Term Sheet and provides Plaintiffs with an avenue of continued harm to Alotech. The March 8, 2024 Order similarly refused to grant Alotech an injunction based upon the determination that there was no breach of the Term Sheet at the time. Because such a result contravenes principles of equity and Ohio contract law, Alotech now appeals.

While a stay of an injunction pending appeal requires the movant to prove "likelihood of success on the merits," a movant seeking stay "is not required to prove his case in full…" *Certified Restoration Dry Cleaning Network, LLC v. Tenke Corp.*, 511 F.3d 535, 543 (6th Cir. 2007) (citing *Univ. of Texas v. Camenisch*, 451 U.S. 390, 395, 101 S.Ct. 1830, 1834 (1981)). Rather, it is generally sufficient that the movant "show more than a mere possibility of success." *Six Clinics*

*Holding Corp. v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citing *Mason Cnty. Med. Ass'n v. Knebel*, 562 F.2d 256, 261 n.4 (6th Cir. 1977)).

A Court holds "the inherent power to enforce agreements entered into in settlement of litigation pending before them." *Acro Corp. v. Allied Witan Co.*, 531 F.2d 1368, 1371 (6th Cir. 1976). "The court must enforce the settlement as agreed to by the parties and is not permitted to alter the terms of the agreement." *Brock v. Scheuner Corp.*, 841 F.2d 151, 154 (6th Cir. 1988) (citation omitted). Put plainly, where it is determined that "the parties did reach an agreement, and its essential terms were clear," the court must enforce the agreement by its express terms. *Tocci v. Antioch Univ.*, 967 F. Supp.2d 1176, 1201 (S.D. Ohio 2013).

By the Term Sheet, ████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████

This shortened window reflects the expediency by which Alotech contemplated its property's return. More than a year has passed and Plaintiffs are no more likely to comply with the Term Sheet than they were a year ago. The express requirements and conditions of the Term Sheet are unambiguous and, for the most part, Plaintiffs do not appear to contest this fact. The Court confirmed the unambiguity by its March 8, 2024 Order. *See* ECF No. 301, at 10 ("the Court concludes that the parties intended to condition Defendants' payment on Plaintiffs' return of Alotech's property.") Going a step further, the Court noted that the "language of the entire agreement and its subject matter bolster this conclusion." *Id.*[4] Still, Plaintiffs refuse to comply. The March 8, 2024 Order determined that "Plaintiffs *may* have failed to return all Defendants'

---

[4] This conclusion also affirms that the contract is unambiguous under Ohio contract law and that its strict enforcement is necessary. "Contractual language is 'ambiguous' only where its meaning cannot be determined from the four corners of the agreement or where the language is susceptible of two or more reasonable interpretations." *U.S. Fid. & Guar. Co. v. St. Elizabeth Med. Ctr.*, 129 Ohio App. 3d 45, 55, 716 N.E.2d 1201, 1208 (1998).

data" and accordingly excuses Defendants of any payment for the time being. *Id.* at 11 (emphasis added). Despite these clear findings, the Court nevertheless has created a situation which undermines the terms for which Alotech bargained to settle this litigation, and instead creates the potential for more litigation. This conclusion on its own would lend to an interpretation that continued maintenance of the status quo is necessary until a full determination of the extent of Plaintiffs' wrongdoing can be made.

In sum, the settlement agreement must be enforced as agreed upon and consistent with the intent of the parties at the time of execution. That intent was predicated on the immediate return of *all* of Alotech's property. That said, nowhere within the Term Sheet is it contemplated that property in the safekeeping of E&Y (or any other neutral party) be returned to Plaintiff while the parties are left to dispute whether Plaintiffs actually retained that property. The Term Sheet is clear and unambiguous, Plaintiffs' non-compliance is unquestioned, and Alotech is likely to succeed on the merits, warranting the imposition of a stay pending appeal.

### 2. Alotech will suffer irreparable harm if the proceedings are not stayed.

Alotech's trade secrets carry incalculable value and this litigation is predicated upon their return. Just as central to Alotech's concerns is that the trade secrets and corresponding personal property are not returned to Plaintiffs for further wrongdoing. The expiration of the temporary stay created by the Court's March 19, 2024 Order and Plaintiffs' receipt of Alotech's property would result in substantial harm to Alotech for which there is no remedy.

A harm to be suffered in the absence of a stay is considered irreparable where "not fully compensable by monetary damages." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 578 (6th Cir. 2002). Injuries which "are difficult to quantify monetarily" inherently present a risk of irreparable harm. *ACT, Inc. v. Worldwide Interactive Network, Inc.*, 46 F.4th 489, 503 (6th

Cir. 2022). Within the Sixth Circuit, "[t]he loss of trade secrets is usually considered an irreparable harm [that] cannot be measured in money damages." *Kendall Holdings, Ltd. v. Eden Cryogenics LLC*, 630 F. Supp.2d 853, 867 (S.D. Ohio 2008); *see also Dayton Superior Corp. v. Yan*, No. 3:12-CV-380, 2012 WL 5497804, at \*5 (S.D. Ohio Nov. 13, 2012) ("Because trade secrets rights include the right to exclude, the damages arising from the misappropriation of trade secrets [are] irreparable and impossible to calculate."). As a result, "'*where it is shown* that the [opposing party] has misappropriated the [party's] trade secrets,' irreparable harm is generally presumed." *Id.* (quoting *Deutsche Investment Mgm't. Americans, Inc. v. Riverpoint Cap. Mgm't. Inc.*, No. 1:02-cv-577, 2002 U.S. Dist. Lexis 16147, at \*18 (S.D. Ohio Aug. 22, 2022)) (emphasis in original).[5]

Alotech has proffered several affidavits revealing that Plaintiffs did in fact alter, copy, delete, or otherwise misappropriate the protected trade secrets to which this motion and this litigation are directly concerned. Beyond those attempts, Plaintiffs' own testimony shows that Plaintiffs tried to conceal this fact and take other steps to deliberately deceive Alotech and this Court. When the evidence clearly demonstrates that Plaintiffs have destroyed or altered trade secret data in the course of this litigation, nothing prevents Plaintiffs from doing that again, whether to the originals currently with E&Y, or worse, upon receipt of Alotech's property and later asserting baseless claims of bias against or alterations of materials left with E&Y. In addition to the irreparable harm to result from Plaintiffs' possession of Alotech's trade secrets, there is similarly a substantial risk of harm to Alotech's physical property should it be returned to Plaintiffs' possession. A stay in this regard has the same effect as a preliminary injunction and would serve

---

[5] Outside the Sixth Circuit, other courts have similarly expressed the seriousness of these concerns. *See Neo Gen Screening, Inc. v. TeleChem Intern., Inc.*, 69 Fed. Appx. 550, 554 (3d Cir. 2003) ("the disclosure of trade secrets would result in irreparable harm [] that would not be remedied by monetary damages."); *FMC Corp. v. Taiwan Tainan Giant Indus. Co.*, 730 F.2d 61, 63 (2d Cir. 1984) (loss of trade secret is an irreparable harm because "a trade secret once lost is, of course, lost forever"); *Airbnb, Inc. v. City of New York*, 373 F. Supp.3d 467, 499 (2019) (S.D.N.Y. 2019) ("[t]he disclosure of private, confidential information is 'the quintessential type of irreparable harm that cannot be compensated or undone by money damages.") (citing *Hirschfield v. Stone*, 193 F.R.D. 175, 187 (S.D.N.Y. 2000)).

the important purpose of "allow[ing] [an appellate] victory by [Alotech] to be meaningful…" *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018) (quoting *AIG Aviation, Inc. v. Boorom Aircraft, Inc.*, 142 F.3d 431, 1998 WL 69013, at *3 (6th Cir. 1998)). Once the property is returned to Plaintiffs, any prospective relief which Alotech may seek on appeal would be of no effect, as the damage would already be done. As a result, the harm to be suffered in the absence of a stay is irreparable and warrants issuance of a stay to protect Alotech's interests while the appeal proceeds.

### 3. Staying the proceedings will not injure Plaintiffs.

Plaintiffs face no harm from a continued maintenance of the status quo. 

The plain language of the Term Sheet (*see id.*) and the effect of the Court's dismissal of the action is to deprive Plaintiffs of any right to that Property. Accordingly, there is no benefit for Plaintiffs to receive were proceedings to continue and simultaneously no injury to be borne by Plaintiffs as a result of a retention of the status quo. Plaintiffs reap no reward from possession of Alotech's property beyond continued harm to Alotech.

Any injury which Plaintiffs may purport to incur as a result of this requested stay pales in comparison to the irreparable harm Alotech faces in its absence and is purely the result of Plaintiffs' own conduct. *See Handel Enterprises, Inc v. Schulenburg*, 765 F. App'x 117, 125 (6th Cir. 2019) (weighing third factor in the movant's favor where opposing party "likely would be harmed by an injunction, [but] this self-inflicted harm was the result of [opposing party's] willful

actions and was outweighed by the harm to [the movant].”). For these reasons, Plaintiffs will suffer no injury as a result of the requested relief and equity weighs heavily in Alotech's favor.

As stated above, Plaintiffs by their March 26, 2024 motion once again recently tried to seek preemptive turnover despite this Court's temporary stay. *See* ECF No. 310. Plaintiffs' basis for the request turned on the statement that "[t]he forensic examiner has expressed that it wants to return the devices now…" *Id.* at 3. Such a statement confirms that there is no harm to be suffered beyond mere wants and desires, and affirms that without a stay Plaintiffs will take action adverse to Alotech to obtain the property by any means necessary. For these reasons, This factor again weighs strongly in Alotech's favor.

### 4. The public interest favors staying the proceedings.

Generally, "[t]he public has an interest in discouraging unfair trade practices." *Hoover Transp. Servs., Inc. v. Frye*, 77 Fed. Appx. 776, 785 (6th Cir. 2003). In the Southern District of Ohio, "the public interest is served by discouraging practices aimed at surreptitiously acquiring trade secrets [and] by prohibiting misappropriation of trade secrets . . ." *Avery Dennison Corp. v. Kitsonas*, 118 F. Supp.2d 848, 855 (S.D. Ohio 2000).[6] These considerations extend by their very nature to the property which Alotech now seeks to shield. Beyond those interests specific to the protection of trade secrets, "[t]here is a fundamental public interest in ending [] abuse of the judicial system, in conserving judicial resources, and in preventing further confusion and disruption in [] litigation." *McGirr v. Rehme*, 891 F.3d 603, 614 (6th Cir. 2018).

Alotech's appeal relates directly to the enforcement of the Term Sheet. With this in mind, the public's interest in the enforcement of settlement agreements is similarly invoked. *See Acro Corp.*, 531 F.2d at 1372 ("Public policy strongly favors settlement of disputes without

---

[6] The Northern District acknowledged this position in *Universal Steel Co. v. Codding*, No. 1:22-CV-00190, 2022 WL 3282495, at *8 (N.D. Ohio Feb. 5, 2022).

litigation…"). "Settlement agreements should therefore be upheld whenever equitable and policy considerations so permit." *Id*. This public interest in cost-effective resolution of complex commercial litigation favors the preservation of Alotech's bargain under the Term Sheet. That bargain will be eliminated entirely in the absence of a stay and the public's interest in making bargaining parties carry out the terms of their agreements would thereby be undermined. As a result, the public interest favors imposition of a stay pending appeal.

## III.  CONCLUSION

For these reasons, the Court should issue a stay of its March 19, 2024 Order and require that the E&Y retain all Alotech property in its possession until a final adjudication on the merits of Alotech's appeal.

<div style="margin-left:40%;">

*/s/ John R. Mitchell*
John R. Mitchell (#0066759)
JMitchell@Taftlaw.com
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-302
T: (216) 706-3909
F: (216) 241-3707

HERMAN JONES LLP
John C. Herman
(admitted *pro hac vice*)
jherman@hermanjones.com
Carlton R. Jones
(admitted *pro hac vice*)
cjones@hermanjones.com
3424 Peachtree Road, NE, Suite 1650
Atlanta, GA 30326
T: (404) 504-6500
F: (404) 504-6501

*Counsel for Defendants*
*Alotech Limited, LLC and John Grassi*

</div>

16

**CERTIFICATE OF SERVICE**

  I hereby certify that on April 9, 2024, I electronically filed the above document with the

Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered

counsel.


        By: */s/ John R. Mitchell*_____
         John R. Mitchell (#0066759)
         Taft Stettinius & Hollister LLP
         JMitchell@Taftlaw.com

# EXHIBIT 8

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHAEL GRASSI, et al., | ) | Case No. 1:18-CV-2619-PAB |
| Plaintiffs, | ) | |
| | ) | Judge Pamela A. Barker |
| vs. | ) | |
| | ) | |
| JOHN GRASSI, et al., | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

## NOTICE OF APPEAL

Defendants Alotech Limited, LLC and John Grassi (collectively, "Alotech") hereby appeal this Court's Opinion and Orders entered in this action on March 8, 2024 (ECF No. 301) and March 19, 2024 (ECF No. 309). A true and accurate copy of the Opinion and Orders from which this appeal is taken are attached hereto.

This appeal is authorized by 28 U.S.C. §§ 1291 and 1292(a)(1).


*/s/ John R. Mitchell*
John R. Mitchell (#0066759)
JMitchell@Taftlaw.com
Taft Stettinius & Hollister LLP
200 Public Square, Suite 3500
Cleveland, OH 44114-302
T: (216) 706-3909
F: (216) 241-3707

HERMAN JONES LLP
John C. Herman
(admitted *pro hac vice*)
jherman@hermanjones.com
Carlton R. Jones
(admitted *pro hac vice*)
cjones@hermanjones.com
3424 Peachtree Road, NE, Suite 1650
Atlanta, GA 30326
Telephone:  (404) 504-6500
Facsimile:  (404) 504-6501

*Counsel for Defendants*
*Alotech Limited, LLC and John Grassi*

## CERTIFICATE OF SERVICE

I hereby certify that on April 5, 2024, I electronically filed the above document with the Clerk of Court using CM/ECF which will send electronic notification of such filing to all registered counsel.

By: */s/ John R. Mitchell*
John R. Mitchell (#0066759)
Taft Stettinius & Hollister LLP
JMitchell@Taftlaw.com